Heidi G. Goebel (10343)
Sam Meziani (9821)
GOEBEL ANDERSON PC
405 South Main Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  801-441-9393
hgoebel@gapclaw.com
smeziani@gapclaw.com

Edward T. Kang (*Pro Hac Vice*)
Gregory H. Mathews (*Pro Hac Vice*)
Susan Moon O (*Pro Hac Vice*)
KANG HAGGERTY & FETBROYT LLC
123 S. Broad Street, Suite 1670
Philadelphia, PA  19109
Telephone: 215-525-5850
ekang@kanghaggerty.com
gmathews@kanghaggerty.com
so@kanghaggerty.com
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| 100 MOUNT HOLLY BYPASS, LLC, MILES TECHNOLOGIES, INC. AND CHRISTOPHER MILES,<br><br>          Plaintiffs,<br><br>vs.<br><br>AXOS BANK, GREGORY GARRABRANTS, BARRY GORDON, JR., KRISTIN PHILLIPS, JEFF PISTORIUS, TECH EQUIPMENT FINANCE, LLC, EVERETTE DORAND A/K/A LEIGH DORAND, NEW JERSEY CLEAN ENERGY SOLUTIONS, LLC D/B/A SOLAR EXPERTS, DAVID J. WIDI, SR. AND DAVID WIDI, JR.,<br><br>          Defendants. | **AMENDED COMPLAINT**<br>**JURY DEMANDED**<br><br>Case No. 2:20-cv-00856-TS<br><br>Judge Ted Stewart |

Plaintiffs 100 Mount Holly Bypass, LLC, Miles Technologies, Inc., and Christopher Miles (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby bring this civil action against Defendants AXOS Bank, Gregory Garrabrants, Barry Gordon, Jr., Kristin Phillips, Jeff Pistorius, New Jersey Clean Energy Solutions, LLC d/b/a Solar Experts, David J. Widi, Sr., David Widi Jr., Tech Equipment Finance, LLC, and Everett Dorand a/k/a Leigh Dorand, (collectively, "Defendants"), and state:

## JURISDICTION AND VENUE

1.      This is a civil action arising out of, among others, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and at least four of the Defendants reside in this District.

## THE PARTIES

3.      Plaintiff 100 Mount Holly Bypass, LLC ("Mt. Holly") is a New Jersey limited liability company with a business address of 100 Mount Holly Bypass, Lumberton, New Jersey 08048. Mt. Holly is the owner of a building with approximately 163,000 square feet located at its business address.

4.      Plaintiff Miles Technologies, Inc. ("Miles Tech") is a New Jersey corporation with a business address of 100 Mount Holly Bypass, Lumberton, New Jersey 08048. Miles Tech

occupies approximately 75,000 square feet of the building owned by Mt. Holly. The balance of the building is leased by Mt. Holly to a tenant ("Tenant").

5.     Plaintiff Christopher Miles ("Miles") is an adult individual residing at 16 Tahteepay Trail, Medford, New Jersey 08055. Miles is the sole member of Mt. Holly and President of Miles Tech.  Plaintiffs Mt. Holly, Miles Tech, and Miles are collectively referred to as "Plaintiffs".

6.     Defendant AXOS Bank ("Axos") is a federally chartered Federal Savings Association and wholly owned subsidiary of Axos Financial, Inc. ("Axos Financial"), a Delaware corporation maintaining its corporate headquarters at 9205 West Russell Road, Suite 400, Las Vegas, Nevada 89148. Axos maintains an office at 6975 Union Park Center, Suite 200, Cottonwood Heights, Utah 84047. Until October 1, 2018, Axos was known as "BOFI Federal Bank," and Axos still uses the "BOFI" brand in some of its transaction records in its dealings with Plaintiffs.

7.     Defendant New Jersey Clean Energy Solutions, LLC d/b/a Solar Experts ("NJCES") is a New Jersey limited liability company with a business address of 420 Chandler Road, Jackson, New Jersey 08527.

8.     Defendant David J. Widi, Sr. ("Widi Sr.") is a resident of New Jersey and the CEO and owner of NJCES.

9.     Defendant David Widi, Jr. ("Widi Jr.") is a resident of New Jersey and the Director of Marketing and Sales for Defendant NJCES. Widi Jr. also is a twice-convicted felon, once under state law and once under federal law according to the Judgment filed in *United States of America v. David Widi,* a copy of which is attached as **Exhibit 1**.

10.    Defendant Tech Equipment Finance, LLC ("TechEFI") is an Arizona limited liability company with a business address of 11700 W. Charleston Blvd, Suite 170-767, Las Vegas,

Nevada 89135. According to its website, TechEFI is engaged in the business of equipment leasing and finance. At all relevant times, TechEFI was acting as an agent for Defendant Axos.

11.     Defendant Everett Dorand a/k/a Leigh Dorand ("Dorand") is an adult individual who is the managing member of TechEFI. Defendant Dorand is a convicted felon. Defendant Dorand pled guilty to wire fraud (18 U.S.C. § 1343) in connection with operating "a fraudulent equipment lease scheme" according to the Information filed in *United States v. Leigh Dorand,* a copy of which is attached as **Exhibit 2**. Defendant Dorand at all relevant times conducted the business of TechEFI in Las Vegas, Nevada. At all relevant times, Dorand was acting as an agent of Defendant Axos Bank.

12.     Defendant Gregory Garrabrants ("Garrabrants") is a citizen of the state of California and the President and CEO of Axos and Axos Financial.

13.     Defendant Jeff Pistorius ("Pistorius") is a citizen of the state of Utah and Senior Relationship Manager employed by Axos.

14.     Defendant Barry Gordon, Jr. ("Gordon") is a citizen of the state of Utah, Vice President of Equipment Leasing for Axos, and the immediate supervisor of Pistorius.

15.     Defendant Kristin Phillips ("Phillips") is a citizen of the state of Utah and Vice President- Documentation for Axos.

<u>**FACTUAL BACKGROUND**</u>

16.     In the summer of 2019, Plaintiffs were exploring the possibility of purchasing a solar energy system for installation on the roof of the building owned by Mt. Holly and occupied by Miles Tech, located in Lumberton, New Jersey.

17.     After learning about NJCES, which advertises itself as the "Solar Experts" with expertise in the commercial sale, installation, and financing of solar systems, the Controller of Miles Tech, Robert Lyons, contacted NJCES to inquire about its services.

18.     In July 2019, Defendant NJCES, acting through Widi Sr. and Widi Jr., and TechEFI, acting through Dorand, presented Plaintiffs with a proposal to sell Plaintiffs a solar energy system manufactured by SunPower Corporation ("SunPower") consisting of 4,000 solar panels with associated equipment (the "Solar System") for a total purchase price of $3,819,700.00, payable over seven years at a 2% interest rate.  The proposal was made with the approval of Axos, acting through Gordon and Pistorius.

19.     Dorand, acting as agent and broker on behalf of Axos,  and Widi Jr. contacted Miles on July 12, 2019, representing that in order to "lock in" the 2% interest rate on a loan to finance the purchase, it was necessary that Plaintiffs immediately pay TechEFI $25,000.00.

20.     On July 12, 2019, Widi Jr. drove to Miles' home to pick up a personal check for $25,000.00 so that Miles could "lock in" the low 2% interest rate. A copy of the check dated July 12, 2019 is attached as **Exhibit 3**.

21.     The representations made by Dorand, acting on behalf of TechEFI as agent for Axos, and by Widi Jr., on behalf of Widi Sr. and NJCES, to induce Plaintiffs to pay $25,000.00 to TechEFI were made in telephone and email communications.

22.     On July 17, 2019, Widi Jr. represented that the "Architect found the building sufficient to hold the weight of 4,000 panels, so we are all clear on that front." Miles had also been told that there would be no need for roof penetrations to secure the panels.

23.     Acting in reliance on the representations of TechEFI and NJCES, Plaintiffs and NJCES entered into a Solar Electric System Purchase Agreement, dated July 24, 2019, for the

purchase and installation of the Solar System (the "Purchase Agreement"). A copy of the Purchase Agreement is attached as **Exhibit 4.**

24.     The Purchase Agreement provided for a total purchase price of $3,819,700.00 with the final disbursement of $1,145,910.00 to be made "when System Installed to Engineered Plans and Operational." Ex. 4, at Exhibit B.

25.     Execution of the Purchase Agreement by Plaintiffs was induced by numerous representations by Defendants NJCES, Widi Sr., Widi Jr., TechEFI, and Dorand, including representations made during telephone and email communications between July 15, 2019 and July 24, 2019. Among other specific representations, it was represented that based on the $25,000.00 payment and execution of the Purchase Agreement, a purported "credit freeze" on processing Plaintiffs' loan to finance the purchase of the Solar System had been lifted.

26.     Defendants NJCES, Widi Sr., Widi Jr., TechEFI, and Dorand represented they would provide a loan to finance the purchase of the Solar System at an interest rate of 2% per annum for seven years required to fund the purchase price for the Solar System.

27.     The Purchase Agreement represented that the components of the Solar System would be delivered by the manufacturer SunPower by October 14, 2019 and that NJCES would complete the installation of the Solar System "in accordance with the Engineered Plans and estimates a completion date of not later than December 31, 2019." Ex. 4, Section 7(d).

28.     The Purchase Agreement represented that NJCES "shall promptly correct work that does not conform to this Agreement and to the Engineered Plans" and that NJCES "shall bear the cost of correcting such nonconforming work, including without limitation, the cost to make the Solar System work in accordance with the specifications and Engineered Plans." Ex. 4, Section 7(b).

29.     The Purchase Agreement represented that, "At all times, as between Purchaser and Solar Contractor, Purchaser shall own the Solar System and all electricity generated by the Solar System shall be for the benefit of Purchaser." Ex. 4, Section 8.

30.     The Purchase Agreement represented that Purchaser would be the sole owner of Solar Renewable Energy Certificates ("SREC") and that NJCES would submit the documentation necessary to enroll in the SREC program and would bear the cost of obtaining Plaintiffs' enrollment in the SREC program. Ex. 4, Section 4.

31.     The Purchase Agreement also represented that NJCES "will submit plans and an Interconnection Application to Purchaser's local utility to obtain net-metering benefits to the full extent available under applicable laws and regulations" and that the "cost associated with the application is included in the Purchase Price." Ex. 4, Section 3. Further, NJCES also "shall provide all documentation necessary to allow Purchaser to claim the 30% Federal Investment Tax Credit ("ITC") associated with the cost of the Solar System. Id., Section 5.

32.     All the Defendants were familiar with the standard form of the Purchase Agreement and its terms and the standard Axos lease documentation, of which Plaintiffs were unaware at the time of execution of the Purchase Agreement.  The Defendants fashioned the Purchase Agreement to interface with Axos' lease documents so as to constitute an integrated written agreement between Plaintiffs and Defendants. During the ensuing months, certain of the Defendants, including Dorand, Gordon, and Pistorius, informed Plaintiffs that all the Defendants had previously worked together on similar Solar System sale and financing transactions with other commercial entities.

33.     For example, the Purchase Agreement provides that the "Purchaser may assign and convey all its rights and interest in the Purchase Agreement to a third party. Upon any such transfer

7

and assignment, the transferee or assignee shall obtain all rights and benefits under this Agreement that belong to Purchaser." Ex. 4, Section 8. Defendants included this provision in the Purchase Agreement to enable Axos to obtain an assignment of Purchaser's rights under the Purchase Agreement to itself without any further documentation, such as a separate assignment agreement.

34.     In connection with entering into the Purchase Agreement, Defendants did not disclose that their plan was to cause Plaintiffs to enter into a Capital Lease for the acquisition of the Solar System, although they previously represented to Plaintiffs it would be a loan, such that Plaintiffs would not actually own the Solar System until the end of term of the lease, notwithstanding the language in the Purchase Agreement to the effect that, at all times, the Purchaser would own all of the right, title, and interest in the Solar System.

35.     The Purchase Agreement was conveyed by email on behalf of NJCES by Widi Jr. for execution by Widi Sr. and Plaintiffs.

36.     At the request of Dorand and TechEFI, Plaintiffs provided extensive financial information for the purpose of obtaining approval of a loan to finance the purchase price of the Solar System.

37.     After providing extensive financial information as requested, on October 10, 2019, Plaintiffs were provided with two options to finance the purchase of the Solar System. One option was the previously offered 7-year at 2% interest option and the other was a new 5-year 0% interest option (the "Commercial Presentation"). The alternative financing terms were provided by Axos to Dorand and NJCES. A copy of these financing proposals is attached as **Exhibit 5.** Copies of these two financing alternatives were conveyed by means of email communications, and Plaintiffs accepted the 0% option the same day.

38.     The Commercial Presentation represented that "No Capital investment" would be required and that the cost of the Solar System of $3,819,700.00 would be the same as the "Loan Payment Total (includes interest)" with monthly payments of $63,662.00. Ex. 5. The Commercial Presentation was false and misleading because it omitted to disclose that Defendants intended to cause Plaintiffs to enter into financing transaction documents with Axos, bearing an exorbitant interest rate to fund the purchase of components of the Solar System from SunPower and to pay NJCES for the balance of the purchase price of $3,819,700.00 BEFORE commencement of the purported 0% interest five-year loan described in the Commercial Presentation.

39.     Also, on October 10, 2019, unbeknownst to Plaintiffs, SunPower sent an invoice to Axos for $1,343,000.00 representing the amount of the components of the Solar System to be provided for installation by NJCES pursuant to the Purchase Agreement. At the time, the SunPower invoice was directed to Axos, Plaintiffs had not entered into any agreement with Axos, and Plaintiffs had not authorized NJCES to instruct SunPower to direct its invoice to Axos. A copy of the SunPower invoice is attached as **Exhibit 6**. All the Defendants previously had worked together on similar transactions, were knowledgeable of the set of documents used in such transactions, and knew that when all the transaction documents had been executed in the future by Plaintiffs, Axos would control the payment of the invoice of SunPower, notwithstanding the terms of the Purchase Agreement providing for payments to be made to NJCES (sometimes referred to as "Contractor").

40.     On October 15, 2019, TechEFI, acting through Dorand, sent what was characterized as the Term Sheet for the financing entitled Conditional Lease Proposal of Axos, a copy of which is attached as **Exhibit 7.** The Conditional Lease Proposal, signed by Pistorius on behalf of Axos, required Plaintiffs to immediately pay Axos $2,000.00 as a condition to commencing its

"investigation and credit approval process" and required an additional payment bringing the total deposit to $63,662.00 "upon formal credit approval" to be held and applied to the final "rental payment due under the Lease." The Conditional Lease Proposal provided that if Axos approved the transaction as described in the document, but the transaction did not proceed for any reason, Plaintiffs would forfeit the entire amount of the deposit as a "transaction fee."

41.      Upon receipt, Plaintiffs reviewed the document, and Miles sent an email to Dorand questioning the meaning of Section 6 of the Conditional Lease Proposal, which referred to a Lease Rate Factor. The Miles email stated, "I believe that was for zero percent for five years. Can you explain this section 6?" Dorand responded by email the same day, "that is all legaleze [sic] in the event the loan carried an interest rate which it doesn't. The rate is fixed and does not adjust on this loan. That is the payment for the entire term." A copy of this email exchange is attached as **Exhibit 8**.

42.      Based on their familiarity with the standard lease documentation used by Axos, as well as Axos' authorization, TechEFI, acting through Dorand, knew Dorand's representation to Plaintiffs on October 15, 2019 was false and misleading. All the Defendants knew that the Lease Rate Factor referenced but undefined in Section 6 was used to calculate a "service charge," also undefined but deeply (and vaguely) buried in Section 5 of the Conditional Lease Proposal. Left undisclosed and completely unexplained is that Axos would impose a monthly "service charge" calculated in reference to the undefined Lease Rate Factor, which would result in annual interest of approximately 20% on all amounts to be advanced, pursuant to a Progress Funding Facility referenced in the Conditional Lease Proposal provided to Plaintiffs on October 15, 2019. Dorand's misrepresentation to Plaintiffs on October 15, 2019 was intended to conceal that this exorbitant interest rate on all progress payments advanced by Axos was part of the entire financing package,

rendering the promised 0% financing of the purchase price for the Solar System false and misleading.

43.     While presenting the Conditional Lease Proposal to Plaintiffs, through TechEFI and Dorand, Axos and Pistorius failed to explain any of its material provisions, such as the service fee and the deposit. Nor did any of the Defendants provide Plaintiffs with Axos' "standard lease documentation" referenced in the Conditional Lease Proposal or explain how the lease documentation described in conclusory fashion in the Conditional Lease Proposal related to or affected the Purchase Agreement between NJCES and Plaintiffs and the Commercial Presentation presented to Plaintiffs with the approval and consent of all Defendants. For example, the Conditional Lease Proposal provided that "Vendor shall invoice Lessor directly for payment," whereas the Purchase Agreement specified certain conditions NJCES must satisfy in order to be entitled to payment. While imposing binding obligations on Plaintiffs, the Conditional Lease Proposal represented that it was "not binding." Ex. 7.

44.     Between October 15, 2019 and November 15, 2019, TechEFI, acting through Dorand on behalf of Axos, requested and received additional financial information from Plaintiffs purportedly required to obtain approval of the loan by Axos' credit committee.

45.     On November 12, 2019, Mr. Lyons, on behalf of Plaintiffs, asked Dorand via email about the status of the loan documentation and inquired about how the disbursement of funds would work. Dorand responded on behalf of the Defendants that the loan documents "are in the works" and that "funds are paid to the installer, but only when Chris [Miles] provides a specific verbal ok, directly to the bank." At the time these representations were made, all the Defendants were aware of Plaintiffs' inquiries about the interest rate on the loan and about how disbursements

would be handled and knew that the statements in Dorand's email to Lyons on November 12, 2019 were false. A copy of this email exchange is attached as **Exhibit 9**.

46.     Later the same day, Defendant Phillips, Vice President-Documentation for Axos, sent an email to Miles, copying others including Dorand, listing outstanding items needed to proceed with the lease documentation. A copy of this email is attached as **Exhibit 10.** In her email, Ms. Phillips indicated that Axos had received from NJCES Invoice No. 3210102219, "which references the requirement for a $2,200,705.00 deposit." Contrary to this representation in Ms. Phillips' email on November 12, 2019, NJCES Invoice No. 3210102219 is dated November 18, 2019 and is for the full amount of the purchase price of the Solar System set forth in the Purchase Agreement, which is $3,819,700.00. Also, contrary to the Purchase Agreement, the NJCES invoice represents that the Solar System was sold to Axos. A copy of this invoice, which was not provided to Plaintiffs at the time it was rendered to Axos, is attached as **Exhibit 11.** NJCES sent this invoice to Axos, but not to Plaintiffs, as part of Defendants' scheme to defraud Plaintiffs.

47.     On November 15, 2019, Axos provided loan documents to NJCES but did not provide them to Plaintiffs until November 18, 2019. Although everyone had been referring to the documents as "loan documents" when they were received, they were actually lease documents pursuant to which Axos would own the Solar System and Plaintiffs would lease the system from Axos for five years for the same monthly payment of $63,221.00, set forth in the proposal provided by NJCES in July for a total of $3,819,700.00, as set forth in the Lease Schedule No. 001 (**Exhibit 12** hereto) to the Master Lease Agreement and Exhibit A (**Exhibit 13** hereto). One of the documents provided was a one-page Master Progress Funding Agreement (**Exhibit 14** hereto), which addressed the terms on which payments would be advanced during the installation of the Solar System.

48.     At no time during the marketing and sale of the Solar System to Plaintiffs did any of the Defendants disclose that, contrary to the Purchase Agreement, Plaintiffs would be entering into a capital lease with Axos to lease the Solar System, not purchase it, on financial terms far in excess of the proffered 0% interest.

49.     Defendants did not disclose to Plaintiffs that the lease documentation presented to Plaintiffs on November 18, 2019 was materially different from the Commercial Presentation used to induce Plaintiffs to execute the Purchase Agreement on July 24, 2019. Defendants specifically concealed and failed to disclose or explain the reference in the Master Progress Funding Agreement to a "service charge" calculated by reference to the "Lease Rate Factor," which Dorand had previously assured Plaintiffs was mere legalese since the interest rate was 0%.

50.     The Master Progress Funding Agreement also provided that upon each Progress Payment, "Lessee's right, title and interest in the Property (including any claims Lessee may have to the Property through vendor, and any licenses from vendor) shall vest in Lessor, and Lessee hereby sells and assigns its purchase orders and contracts and all of its right, title and interest to such items of Property to Lessor." Ex. 14.

51.     The effect of this provision in the Master Progress Funding Agreement, in conjunction with the Master Lease Agreement, was to deprive Plaintiffs of all their rights under the Purchase Agreement, including, among other things, to enforce NJCES's contractual obligations to "install the Solar System in accordance with the Engineered Plans" (Section 7(d)), to "perform all work in a good and workman-like fashion" (Section 10(v)), to "promptly correct work that does not conform to this Agreement and to the Engineered Plans" (Section 7(b)), to assure that at the time of each payment, "all work and materials . . .shall… be free and clear of liens, security interests, or other encumbrances adverse to Purchaser's interests" (Section 15), and

that the installation of the Solar System and the application of a GacoFlex roof coating provided by Gaco Western ("Gaco") would be done "in a manner appropriate to obtain these manufacturer warranties" for the benefit of Purchaser (Section 6).

52.     The lease documents failed to disclose this and other material information necessary to disclose to Plaintiffs in order for the lease documents to not be misleading. For example, there are references to an "Acceptance Certificate" in the Master Lease Agreement and in Equipment Schedule No. 001; however, no form of Acceptance Certificate was provided to Plaintiffs. Further, the Master Lease Agreement provides at Section 8 that the Solar System, at all times, shall be the property of Axos with Plaintiffs' transferring all their ownership interest to Axos and obligating Plaintiffs to keep the property (referred to in the lease documentation as the "Property"), constituting the Solar System free and clear of all liens, while Axos disclaimed any responsibility for the manner in which the system was installed and performed.

53.     The terms of the Master Lease Agreement provided that regardless of whether Lessee "is satisfied that the Property is satisfactory. . . the Acceptance Date of the Lease shall be the date determined by Lessor in its sole discretion." Ex. 13, Section 6(a).

54.     The Master Lease Agreement contained an indemnification in Section 14, which required Lessee to indemnify and hold Lessor harmless from all claims, damages, suits, and any and all costs in connection therewith (including attorney's fees) "arising out of or in any manner connected with or resulting from the Lease, the Property, or use of the Property, including without limitation . . .(d) claims for wrongful, illegal, negligent or improper act or misuse by Lessor."

55.     Plaintiffs signed and returned the lease documents on November 18, 2019. A copy of the executed documents also was emailed to NJCES and TechEFI. One of the documents Plaintiffs executed was Authorization for Pre-Authorized Payments (the "ACH Authorization"),

which Defendants represented would be used for making the even monthly payments of $63,662.00 for the five-year term of the Master Lease Agreement. A copy of this ACH Authorization is attached as **Exhibit 15**.

56.     Also, on November 18, 2019, NJCES exchanged a series of emails with Plaintiffs in an effort to persuade Plaintiffs to advance more than 40% of the total cost of the Solar System rather than wait for Axos to receive the signed lease documents and set up the funding facility. Miles told Widi Jr. that Plaintiffs were not in a position to pay the full amounts sought without knowing if the loan had gone through but were willing to pay the amount due to SunPower ($1,343,000.00); however, NJCES eventually concluded in the email exchange "we are just going to have to wait for the bank." These emails are attached as **Exhibit 16**.

57.     During the same email exchange, Plaintiffs expressed concern about the need to have assurance that suppliers of NJCES had been paid in connection with advancing progress payments to NJCES. Widi Jr. responded, "Spoke to Senior and we will provide you with lien waivers from all the vendors before we take the last draw [of 30%]." *Id.* Contrary to this assurance, and despite the express requirements of the Purchase Agreement that "title to all work covered by all payments will pass to Purchaser . . . free and clear of liens, security interest, or any other encumbrances adverse to Purchaser's interests," NJCES received payments for work but did not pay certain of its suppliers or vendors, which to date has resulted in a construction lien in the amount of approximately $164,668.39, being filed by Cooper Electric Supply Co. against Mt. Holly and Miles Tech, as discussed further below.

58.     On November 21, 2019, pursuant to documents provided by Axos, Plaintiffs signed Partial Acceptance and Authorization for Progress Payment Certificate No. 1 in the amount of $1,330,790.00 payable to NJCES and Authorization Payment Certificate No. 2 in the amount of

$1,343,000.00 payable to SunPower. Copies of these Partial Acceptance and Payment Authorizations are attached as **Exhibits 17** and **Exhibit 18**.

59. In connection with being asked to authorize payments well in excess of the amounts due initially under the terms of the Purchase Agreement,  on or about November 21, 2019, Miles had a telephone conference with Gordon and Pistorius, who assured him that NJCES had a strong balance sheet and that Axos had done a number of similar sized transactions with NJCES in the past. In reliance on these assurances, Plaintiffs authorized the two payments totaling $2,673,790.00, as reflected in Exhibit 17 and 18.

60. In early December 2019, after receiving the monthly TD Bank statement of Mt. Holly, Plaintiffs discovered two ACH charges from Axos. On December 10, 2019, Miles asked Pistorius what the two charges represented. Pistorius responded that the first charge on 11/20/20 was the balance of the deposit required to be paid in advance representing the last monthly payment to be made under the Master Lease Agreement. The second charge in the amount of $12,355.31, according to Pistorius, was "the progress funding fee based on the amount we disbursed in November." A copy of this email exchange is attached as **Exhibit 19**. This explanation from Pistorius was false and misleading because there is no such thing as a "progress funding fee" referenced in any of the lease documentation. Plaintiffs believe Pistorius intended to lead Plaintiffs to believe this was a one-time charge when, in fact, it reflected the hidden "service fee" charged at over 20% per annum on the outstanding balance of the progress payments advanced by Axos. The ACH Authorization did not authorize such charges to be deducted automatically from Mt. Holly's bank account. The ACH Authorization was expressly limited to "all rental payments and other sums required to fulfill Lessee's contractual obligation under the Master Lease and the Lease

16

Schedules." Ex. 13. The ACH Authorization makes no reference to the separate  Master Progress Funding Agreement.

61.     Later in the day on December 10, 2019, Miles followed up with Pistorius asking him "Jeff, please explain the funding fee. No one ever explained it to me." Pistorius did not respond to this request for an explanation. Axos neither provided written notice at the time each specific amount was charged against Mt. Holly's bank account pursuant to the ACH Authorization nor any monthly or quarterly statements. No such written statements were ever provided to Plaintiffs by Axos. This communication and the related improper charge, which was subsequently made each month in varying amounts, constitute acts of wire fraud.

62.     The following improper service charges were made against Plaintiffs' ACH Authorization but were misleadingly described as "BOFI FBO Leasing Payment":

> December 2019: $12,355.31;
>
> January 2020:   $38,301.47;
>
> February 2020: $38,301.47;
>
> March 2020:    $37,080.42;
>
> April 2020:     $42,607.06;
>
> May 2020:      $41,232.64;
>
> June 2020:      $45,329.30;
>
> July 2020:      $47,066.02

Redacted copies of Mt. Holly's bank statements reflecting these improper charges are attached as **Exhibit 20.** Each of these ACH charges, none of which were authorized by the terms of the ACH Authorization, constitutes a predicate act of wire fraud.

63.     By April 2020, NJCES informed Plaintiffs that the installation was mechanically complete and requested payment of the balance due under the Purchase Agreement, except for $200,000.00 which NJCES proposed be placed in escrow until an inspection could be performed. Axos rejected putting funds in an escrow account. In response, Plaintiffs indicated they were aware of certain problems with the Solar System and wanted to have it inspected to confirm it had been installed in conformance with the Engineered Plans and was fully operational.

64.     Soon thereafter, Plaintiffs learned from Mt. Holly's Tenant that there were leaks in the roof, which Plaintiffs needed to repair. The leaks were caused by, among other things, improper installation of the Solar System using wood screws and improper roof anchors. The improper installation also jeopardized the Gaco roofing warranty. The failure of NJCES to correct the leaks has damaged Mt. Holly's relationship with the Tenant and the possible loss of the Tenant, which pays Mt. Holly over $900,000 a year in rent and related taxes and common area expenses.

65.     Plaintiffs brought this and other issues to the attention of NJCES and Axos. NJCES assured Plaintiffs the problems identified would be addressed but indicated it needed a release of additional funds to complete the work, notwithstanding the provisions of the Purchase Agreement providing that the final 30% of the Purchase Price would not be due until the installation had been completed in accordance with the "Engineered Plans and was Operational." As an accommodation, although not required to do so, Plaintiffs authorized two additional payments to NJCES in Partial Acceptance and Payment Authorizations No. 3 and No. 4, a copy of which is attached as **Exhibit 21** and **Exhibit 22**.

66.     The invoice submitted to Axos (Ex. 21) dated January 30, 2020 in the amount of $250,000.00 was supported by documentation of electrical equipment supplied by Cooper Electric to NJCES.  NJCES represented to Plaintiffs, to induce them to issue Payment Authorization No.

3, that the funds would be used to pay for the electrical supplies needed to complete installation of the Solar System.  In fact, however, upon receipt of the additional $250,000.00 on or about February 21, 2020, NJCES retained the entire amount rather than pay Cooper Electric.  Eventually, this led Cooper Electric to file a lien against the property owned by Mt. Holly in Lumberton, New Jersey.

67.     By early June, NJCES represented to Plaintiffs that the Solar System was close to being turned on as operational. Plaintiffs informed NJCES and Axos on June 9, 2020 that it had engaged Rob Corson of Triad Consulting Engineers to inspect the system and, for that purpose, needed a copy of all project documentation. When the documents were not provided, on June 20, 2020, Plaintiffs again requested the documentation "for verification of safety, compliance and completion" of the Solar System. Widi Jr. responded the same day, indicating that he didn't have time to collect the requested documents and represented "[w]e will be continuing to work to complete this project in accordance with the approved plans." A copy of this email exchange is attached as **Exhibit 23.**

68.     Even though Axos had been informed of the problems with the installation of the Solar System, on June 24, 2020, Axos demanded that Plaintiffs make final payment to NJCES and sign an acceptance certificate that contains false information together with a general release. The false acceptance certificate was transmitted to Plaintiffs by email by Kira Jones at the direction of Kristin Phillips, Pistorius, and Gordon, all of whom knew that the information in the Acceptance Certificate contained false representations.

69.     The same day, Plaintiffs informed Axos that until the safety, compliance, and completion of the project can be confirmed, no additional release of funds would be authorized. Two days later, Plaintiffs received a voicemail from Barry Gordon, Vice President of Equipment

19

Leasing with Axos, in which he demanded Plaintiffs authorize the final payment to NJCES and sign the final authorization and acceptance certificate. In his voicemail, Gordon falsely represented that the system had been "inspected by the state" and that Plaintiffs should deal with any "business issue" under the Purchase Agreement, even though Axos had required Plaintiffs to assign all their rights under the Purchase Agreement to Axos as part of the lease documentation.  Pistorius sent  a follow up email the same day containing numerous false statements, all of which Plaintiffs corrected. Pistorius promised "I will be looking into multiple things." These email exchanges between June 24 and June 26, 2020 are attached as **Exhibit 24**. These emails and the June 26, 2020 voicemail constitute predicate acts of wire fraud.

70.     On July 7, 2020, Timothy S. Czarnik, PE, ("Czarnik") of Huskies Engineering, LLC ("Huskies") and Miles spoke over the phone. Czarnik is the engineer that was hired by NJCES, not Plaintiffs.  Czarnik told Miles that Czarnik had warned NJCES that they needed to remove panels or structurally attach them because the roof was overloaded. Czarnik said his warnings to NJCES went "unheeded." Czarnik explained to Miles that the roof was overloaded as installed by the Contractor and that if there was a big snowstorm, there would be a problem. He explained that the installation does not meet code. Czarnik did not know how the Contractor was able to get a building permit.

71.     Another month passed and the deficiencies with the installation of the Solar System remained uncorrected. On July 29, 2020, Plaintiffs asked NJCES to indicate when the project was 100% complete so an inspection by Plaintiffs' engineering consultant could be confirmed "so we can close out the project and issue payment." In response, Widi Jr. wrongly asserted the final payment "is due at substantial completion" and that waiting for verification of the work "would be a breach of our contract." A copy of this email exchange is attached as **Exhibit 25.** The

representations by Widi Jr. were false and misleading, mischaracterized the relevant terms of the Purchase Agreement, and contradicted prior representations by Defendants that payment authorizations by Plaintiffs would not be made until Plaintiffs were satisfied that the work had been properly performed. Contrary to Widi Jr.'s representations, the reference to "Substantial Completion" in the Purchase Agreement has to do with when the 10-year warranty on the Solar System commences, whereas final payment is not due until it is determined "System Installed to Engineered Plans & Operational." Ex. 4, at Exhibit B.

72.     Miles responded to Widi Jr.'s demand for final payment by providing on July 29, 2020 a partial list to NJCES of the problems with the installation of the Solar System and again copied Pistorius with Axos, which had done nothing to assist Plaintiffs in obtaining the documents needed to ascertain whether the system had been installed in accordance with the Engineered Plans. A copy of this email is attached as **Exhibit 26**.

73.     After this email exchange, Widi Jr. appeared at the office of Chris Miles and demanded payment in person. He told Miles "you are only hurting yourself" by not paying because Plaintiffs were being charged a hefty service fee each month until NJCES was paid in full.  In effect, NJCES sought to extort the final payment to which it was not entitled by threatening Plaintiffs with significant ongoing economic loss in the form of exorbitant service charges until it did pay the final amount. At that point, Plaintiffs realized they had been misled about the nature of the monthly charges being automatically deducted from Mt. Holly's bank account and terminated the ACH Authorization. Based on the explanation from Pistorius in November, Plaintiffs had assumed they were making monthly lease payments at 0% interest and the monthly charges to Mt. Holly's bank account were described as "Leasing Payments."

74.     After Plaintiffs terminated the ACH Authorization, Plaintiffs complained about being misled about the service charges and sought to negotiate a settlement, which is described below. When efforts at settlement failed, on October 1, 2020, Axos invoiced Plaintiffs for several months of unpaid service charges which Plaintiffs paid by check as follows:

July 2020:          $47,066.02

August 2020:     $48,634.89

September 2020: $47,066.02

A copy of this invoice is attached as **Exhibit 27.** Transmission of the invoice was an act of mail fraud in furtherance of Defendants' scheme to default Plaintiffs.

75.     Between August 7 and August 14, 2020, Plaintiffs had a number of exchanges with the Defendants regarding the ongoing deficiencies with the installation, including continuing leaks and other issues as reflected in email communications, a copy of which is attached as **Exhibit 28.**

76.     On August 12, 2020, Gordon and Pistorius left Miles a voicemail in which Gordon falsely represented that Plaintiffs' termination of the ACH Authorization, which Axos had deceptively use to charge the unauthorized service charges concealed as "lease payments," was an event of default under the Master Lease Agreement.  The August 12, 2020 voicemail was a predicate act of wire fraud.

77.     Despite having been informed of the various problems with the installation, Gordon and Pistorius left a voicemail for Miles  the next day on August 13, 2020 in which Gordon falsely represented that Axos had "put out almost four million dollars" and that the service charges were "not even 4%." The August 13, 2020 voicemail is a predicate act of wire fraud.

78.     Despite the unresolved issues and the continuing failure to provide the requested documentation, on August 14, 2020, Widi Sr. insisted in one of the emails that the job "should be

22

deemed complete" and listed a number of items- most of which were false. Widi Sr. attached documents he represented to be "as built" plans, but the attached plans are not signed and sealed, and the actual installation was not made in accordance with the purported "as built" plans, which was confirmed when NJCES's architect and engineer participated in an inspection at the site in early September, which is described below. Widi Sr.'s emails constitute predicate acts of wire fraud.

79.    On August 25, 2020, Plaintiffs again requested a signed and sealed copy of the "as-built" plans from NJCES through Widi Sr. and Widi Jr.

80.    Having been stymied in efforts to obtain the requested relevant project documentations from NJCES, including authenticated as-built drawings to show the project was built to plan, Plaintiffs went directly to Lawrence Cirangle, the architect hired by NJCES to prepare the plans for the installation. On August 28, 2020, Cirangle, Robert Corson (Plaintiffs' engineering consultant), Robert Hoxit (an NJCES employee or prior employee), and Plaintiffs' counsel participated in a video conference concerning the status of the installation. Cirangle, like Czarnik had done previously, advised that NJCES had chosen to ignore the plans when installing the Solar System. When Plaintiffs raised questions about whether the installation complied with the Engineered Plans, Cirangle indicated that NJCES attempted to pressure him to approve all the deviations from the plans, which he refused to do. Cirangle indicated that there were numerous problems with the work in addition to the deviations from his plans. Cirangle indicated he would provide a complete list of the plan deviations.

81.    During the August 28, 2020 video conference, both Cirangle and Corson expressed concerns about the rating of the AIC that had been installed, both believing it to be seriously underrated and that it could be dangerous unless replaced with the proper system. In addition, it

had become clear that the roof mounts had been improperly installed and, unless redone, could void the roof warranty. All of this information was conveyed to Axos, but Axos refused to become involved in efforts to obtain compliance by NJCES with its contractual obligations, which Axos had assumed as part of the lease documentation. At the same time, Axos insisted it would continue to charge the monthly service fee until NJCES was paid in full.

82.  An inspection of the site was conducted on September 3, 2020, which included Widi Jr. and NJCES's professionals Czarnik (engineer) and Cirangle (architect). Subsequently, Czarnik issued a written dated September 17, 2020 and updated September 22, 2020 ("Huskies Report"). The Huskies Report identifies extensive problems with the installation of the Solar System.

83.  Because the September 3, 2020 inspection confirmed that the installation had not been performed in accordance with the original  specifications and plans, Cirangle Architects rendered an invoice to NJCES dated September 23, 2020 for additional architectural professional services in the amount of $1,200.00 it would perform, including the preparation of signed and sealed "as-built" plans necessary to provide to Lumberton Township's Construction Office in order to obtain final approval of the installation.

84.  NJCES never paid Cirangle Architects and never obtained proper signed and sealed "as-built" plans from Cirangle Architects.  Instead, NJCES fabricated purported "as-built" plans, which were a version of the original plans from 2019 that NJCES had failed to follow during the installation and submitted these false documents to obtain final township approval.  NJCES's submission of fabricated "as-built" plans in July 2020 to obtain final approval defrauded Lumberton Township and constituted a third-degree felony under New Jersey law and a predicate act of racketeering activity.

85.     When NJCES failed to pay the invoice of Cirangle Architects, Plaintiffs submitted the Cirangle Architects invoice to Axos and requested it to pay the invoice, but Axos has refused to do so.

86.     On September 25, 2020, Robert Corson issued a letter report identifying outstanding items and concerns ("Corson Report"). He specifically noted: "It is our concern that this switchboard is greatly underrated."

87.     On September 25, 2020, Plaintiffs sent an email to in-house counsel for Axos, attaching a copy of the two engineering reports on the deficient installation. A copy of this email and enclosures is attached as **Exhibit 29**. At that time Plaintiffs demanded that Axos commence the Lease per section 6(a) of the Lease.

88.     The September 25, 2020 email summarized the history of Plaintiffs' efforts to obtain assistance from Axos to resolve the failures of NJCES to follow the plans and address the resulting installation deficiencies.  The email, which was copied to Gordon and Pistorius, summarized a recent telephone conversation during which in-house counsel for Axos informed Plaintiffs' counsel that Axos' CEO Garrabrants had been consulted about the situation and refused to commence the lease until Axos had funded the full cost of the Solar System.  In effect, Garrabrants was insisting that Plaintiffs continue to pay the exorbitant monthly services changes until they authorized Axos to pay NJCES for the balance of the purchase price of the Solar System. In-house counsel for Axos did not provide any reference to any provision of the lease documentation that would support the position being taken by Garrabrants.

89.     The Huskies Report explained that on October 20, 2019 Huskies had issued a report reviewing the original SunPower July 19, 2019 ballast plan. ("Huskies 10/20/19 Report"). The Huskies 10/20/19 Report "stated that the proposed SunPower Helix DT racking and the SunPower

solar panels may be installed on the entire high roof and the portion of the low roof of the existing structure . . . that is more than 40 feet from the high roof as long as the maximum ballast group dead load pressure and the total array dead load pressure stays less than 4.0 psf. This can be accomplished by using a mechanical anchor to the roof deck in lieu of non-penetrating ballast for those ballast groups that exceed 4.0 psf." *See* Huskies Report, Ex. 29.

90.     As of October 20, 2019, NJCES was aware of the need to either remove panels or install roof anchors, or the roof would be overloaded.  Despite this knowledge NJCES did neither.

91.     On December 12, 2019, Huskies sent a proposed alternative new ballast design. As described by Huskies: "That document indicated a new proposed alternative design which indicated revisions to the SunPower July 19, 2019 ballast plans. These SunPower ballast plans were annotated by Huskies as to which solar modules could be removed to meet the requirements stated in the October 20, 2019 report." See Huskies September 22, 2020 Report attached as Ex. 29.

92.      Despite knowing that panels would either need to be removed or anchored to the roof deck, "Per David Widi, Jr. . . . the solar modules were initially installed based on the SunPower July 19, 2019 ballast plans with no roof anchors and with excessive ballast." See Huskies September 22, 2020 Report attached as Ex. 29.

93.     Huskies revealed that sometime: "[a]fter discussions, it was proposed that if solar modules could not be eliminated, then the higher loaded areas that were previously marked to eliminate modules would instead have the modules remain, but be anchored to the roof deck with the ballast removed."

94.     However, NJCES never obtained from its engineer a plan as to how to properly attach the roof anchors until August 3, 2020. *See* Huskies September 22, 2020 Report).

95.     Despite knowing that its own engineer did not approve of the installation, NJCES, Widi Sr., and Widi Jr. made numerous misrepresentations about the status of the project:

a.      On or about April 29, 220, Widi Sr. and Widi Jr. falsely represented to Plaintiffs that the installation was complete and final payment was due;

b.      On June 20, 2020, Widi Jr. represented "Our PE Engineer has provided a valid stamp. . .;"

c.      On July 30, 2020, Widi Jr. falsely claimed that PSE&G supplied the electrical cabinet;

d.      On July 30, 2020, Widi Jr., in falsely claiming the System had been designed and approved by an engineer, asserted that "The engineer would not design a system that overloads the roof and the town would not approve it." As it turns out, NJCES built the system in such a way that it did, in fact, overload the roof. More troubling, the Contractor knew, based on the warnings of Czarnik, that the roof was overloaded but disregarded these warnings.

e.      On July 30, 2020, Widi Jr. claimed that: "my father is going to go over the entire job with our engineer and confirm that everything is in accordance with the final plans." In actuality, Widi Jr. knew that the work did not comply with the "final plans" because no final plans had been obtained for the roof anchors until August 3, 2020.

f.      On August 14, 2020, Widi Sr. declared: "The job is now deemed complete." He also made reference to unsigned plans, which he claimed were "as built." This claim was false as Czarnik and Cirangle did not inspect the site until September 3, 2020, after which they both informed Plaintiffs and Widi Sr. that the installation was not done in accordance with the plans.

g.      On August 24, 2020, in response to questions from Miles, Widi Sr. claimed: "The as-builts are stamped and corrected attachments" Again, he falsely made this statement before the engineer and architect inspected the property and knew that no such authentic documents existed.

96.     On October 2, 2020, Axos advised of its intention to commence the lease.

97.     On October 2, 2020, Miles spoke with Pistorius at which time Axos agreed to commence the lease and stop the so-called progress payments, which actually represented the exorbitant monthly service charges.

98.     By email on October 2, 2020, Axos issued an invoice to Miles dated October 1, 2020 for a total due of $207,997.80, representing the following amounts:

| | |
|---|---|
| Progress Payment September 2020 | $47,066.02 |
| Progress Payment August 2020 | $48,634.89 |
| Progress Payment July 2020 | $48,634.89 |
| Lease Payment October 2020 | $63,662.00 |

99.     Pistorius insisted in the email accompanying the invoice that the amounts "when paid will bring the account current." Since the invoiced amounts included the October 2020 lease payment, Plaintiffs understood that if it paid three more months of service charges plus the first month of the lease, Axos would commence the lease. Indeed, the October 2nd email from Pistorius, which copied Gordon, among others, informed Plaintiffs that "[w]e are preparing closing documents to commence the lease." Based on these requirements, representations, and assurances, Miles had no choice but to pay the above sums to stop further so-called "Progress Payments." Plaintiffs promptly paid Axos $207, 997.80.

28

100.     Although Axos was well aware of the extensive problems with the Solar System, the fact that the system did not comply with the conditions for final payment, and the fact that Axos had already agreed to commence the Lease and stop the service charges, on October 27, 2020, Axos presented Plaintiffs with an Acceptance Certificate and Affirmation Letter, which it insisted Plaintiffs had to sign in order for the bank to cease the service charges and commence the lease. The forms of these documents, a copy of which is attached as **Exhibit 30**, contain numerous false representations of fact that Axos insisted Plaintiffs were required to sign. Among other things, the form of Acceptance Certificate required Plaintiffs to agree to unconditionally accept the Property, to represent that the Property is free and clear of all liens, and to agree that Plaintiffs release Axos "from any and all liability associated with the Master Funding Agreement . . . and all actions taken by Lessor up to the date hereof, and waives all rights to any and all future claims, including but not limited to, claims of fraud, misrepresentation or economic loss resulting from the progress funding."

101.     Plaintiffs responded on November 3, 2020 that it would not sign the documents because they contained false statements of fact. A copy of this email is attached as **Exhibit 31**.

102.     While insisting that Plaintiffs give Axos knowingly false representations about the project and provide Axos a general release as a condition to commencing the Master Lease term, in fact, Plaintiffs paid the fixed monthly lease payments due and payable under the Master Lease Agreement for October, November, and December, as invoiced by Axos. A copy of the most recent invoices is attached as **Exhibit 32**.

103.     In the meantime, NJCES completely abandoned the project, notwithstanding the numerous deficiencies documented by both its engineer and architect and Plaintiffs' engineering consultant and notwithstanding multiple requests by Plaintiffs for NJCES to finish the job. As a

result, on November 16, 2020, Plaintiffs terminated NJCES and engaged other professionals to begin to correct all the problems created by NJCES with respect to the installation of the Solar System. A copy of this letter, including a copy of the lien against the property filed due to NJCES failing to pay Cooper Electric Supply Co., its electrical supplier, $164,668.39, is attached as **Exhibit 33.**

104.    Payments disbursed by Axos on account of the project to date are as follows:

| | | |
|---|---|---|
| Funded to SunPower | 11/22/2019 | $1,343,000.00 |
| Funded to NJCE | 11/22/2019 | $1,330,790.00 |
| Funded to NJCE | 2/28/2020 | $250,000.00 |
| Funded to NJCE | 5/20/2020 | $350,000.00 |
| Total | | $3,273,790.00 |

105.    The vast majority of the payments Cooper Electric Supply Co. claims it is owed under its lien are for invoices that predate the May 20, 2020 disbursement by Axos and should have been paid by NJCES per the terms of the Purchase Agreement. *See* Ex. 4.

106.    On November 18, 2020, Defendant Gordon, Vice President of Equipment Finance for Axos, sent another email to Plaintiffs threatening that if the unexecuted Acceptance Certificate and Affirmation Letter were not executed and returned "we will be forced to move payments back to progress payments until the forms are executed." A copy of this email is attached as **Exhibit 34.** This email constitutes both a predicate act of wire fraud and an attempt to extort Plaintiffs to give Axos a general lease and to make false representations upon threat of economic loss. Nothing in the lease documents permits Axos to revoke the Acceptance date of the Master Lease Agreement, which had commenced on October 1, 2020.

107.    On November 23, 2020, Axos went further, threatening in an email that unless Plaintiffs executed the Acceptance Certificate and Affirmation by December 1, 2020, Axos would "consider the lease to be in the progress funding phase until installation and project are complete

30

and Miles Technologies authorizes payment for the final payment due to New Jersey Clean Energy Solutions." A copy of this email is attached as **Exhibit 35**. Having already determined the Acceptance Date and accepted lease payments from Plaintiffs for October and November, there was no basis under the lease documents to take such a position. At the time this email was transmitted, Axos and the other Defendants knew that the Solar System had not been installed in the manner required by the Purchase Agreement that Plaintiffs were required to assign to Axos in connection with the lease documentation. Yet, despite months of efforts by Plaintiffs to obtain Axos' agreement to assist Plaintiffs in obtaining compliance by NJCES, Axos, again, threatened Plaintiffs with economic loss unless they abandoned all their legal claims against the Defendants.

108.   Moreover, in its November 23, 2020 email, Axos insisted that Miles use NJCES to complete the project, stating: "it appears you are proposing that you want to use a different vendor/solar panel installation company to complete the project. This is not something that Axos is willing to agree to – in order for clear title to pass to Axos (as we are the owner of the equipment during the term of the Lease), we are required to process payment for the final payment and ensure the vendor (New Jersey Clean Energy) is paid in full." No provision in any of the Lease documents supports this assertion by Axos. *See* Ex. 35**.**

109.   Axos further asserted: "Additionally, the Lease requires that the equipment remains unencumbered and free of any and all liens except for the liens filed by Axos – although, due to non-payment of the final payment owed to New Jersey Clean Energy Solutions and Miles Technologies' unwillingness to work with New Jersey Clean Energy Solutions on identifying a remedy that is acceptable to both parties, New Jersey Clean Energy is now in a position where they are considering filing a mechanic's lien against the equipment. If they file a mechanic's lien, it will take priority over the lien filed by Axos and we would be subject to losing our first priority

security interest in the equipment we financed. Subsequently, this would be considered an event of default under the Lease and we can enforce the rights and remedies available to us under the Lease." *See* Ex. 35.

110.    Of course, when Axos wanted Plaintiffs to represent that the property was free and clear of suppliers and subcontractors' liens, Axos had an entirely different position, stating in an October 28, 2020 email:

> Chris, I looked into this document and the last line referring to our property (the solar project) being free of liens is accurate. You and I discussed the potential of subcontractors filing liens. Studying the lien laws in NJ they can't file against our equipment, only real estate/property.
>
> This document should be good to go based on that understanding . . .

See October 28, 2020 email from J. Pistorius attached as **Exhibit 36.**

111.    Axos has demanded that Plaintiffs use NJCES despite the fact NJCES failed to timely complete the project, failed to properly perform the work, failed to comply with engineering plans, failed to timely obtain engineering plans, failed to timely correct the work to comply with engineering plans once obtained, failed to properly perform the work in accordance with engineering plans once obtained, failed to pay a supplier, allowed a mechanic's lien to be filed, violated multiple provisions of the parties' agreement, made multiple misrepresentations, committing fraud, and created and failed to address health and safety issues.

112.    As a result of the fraudulent scheme perpetrated on Plaintiffs by the Defendants, Plaintiffs have not only paid a $25,000.00 "deposit" to TechEFI in July 2019 but also paid a total of $446,609.49 in service charges between December 2019 and September 2020, while Plaintiffs still has no operating Solar System in compliance with the Engineered Plans.

113.     In response to invoices from Axos, Plaintiffs made monthly lease payments of $63,662.00 for October 2020 through January 2021. Plaintiffs also paid on November 20, 2019, at Axos' insistence, a nonrefundable deposit of $63,662.00 to be applied to the last rental payment due at the end of the five-year term of the lease.  After this lawsuit was commenced on December 4, 2020, Axos ceased issuing monthly invoices for lease payments; nevertheless, Plaintiffs made the monthly lease payment due on February 1, 2021 and will continue to abide by the payment terms of the Master Lease Agreement notwithstanding this lawsuit.

114.     On or about November 29, 2020, Widi Sr. and Widi Jr. trespassed onto the property of Mt. Holly, broke the locks on the cabinets containing the breakers for the 21 inverters and the breaker for the monitoring system for the Solar System. They also turned off the main switch for the solar field, which caused all electric power generation and SREC generation to cease. Plaintiffs discovered this criminal conduct on December 1, 2020 and filed a criminal complaint against Widi Sr and Widi Jr. By rendering the Solar System inoperable, Plaintiffs lost SREC revenue of about $1,250.00 a day for three days and electric power generation of about $800.00 a day for three days. This intentional misconduct conduct of Widi Sr. and Widi Jr. amounts to a predicate act of tampering with a witness or victim and extortion.

115.     On December 3, 2020, Plaintiffs informed Axos by email that Cooper Electric had filed a construction lien claim, a copy of which is attached as **Exhibit 37,** in the amount of $164,668.39 for electrical supplies ordered by NJCES for use in connection with the installation of the Solar System.  Plaintiffs requested that Axos pay this lien amount since NJCES had previously received advances authorized by Plaintiffs, which should have been used to pay Cooper Electric.

116.     Because both  the NJCES defendants and the Axos defendants had refused to pay the September 23, 2020 invoice of Cirangle Architects rendered to NJCES, on December 7, 2020, Plaintiffs engaged Cirangle Architects by letter agreement (the "Cirangle Letter Agreement"), a copy of which is attached as **Exhibit 38**, to prepare the required  signed and sealed "as-built" plans and provide other consulting services  required for completion of the installation in accordance with the "Engineered Plans," as required as a condition to making final payment under the Purchase Agreement.  Plaintiffs subsequently provided the Cirangle Letter Agreement to Axos, requesting Axos to pay the amounts due to Cirangle Architects, but Axos has refused to do so.

117.     On December 8, 2020, Plaintiffs informed Axos that NJCES had not paid the September 23, 2020 invoice of Cirangle Architects for preparation of "as-built" plans and requested the bank to pay the invoice so the necessary "as-built" plans would be prepared.  A copy of this email and the unpaid invoice is attached as **Exhibit 39.**

118.      On December 8, 2020, NJCES, through its counsel, contacted Axos and instructed the bank not to pay the Cirangle Architects invoice or any other invoice (presumably including Cooper Electric) other than that of NJCES. A copy of this email is attached as **Exhibit 40.**  Axos sided with NJCES and has refused to pay either invoice, causing Cooper Electric to commence litigation to collect its unpaid invoice and enforce its lien.

119.     On December 5, 2020, NJCES filed a construction lien in the amount of $545,910.00 against the property owned by Mt. Holly in Burlington County, New Jersey.  The NJCES construction lien was executed by Widi Sr. and falsely represented that the work for which payment was sought had been completed on November 10, 2020. Video surveillance reflects that no work was performed by NJCES on November 10 or any other date in November 2020.

120.    Also included in the NJCES lien documentation filed in Burlington County was an undated invoice to Mt. Holly in the amount of $545,910.00.  All previous invoices of NJCES had been rendered to Axos as the owner of the Solar System.  The invoice NJCES prepared for filing in Burlington County had not previously been invoiced to Mt. Holly.

121.    On December 11, 2020, Cooper Electric brought a collection action against Solar Experts and Widi Sr. in the New Jersey Superior Court in Middlesex County.  A copy of the Complaint is attached as **Exhibit 41.**

122.    On January 26, 2021, Solar Experts and Widi Sr. answered the Middlesex County Complaint filed by Cooper Electric and asserted a third party complaint against Axos and Plaintiffs for failure to pay NJCES $545,000.00, representing the remaining amount NJCES purports it is due under the Purchase Agreement.  A copy of the Answer and Third Party Complaint is attached as **Exhibit 42.**

123.    Since terminating NJCES in November 2020 and engaging other professionals to correct the various deficiencies in the installation and to obtain proper "as-built" plans, the original Architect, the engineering firm, SunPower, and the SREC program have worked  and in a cooperative manner to confirm all the deficiencies and address them.

124.    Due to deficiencies discovered in the submissions made by NJCES to the New Jersey Board of Public Utility's ("BPU") SREC Program, Plaintiffs had to file corrected submissions to complete the SREC registration and approval process for which NJCES was responsible under the Purchase Agreement.  In this regard, Plaintiffs discovered that NJCES had submitted forged documents containing incorrect information in connection with SREC registration.  A copy of NJCES's submission, dated March 21, 2020, with forged signatures of Chris Miles, is attached as **Exhibit 43**. A copy of the corrected SREC filing with authentic

signatures of Chris Miles is attached as **Exhibit 44**. By submitted a forged instrument to a state agency, NJCES, Widi Sr., and Widi Jr. committed a third-degree felony pursuant to N.J.S.A. 2C:21-1a.

125.    A final SREC inspection occurred on January 20, 2021, and the Solar System passed with deficiencies that were required to be corrected.  Miles submitted the corrected paperwork to the SREC program on January 27, 2021. Plaintiffs received, on February 17, 2021, a final approval  number from the BPU, which was necessary in order for Plaintiffs to generate any economic benefit from the SREC program.  A copy of the final approval is attached as **Exhibit 45**.

126.    On January 25, 2021, Counsel for Axos sent a letter to Plaintiffs' counsel notifying Plaintiffs that unless they signed the Acceptance Certificate, presumably in the form previously provided to Plaintiffs on October 27, 2020 (see Ex. 30 hereto) containing material factual misrepresentations and a general release, Axos would, effective February 1, 2021, issue "revised" invoices converting previous invoices rendered for lease payments into invoices for progress payments.  The letter from Axos' counsel enclosing the Axos "revised" invoices is attached as **Exhibit 46.**

127.    On February 1, 2021, Counsel for Plaintiffs responded to Axos' January 25, 2021 letter. A copy of Plaintiffs' responsive letter with enclosed exhibits is attached as **Exhibit 47**. Plaintiffs' counsel's letter indicated that nothing in the lease documentation authorized Axos to revoke its written notice in October activating the lease or to recharacterize five months of lease payments made by Plaintiffs. Counsel's letter of January 25, 2021 and, in particular, the enclosures constitute predicate acts of wire fraud and extortion.

128.     On February 16, 2021, Plaintiffs answered the Cooper Electric Lien Complaint in Burlington County and asserted cross claims against Axos, Solar Experts, and NJCES.  A copy of this filing is attached as **Exhibit 48.**

129.     Also, on February 16, 2021, Plaintiffs answered the Third Party Complaint of Solar Experts and Widi Sr. in the Middlesex County action and asserted counterclaims against them, as well as cross claims against Axos, as reflected in Plaintiffs' filing attached as **Exhibit 49.**

130.     As reflected in the forgoing allegations, the actions and conduct of Defendants have not only victimized Plaintiffs but also Cooper Electric (for its unpaid invoices), potentially other suppliers of NJCES, the original architect, Cirangle Architects (for its unpaid invoice), Lumberton Township (induced to issue a Certificate of Approval based on fabricated as-built plans), and the BPU.

## ALLEGATIONS COMMON TO ALL RICO COUNTS

131.     At all times relevant to this Complaint, Axos was an enterprise, as defined by 18 U.S.C. § 1961(4), which was engaged in, and its activities affected, interstate commerce.

132.     At all relevant times, Gordon, Vice President of Equipment Leasing for Axos, directed, authorized, coordinated, and controlled the transactions and the conduct engaged in by Defendants, Phillips, Pistorius, TechEFI, Dorand, NJCES, Widi Sr., and Widi Jr., supported by his supervisor Garrabrants.

133.     Gordon conceived the scheme undertaken by the Defendants, which involved having NJCES, Widi Sr., and Widi Jr. market solar systems for sale with low or interest free loans to be provided by Axos as brokered by Dorand and TechEFI. Then, after signing up customers like Plaintiffs based on offering interest free loans, presenting them with lease documentation rather

than loan documentation, Defendants, including Dorand and Pistorius, actively concealed hidden exorbitant service charges, as directed by Gordon.

134.    In addition to directing the structure and method for implementing the scheme, Gordon personally participated in making false representations to Plaintiffs to induce them to enter into the transactions and then repeatedly made false representations, including  continuation of ruinous interest rates disguised as "service charges" unless Plaintiffs provided authorized final payment to NJCES and gave Axos a general release.  Gordon delegated various tasks to other members of the group, such as by having Dorand, deal directly with Plaintiffs to make false representations about the terms of the transactions, collect purported loan application documents from Plaintiffs to be conveyed by TechEFI to Axos and demand improper advances of funds. Gordon also directly supervised the activities of Pistorius who reported directly to him and Phillips, who prepared and provided documentation as directed by Gordon and Pistorius. Phillips sent false and misleading emails to Plaintiffs and was copied on numerous emails to and from Plaintiffs, thereby obtaining actual knowledge that the documents prepared were false and misleading. Since the Defendants' equipment leasing scheme had been approved by executive management of Axos at Gordon's urging, Gordon solicited and received the support of Garrabrants in the face of Plaintiffs' efforts to commence the lease without paying three months of service charges.

135.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud, extort, and steal from Plaintiffs, carried out since July 2019 to the present and continuing, includes, among others:

    (a)    Dorand and Widi Jr. contacting Miles on or about July 12, 2019 by telephone and email communications making false representations to induce Plaintiffs to

pay Tech EFI $25,000.00 to "lock in" the 2% interest rate on a loan to finance the purchase of the Solar System, in violation of 18 U.S.C. § 1343;

(b)     NJCES, Widi Sr., and Widi Jr. making false and misleading representations between July 15, 2019 and July 24, 2019 during telephone and email communications to induce Plaintiffs to execute the Purchase Agreement, in violation of 18 U.S.C. § 1343;

(c)     NJCES, Widi Sr., and Widi Jr. causing the Purchase Agreement containing material misstatements and omissions to be transmitted by email attachment, in violation of 18 U.S.C. § 1343;

(d)     TechEFI, Dorand, NJCES, Widi Sr., Widi Jr., Gordon, and Pistorius preparing, approving, and transmitting by email on or about October 10, 2019, false and misleading financial alternatives set forth in the Commercial Presentation, in violation of 18 U.S.C. § 1343;

(e)     TechEFI, Dorand, Garrabrants, Gordon, and Pistorius preparing, approving, and authorizing the transmission on or about October 15, 2019 by email of a Commercial Lease Proposal containing false and misleading information, in violation of 18 U.S.C. § 1343;

(f)     TechEFI, Dorand, Gordon and Pistorius approving and authorizing Dorand to send an email on or about October 15, 2019 to Plaintiffs falsely representing the meaning of terms contained in the Commercial Lease Proposal, including, among other things, falsely representing that the Lease Rate Factor referenced in the Conditional Lease Proposal was mere "legaleze[sic] which would only apply "in the event the loan carried an interest rate which it doesn't",  in violation of 18 U.S.C. § 1343;

(g)     TechEFI and Dorand, on behalf of all the Defendants communicating by email on November 12, 2019 with Robert Lyons, controller for Miles Tech, that payments by Axos to NJCES would only be made upon the express approval of Miles, in violation of 18 U.S.C. § 1343;

(h)     Phillips communicating by email on November 12, 2019, falsely representing that Axos had received an invoice from NJCES for a $2,200,705.00 deposit, in violation of 18 U.S.C. § 1343;

(i)     NJCES, acting through Widi Sr. and Widi Jr. on or about November 18, 2019, transmitting via email to Axos an invoice falsely representing payment in full was due for the $3,819,700.00 price of the Solar System, in violation of 18 U.S.C. § 1343;

(j)     On or about November 17, 2019, Garrabrants, Gordon, and Pistorius approved, authorized, and directed the mailing of lease documentation to Plaintiffs containing false and misleading representations, in violation of 18 U.S.C. § 1341;

(k)     NJCES, Widi Sr. and Widi Jr. falsely representing in an email on November 18, 2019 that lien waivers from all vendors would be provided to Plaintiffs before final payment was due for the Solar System, in violation of 18 U.S.C. § 1343;

(l)     On or about November 18, 2019, Axos, Gordon, Pistorius and Phillips falsely represented that the requested ACH Authorization which was required to be executed by Plaintiffs  although not specifically referenced in the lease documentation, would be used to withdraw automatically  from Plaintiffs' bank account monthly lease payments, in violation of 18 U.S.C. § 1343;

(m)     Gordon, Phillips, and Pistorius approved, authorized, and directed the transmission by email of Partial Acceptance and Authorization for Progress Payment

Certificate No. 1 in the amount of $1,330,790.00 payable to NJCES and Partial Acceptance and Authorization for Progress Payment Certificate No. 2 in the amount of $1,343,000.00 payable to SunPower, in violation of 18 U.S.C. § 1343;

(n)     On or about November 21, 2019, Gordon and Pistorius had a telephone conference call with Miles during which in order to induce Plaintiffs to execute the first two payment authorizations, they both assured Miles that NJCES had a strong balance sheet and that Axos had previously done a number of similar sized commercial transaction with NJCES, in violation of 18 U.S.C. § 1343.

(o)     On December 10, 2019, Pistorius transmitted an email to Miles, which falsely represented the nature of a $12,355.31 ACH charge by Axos against Mt. Holly's TD Bank Account, in violation of 18 U.S.C. § 1343;

(p)     On December 10, 2019, Pistorius, when specifically asked by Miles to explain what he called a "funding fee" in light of the representations that there would be 0% financing, ignored Plaintiffs' request for an explanation, in violation of 18 U.S.C. § 1343;

(q)     Axos made monthly ACH charges against Mt. Holly's TD Bank account between December 2019 and July 2020, each falsely representing the monthly charge was a "Leasing Payment" when, in fact, the charges were for exorbitant interest charges on progress funding payments benignly and vaguely referenced as service charges in the lease documentation; each such false representation when made constituted a violation of 18 U.S.C. § 1343 and also 18 U.S.C. § 1344;

(r)     On or about January 31, 2020, NJCES rendered an invoice to Axos for $250,000.00 to pay amounts purportedly due for electrical supplies listed on the invoice.

Axos provided the NJCES invoice to Plaintiffs to induce them to execute Payment Authorization No. 3 on February 21, 2020 (Exhibit 21), in violation of 18 U.S.C. § 1343.

(s)     On or about March 21, 2020, NJCES, Widi Sr., and Widi Jr. forged the signature of Chris Miles on one or more documents containing false information, which NJCES submitted to the New Jersey BPU's SREC office, in violation of 18 U.S.C.§ 1343 and  N.J.S.A. 2C:21-1a.

(t)     On or about April 29, 2020, Widi Sr. and Widi Jr. falsely represented to Plaintiffs in an email that the installation of the Solar System was complete and final payment was due, in violation of 18 U.S.C. § 1343.

(u)     On June 20, 2020, NJCES and Widi Jr. transmitted a false and misleading email regarding NJCES, continuing to complete the Solar System project "in accordance with the approved plans," in violation of 18 U.S.C. § 1343;

(v)     Between June 24, 2020 and June 26, 2020, Gordon, Pistorius, and Kira Jones, Senior Document Specialist, who reported to Phillips, sent multiple false and misleading emails and a voicemail from Gordon on June 26th  to Plaintiffs demanding that Plaintiffs execute an acceptance certificate containing false representations and payment authorization for the balance of the purchase price of the Solar System, in violation of 18 U.S.C. § 1343;

(w)     Garrabrants, Gordon, Pistorius, NJCES, Widi Sr., and Widi Jr. extorted Plaintiffs by creating fear so that they would sign the Acceptance Certificate and Affirmation Letter (Ex. 30), thereby relinquishing their rights to receive a completed Solar System in accordance with the Engineered Plans and operational and their rights of action against the Defendants, in violation of 18 U.S.C. § 1951;

(x)     On or about July 10, 2020, NJCES, acting through Widi Sr. and Widi Jr., submitted fabricated "as-built" plans to Lumberton Township to induce the Township to issue a Certificate of Approval of the installation of Solar System, in violation of 18 U.S.C. § 1343 and N.J.SA. 2C:21-1a;

(y)     On July 29, 2020, Widi, Jr. falsely represented that final payment was due upon "substantial completion" and that waiting to verify the proper installation of the Solar System would be a breach of contract, in violation of 18 U.S.C.§ 1343;

(z)     On July 29, 2020, when Plaintiffs refused Widi Jr.'s demand to pay NJCES the remaining $545,910.00 of the purchase price of the Solar System, even though the conditions to final payment had not been satisfied, Widi Jr. told Miles, "you are only hurting yourself" because the Defendants planned to charge Plaintiffs the exorbitant monthly service charge until they relented and paid NJCES regardless of the condition of the Solar System, in violation of 18 U.S.C. § 1951;

(aa)     On August 12, 2020, Gordon and Pistorius left Miles a voicemail in which Gordon falsely represented that Plaintiffs' termination of the ACH Authorization, which Axos had deceptively use to charge the unauthorized service charges concealed as "lease payments," was an event of default under the Master Lease Agreement, in violation  of 18 U.S.C. § 1343;

(bb)     Gordon and Pistorius left a voicemail for Miles the next day on August 13, 2020 in which Gordon falsely represented that Axos had "put out almost four million dollars" and that the service charges were "not even 4%." The August 13, 2020 voicemail is a predicate act of wire fraud, in violation of 18 U.S.C. § 1343;

43

(cc)     On August 14, 2020, Widi sent an email falsely representing that the job was complete and making repeated false representations, including that the solar array shifted because ballast had not been installed yet, that PSEG supplied and hooked up the switchboard, that sheet metal had been added at the bottom of the switch gear, and that attached to the email were "as built" plans, in violation of 18 U.S.C. § 1343;

(dd)     In late August and September 2020, Garrabrants, Gordon, Pistorius, Phillips, and others participated in telephone calls in an effort to induce Plaintiffs to pay NJCES the balance of the purchase price of the Solar System, notwithstanding the many known deficiencies, in violation of 18 U.S.C. § 1343;

(ee)     On or about September 25, 2020, Garrabrants informed in-house counsel, Gordon, and Pistorius to tell Plaintiffs that the service charges would continue until NJCES was paid the balance of the purchase price for the Solar System, in violation of 18 U.S.C. § 1343, state law extortion and 18 U.S. C. § 1951;

(ff)     On or about October 27, 2020, Phillips, at the direction of Garrabrants, Gordon, and Pistorius, transmitted by email an Acceptance Certificate and Affirmative Letter, in violation of 18 U.S.C. § 1343;

(gg)     On or about November 18, 2020, Gordon transmitted an email to Plaintiffs in which he threatened to reimpose exorbitant service charges unless Plaintiffs executed the Acceptance Certificate and Affirmation Letter, in violation of 18 U.S.C. § 1343;

(hh)     On or about November 23, 2020, Phillips, at the direction of Garrabrants, Gordon, and Pistorius, transmitted an email threatening to return to "the progress funding phase. until Miles Technologies authorizes payment for the final payment due to New Jersey Clean Energy Solutions", in violation of 18 U.S.C. § 1343;

(ii)   On or about November 29, 2020, Widi Sr. and Widi Jr. trespassed on the site of the  Solar System, disabled it, and caused other property damage in an effort to intimidate Plaintiffs and induce them to pay NJCES monies to which they are not entitled, in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 1951;

(jj)   On December 8, 2020, NJCES instructed Axos via email not to pay Cirangle Architects or anyone else (including Cooper Electric) other than NJCES for amounts due for work or services performed related to the Solar System, in violation of 18 U.S.C. § 1343;

(kk)   On December 5, 2020, NJCES recorded a construction lien in the amount of $545,910.00 against the property of Mt. Holly located in Lumberton Township, Burlington, County, New Jersey, which contained false and misleading written representations, including a fabricated invoice never provided to Plaintiffs, which was transmitted by mail to Plaintiffs in violation of 18 U.S.C. 18 U.S.C. § 1341; and

(ll)   On January 25, 2021, counsel for Axos transmitted to Plaintiffs' counsel various bank documents purporting to be "revised" invoices dated February 1, 2021 converting prior invoices for lease payments into invoices for progress payments under the Progress Funding Agreement that had been closed in early October, in violation of 18 U.S. C. § 1343, 18 U.S.C. § 1951 and state law extortion.

## COUNT I
## RICO VIOLATION (§ 1962(c))
### (Garrabrants, Gordon, Phillips, Pistorius, NJCES, Widi Sr., Widi Jr., TechEFI, and Dorand (collectively, the "Count I Defendants"))

136.   Plaintiffs incorporate herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

137.    Each of the named Count I Defendants conducted or participated in the conduct of the affairs of Axos by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). See ¶ 135.

138.    The pattern of racketeering activity in which the Count I Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits, constituting mail fraud (18 U.S.C. §§ 1341), wire fraud (18 U.S.C. § 1343), bank fraud ( 18 U.S.C. § 1344),  tampering with a witness or victim ( 18 U.S.C. § 1512), third-degree felonies of forgery under state law, and extortion (18 U.S.C. § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

139.    The predicate acts of mail fraud, wire fraud, bank fraud, tampering with a witness or victim, third-degree state law felonies of forgery, and extortion involved the transmission and use of false documentation in furtherance of the Count I Defendants' scheme to defraud Plaintiffs in connection with the sale, financing, and installation of the Solar System.

140.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Count I Defendants and against each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000.00 and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

<u>**COUNT II**</u>
<u>**RICO VIOLATION (§ 1962(d))**</u>
**(Garrabrants, Gordon, Phillips, Pistorius, NJCES, Widi Sr., Widi Jr., TechEFI, and**
**Dorand (collectively, the "Count II Defendants"))**

141.     Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

142.     From around July 2019 to the present , the Count II Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of Axos through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). See ¶ 135.

143.     The pattern of racketeering activity in which the Count II Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts, conducts, and transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952), wire fraud (18 U.S.C. § 1343),  bank fraud ( 18 U.S.C. § 1344),  tampering with a witness or victim ( 18 U.S.C. § 1512), third-degree felonies of forgery under state law, and extortion (18 U.S.C. § 1951),  – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

144.     The predicate acts of mail fraud, bank fraud, tampering with a witness or victim, wire fraud, third-degree felonies of forgery under state law and extortion also involved the transmission and use of false and misleading documentation in furtherance of the Count II Defendants' scheme to defraud Plaintiff in connection with the sale, financing, and installation of the Solar System.

145.     As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Count II Defendants and against each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000.00 and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiffs' reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

## COUNT III
## RICO VIOLATION (§ 1962(c))
### (All Defendants (collectively, the "Count III Defendants"))

146.     Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

147.     At all times relevant to this Complaint, the Count III Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)- that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of these the Count III Defendants participated in the operation and management of the enterprise, which Gordon orchestrated, coordinated, and led with the support of Garrabrants.

148.     In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity. See ¶ 135.

149.     The Count III Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

150.     The pattern of racketeering activity in which the Count III Defendants engaged involved numerous specific acts and transactions as described in detail in this Complaint and the

accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341), wire fraud (18 U.S.C. § 1343), bank fraud ( 18 U.S.C. § 1344),  tampering with a witness or victim ( 18 U.S.C. § 1512), third-degree felonies of forgery under state law, and  extortion (18 U.S.C. § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

151.    The predicate acts of mail fraud, wire fraud, bank fraud, tampering with a witness or victim, third-degree felonies of forgery under state law and extortion involved the transmission and use of false and misleading documentation in furtherance of the Count III Defendants' scheme to defraud Plaintiffs in connection with the purchase, financing, and installation of the Solar System.

152.    The Count III Defendants knowingly and intentionally engaged in the predicate acts constituting the pattern of racketeering activity.

153.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Count III Defendants and against each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000.00 and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

**COUNT IV**
**RICO VIOLATION (§ 1962(d))**
**(All Defendants (collectively, the "Count IV Defendants"))**

154.    Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

155.    At all times relevant to this Complaint, the Count IV Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)- that is, a group of  entities and individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce.

156.    From around July 2019 to present, the Count IV Defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together with each other and with others, whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity violation of 18 U.S.C. § 1962(d).  See ¶ 135.

157.    The pattern of racketeering activity in which the Count IV Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952), wire fraud (18 U.S.C. § 1343), bank fraud ( 18 U.S.C. § 1344),  tampering with a witness or victim ( 18 U.S.C. § 1512), third-degree felonies of forgery under state law, and   extortion (18 U.S.C. § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

158.    The predicate acts of mail fraud, wire fraud, bank fraud, tampering with a witness or victim, third-degree felonies of forgery under state law and extortion involved the transmission and use of false documentation in furtherance of the Count IV Defendants' scheme to defraud Plaintiff in the connection with the purchase, financing, and installation of the Solar System.

159.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs demand judgment against the Count IV Defendants, and each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000.00 and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiffs' reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

<u>**COUNT V**</u>
<u>**FRAUD**</u>
**(All Defendants (collectively, the "Count V Defendants"))**

160.    Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

161.    The Defendants have made misrepresentations of material facts, deliberately concealed, omitted material facts that they had a duty to disclose in connection with their dealings with Plaintiffs, and engaged in other conduct, which amounts to a scheme to defraud Plaintiffs, including, among other things, the conduct set forth in paragraphs 19-80 above.

162.    The Defendants' misrepresentations, omissions, concealment of material facts, and scheme and artifices to defraud were made and undertaken intentionally or recklessly for the purpose of benefiting themselves economically and harming Plaintiffs.

163.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of Defendants' representations, on the completeness of their disclosures of material facts, and without knowledge of Defendants' scheme and artifice to defraud them.

164.    The Defendants knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their truthfulness. But for the Defendants' misrepresentations,

omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have entered into and continued their dealings and transactions with the Defendants.

165.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

166.    As a direct and proximate cause of the Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Defendants, Plaintiffs have been damaged, and because their conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgement against the Defendants as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An award of punitive damages; and

(c)    Such other relief as the Court deems just and proper.

<u>**COUNT VI**</u>
<u>**CIVIL CONSPIRACY**</u>
**(All Defendants (collectively, the "Count VI Defendants"))**

167.    Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

168.    During the relevant time period, the Count VI Defendants, either directly or indirectly, combined or agreed with intent to defraud, deceive, steal, divert, and misappropriate money and other assets of Plaintiffs by unlawful means, including, among other things, common law fraud, civil theft, and conversion.

169.     At all relevant times, the Count VI Defendants acted with intent to cause damages to Plaintiffs by defrauding, diverting, and taking money, property, and assets from Plaintiffs.

170.     The Count VI Defendants did, in fact, carry out their conspiracy by, among others, mail fraud, wire fraud, extortion, common law fraud, civil theft, and conversion.

171.     As a result of the Count VI Defendants' unlawful acts, using unlawful means, Plaintiffs have suffered damages.

172.     The Count VI Defendants' unlawful acts using unlawful means were the proximate cause of the damages to Plaintiffs.

173.     To the extent that the Count VI Defendants' conspiracy was done knowingly, intentionally, willfully, wantonly, and recklessly, Plaintiffs are entitled to an award of punitive damages.

**WHEREFORE**, Plaintiffs against the Count VI Defendants, each of them, jointly and severally, as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)     An award of punitive damages; and

(c)     Such other relief as the Court deems just and proper.

## COUNT VII
## BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING
### (NJCES)

174.     Plaintiffs incorporate herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

175.     On July 24, 2019 Plaintiffs and NJCES entered into, and agreed to abide by, the Purchase Agreement (Ex. 4).

176.    NJCES breached the Purchase Agreement and its covenant of good faith and fair dealing with Plaintiffs by, among others, (i) failing to install the Solar System in accordance with the Engineered Plans; (ii) failing to complete installation of the Solar System by December 31, 2019 or within a reasonable time thereafter; (iii) failing to perform all work in a good and workman-like manner; (iv) failing to promptly correct work that does not conform to the Purchase Agreement and to the Engineered Plans; (v) failing to complete the Interconnection Application and approval process; (vi) failing to convey title for work covered by all payments free and clear of liens, security interest, or other encumbrances adverse to Plaintiffs' interests; and (vii) failing to apply the roof coating and the installation in a manner to obtain the manufacturer's warranties attached as Exhibit C of the Purchase Agreement.

177.    Plaintiffs have been damaged by NJCES's breach of the Purchase Agreement  by among other things, the loss of the economic benefits of a timely and properly installed Solar System, the imposition of liens due to NJCES's failure to pay its suppliers and vendors, which will cost more than $165,000.00 to remove, the cost of having the Solar System properly completed by replacement contractor, and excessive interest charges imposed by Axos due to the delays in completing installation of the Solar System by NJCES.

**WHEREFORE**, Plaintiffs demand judgment against NJCES as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest; and

(b)    Such other relief as the Court deems just and proper.

## COUNT VIII
## BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING
### (Axos)

178.   Plaintiffs incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

179.   In or around, November 18,2020, Plaintiffs and Axos entered into, and agreed to abide by, the Master Lease Agreement (Ex. 13), Lease Schedule No. 001 (Ex. 12), the Master Progress Funding Agreement (Ex. 14) and the ACH Authorization (Ex. 15) ( collectively the" Lease Agreements").

180.   Axos breached the Lease Agreements with Plaintiff by, among others, (i) representing NJCES was a capable Contractor, with which Axos was familiar from prior experience, with the financial strength and ability to complete the installation of the Solar System in accordance with the requirements of the Purchase Agreement; (ii) charging Plaintiffs amounts not authorized by the ACH Authorization; (iii) failing to commence the term of the lease in accordance with the Master Lease Agreement in order to continue the imposition of excessive service fees under the Master Progress Funding Agreement; and (iv) acting in the interests of NJCES and contrary to the interests of Plaintiffs in exercising discretion in the administration of the lease documentation and the assignment of Plaintiffs' rights in the Purchase Agreement to Axos in accordance with the Master Lease Agreement by (a) insisting the project was satisfactorily completed and the balance of the purchase price was due to NJCES, notwithstanding its knowledge of numerous deficiencies with the installation and (b) insisting that Plaintiffs were not permitted to engage other contractors to satisfactorily complete the project and correct the deficiencies caused by NJCES but instead must pay only NJCES under the terms of the Lease Agreements.

181.     Plaintiffs has been damaged by breach of the lease documentation and the covenant of good faith and fair dealing by, among other things, the imposition of excessive and improper service charges via ACH deductions from Mt. Holly's bank account, failure to commence the lease agreement, and imposition of monetary damages and safety risks upon Plaintiffs due to failures to enforce its rights as Plaintiffs' assignee under the Purchase Agreement, loss of the economic benefits of a timely installed and operational Solar System, the cost of removing liens resulting from NJCES's failure to pay its suppliers and vendors, and the costs of having the Solar System properly installed using replacement contractors

**WHEREFORE**, Plaintiffs demand judgment against Axos as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest; and

(b)     Such other relief as the Court deems just and proper.

### COUNT IX
### BREACH OF FIDUCIARY DUTY
#### (Axos)

182.     Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully set forth at length.

183.     Pursuant to the Master Progress Funding Agreement, Plaintiffs, defined therein as "Lessee", were required to sell and assign "its purchase orders and contracts and all of its right, title and interest to such items of Property to Lessor." The referenced purchase orders and contracts consist of the Purchase Agreement between Plaintiffs and NJCES for the purchase and installation of a Solar System in accordance with its terms.

184.     At the time of execution of the Lease Agreements, including the Master Progress Funding Agreement, Axos was familiar with and aware of the terms and provisions of the Purchase

Agreement between Plaintiffs and NJCES. Among other provisions of the Purchase Agreement, Axos was aware of Section 8 of the Purchase Agreement providing that "Purchaser may transfer and assign the Solar System to any third party. Upon any such transfer and assignment, the transferee or assignee shall obtain all rights and benefits under this Agreement that belong to Purchaser."

185.     By virtue of requiring Plaintiffs to assign their rights and interest in the Purchase Agreement to Axos, Axos acquired and assumed a fiduciary duty to Plaintiffs, including the duty of loyalty, duty of care, and the duty of good faith and fair dealing.

186.     Defendant Axos breached its fiduciary duties to Plaintiffs by, among other things, (i) failing to assure that all progress payments advanced to NJCES pursuant to the Master Progress Funding Agreement were made in accordance with the Purchase Price Payment Terms of the Purchase Agreement, set forth in Exhibit B of the Purchase Agreement; (ii) assuring that NJCES used progress payments for work performed and materials purchased from third parties to be timely paid such that no liens would be recorded against the Property, as defined in the Lease Documents; (iii) failing to enforce the rights of the Purchaser under the Purchase Agreement, including, among others, to have NJCES perform all work in a good and workman-like fashion; (iv) failing to enforce the rights of the Purchaser under the Purchase Agreement to  cause NJCES to promptly correct work that does not conform to the Purchase Agreement and to the Engineered Plans, solely at the cost of NJCES; (v) favoring the interest of NJCES over the interest of Plaintiffs by pressuring Plaintiffs to make false representations that the Solar System was satisfactory to Plaintiffs and that the balance of the purchase price of the Solar System was due and payable to NJCES; and (vi) charging undisclosed and unexplained exorbitant "service charges" on progress

payments from at least January 2020 through June 2020 due to the failure to assure the Solar System was completed by December 31, 2019, as provided in the Purchase Agreement.

187.    The improper conduct of Axos in breaching its fiduciary duties to Plaintiffs is extreme, outrageous, and malicious, justifying the imposition of punitive damages.

188.    Plaintiffs have suffered damages, which are continuing as a result of Axos' breaches of its fiduciary duties to Plaintiffs, including, without limitation, loss of the economic benefits of a timely installed and operational Solar System, the payment of service fees to which Axos was not entitled due to its breaches of fiduciary duty, the imposition of liens against Plaintiff's property which will cost more than $165,000.00 to remove, and the cost of installing the Solar System properly by engaging replacement contractor.

**WHEREFORE**, Plaintiffs demand a judgement against Axos, as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    Restitution of all service charges imposed upon Plaintiffs by Axos during the period of its breaches of the fiduciary duties owed by Axos to Plaintiffs;

(c)    An award of punitive damages; and

(d)    Such other relief as the Court deems just and proper.

## COUNT X
## DECLARATORY JUDGMENT
## Pursuant to Utah Declaratory Judgment Act (Ut St §78B-6-401 et seq. and §70A-2-302 and 28 U.S.C. §2201)
### (Axos)

189.    Plaintiffs incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

190.    The Utah Declaratory Judgment Act (Utah Code §70A-2-302) permits a party to a contract to obtain a judicial determination of the construction or validity of any such contract or provision therein.

191.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

192.    Utah Law at §70A-2-302 authorizes a court to determine whether a contract or any clause of a contract to have been unconscionable at the time the contract was made and can refuse to enforce such contract or any clause found to be unconscionable.

193.    Plaintiffs and Axos entered into certain contracts dated November 15, 2019, including, in particular, the Master Lease Agreement, the Master Progress Funding Agreement (Ex. 13), Lease Schedule No. 001 (Ex. 12), the Master Progress Funding Agreement (Ex. 14) and the ACH Authorization (Ex. 15) (collectively the "Lease Agreements").

194.    On or about October 27, 2020, November 18, 2020, and November 23, 2020, Axos sought to cause Plaintiffs to execute an Affirmation Letter and Certificate of Acceptance to Lease Schedule No. 001, which, according to Section 20 of the Master Lease Agreement, incorporates by reference all the terms and conditions of the Master Lease Agreement and constitutes a separate Lease.

195.    The provisions of the Lease Agreements, the Affirmation Letter, and the Certificate of Acceptance to Lease Schedule No. 001 were not the result of arms-length negotiation by the parties to such documents but rather were drafted solely by Axos for its sole benefit and are so one-sided, unfair, unconscionable, and against public policy that the Court should find certain of them void and unenforceable.

196.    In particular, the following provisions of the Lease Agreements should be declared to be void and unenforceable for any purpose as a matter of law:

(i)      Section 15 (Indemnification) of the Master Lease Agreement to the extent it purported to require Plaintiffs, as Lessee to "indemnify and hold Lessor harmless from and against any and all claims (including without limitation negligence, tort and strict liability), damages, suits, administrative and legal proceedings, and any and all costs and expenses in connection therewith (including attorney fees incurred by Lessor and Lessor's internal costs either in enforcing this indemnity or in defending against such claims), arising out of or in any manner connected with or resulting from the Lease, or use of the Property including, without limitation the manufacturer, purchase, financing, ownership, ordering, installation, selection, assignment, rejection, non-delivery, transportation, delivery, possession, use, operation, maintenance, condition, lease, return, storage or disposition thereof, including, without limitation . . . (d)claims for wrongful, negligent or improper action or misuse by Lessor;"

(ii)     Acceptance Certificate to Lease Schedule No. 001 provides at Section 1, "in consideration for being allowed to commence the Lease, Lessee releases Lessor from any and all liability associated with the Master Progress Funding Agreement dated November 15, 2019 (the "Progress Funding Agreement") and all actions taken by Lessor up to the date hereof, and waives all rights to any and all future claims, including, but not limited to, claims for fraud, misrepresentation or economic loss resulting from the progress funding."

197.    The effect of the referenced provisions in Section 15 of the Master Lease Agreement and the Acceptance Certificate to Lease Schedule No. 001 is to indemnify and release Axos from its own acts of fraud, misrepresentation, and intentional misconduct in violation of the

60

public policy of Utah, is unconscionable under Utah law, and is against the public policy embodied in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

198.    Pursuant to 28 U.S.C. §2201(a), the Court can and should declare the referenced provisions in Section 15 of the Master Lease Agreement and the Acceptance Certificate to Lease Schedule No. 001 are unconscionable under Utah law and are against the public policy embodied in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

**WHEREFORE**, Plaintiffs demands judgment against Axos as follows:

(a)    The referenced provisions in Section 15 of the Master Lease Agreement are declared to be void and unenforceable as a matter of law; and

(b)    The referenced provision of the Acceptance Certificate to Lease Schedule No. 001 is void and unenforceable as a matter of law.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury on all issues so triable.

DATED this 24th day of February, 2021.


GOEBEL ANDERSON PC


*/s/ Sam Meziani*
Heidi G. Goebel
Sam Meziani

KANG HAGGERTY & FETBROYT LLC

Edward T. Kang (*Pro Hac Vice*)
Gregory H. Mathews (*Pro Hac Vice*)
Susan Moon O (*Pro Hac Vice*)
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory H. Mathews, hereby certify that on February 24, 2021, a true and correct copy of the Amended Complaint has been electronically filed as of this date and can be viewed and/or downloaded through the ECF system maintained by the Clerk of the United States District Court for the District of Utah. The following have been served via ECF Notification:

James D. Gilson & Lyndon R. Bradshaw
Dentons Durham Jones Pinegar P.C.
111 South Main Street, Suite 2400,
 Salt Lake City, UT 84111
lyndon.bradshaw@dentons.com
james.gilson@dentons.com

Robert Tee Spjute
Shumay Van
8 East Broadway, Suite 550
Salt Lake City, Utah 84111
Ph: (801) 478-8080
tee@shumwayvan.com

Sean N. Egan
South Temple Tower – Suite 1505
136 East South Temple
Salt Lake City, Utah 84111-1152
seannegan@sneganlaw.com

By:  */s/Gregory H. Mathews*
        Gregory H. Mathews