IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| 100 MOUNT HOLLY BYPASS, MILES TECHNOLOGIES, and CHRISTOPHER MILES,<br><br>Plaintiffs,<br><br>v.<br><br>AXOS BANK, GREGORY GARRABRANTS, BARRY GORDON JR., KRISTIN PHILLIPS, JEFF PISTORIUS, TECHNICAL EQUIPMENT FINANCE, LEIGH EVERETT DORAND, NEW JERSEY CLEAN ENERGY SOLUTIONS d/b/a SOLAR EXPERTS, DAVID J. WIDI SR., and DAVID WIDI JR.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS TO DISMISS<br><br><br><br>Case No. 2:20-CV-856-TS-CMR<br><br>District Judge Ted Stewart |

Plaintiffs sue Defendants under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* and for numerous state common-law causes of action for Defendants' alleged roles in a complex equipment leasing scheme.[1] Defendants have filed various motions to dismiss.[2] For the reasons below, the Axos Defendants' motion to dismiss will be granted as to the breach of contract claim but otherwise denied. All the other motions to dismiss will be denied.

---

[1] Am. Compl., Docket No. 50.

[2] Solar Defs' Mot., Docket No. 52; Axos Defs' Mot., Docket No. 53; Garrabrants and Phillips' Mot., Docket No. 54; TechEFI Defs' Mot., Docket No. 55.

# I.   BACKGROUND

A.  The Parties[3]

1.  Plaintiffs

100 Mount Holly Bypass, LLC ("Mount Holly") is a New Jersey LLC that owns a large commercial building in Lumberton, New Jersey. Miles Technologies, Inc. ("Miles Tech") is a New Jersey corporation that occupies part of the building. Christopher Miles is the sole member of Mount Holly, the president of Miles Tech, and a New Jersey resident.

2.  Defendants

a.   "Solar Defendants"

New Jersey Clean Energy Solutions, LLC d/b/a Solar Experts ("Solar Experts") is a New Jersey LLC that sells and installs solar energy systems in New Jersey. David J. Widi, Sr. ("Widi Sr.") is a New Jersey resident and the president and CEO of Solar Experts. David Widi, Jr. ("Widi Jr.") is a New Jersey resident and Solar Experts' Director of Marketing and Sales.

b.   "Axos Defendants"

Axos Bank ("Axos") is a federally chartered Federal Savings Association with an office in Cottonwood Heights, Utah. It is a wholly owned subsidiary of Axos Financial, Inc. ("Axos Financial"), a Delaware corporation with corporate headquarters in Nevada. Gregory Garrabrants, a citizen of California, is the president and CEO of both Axos and Axos Financial. Jeff Pistorius is a Utah citizen and Senior Relationship Manager for Axos. Barry Gordon is a Utah citizen, Vice President of Equipment Leasing for Axos, and Pistorius's immediate supervisor. Plaintiffs allege

---

[3] Am. Compl. ¶¶ 3–15.

Kristin Phillips is a Utah citizen,[4] but Phillips avers she now resides in California and works out of Axos's San Diego office. Phillips is Axos's Vice President for Documentation.

c. "TechEFI Defendants"

Tech Equipment Finance, LLC ("TechEFI") is an Arizona LLC with a business address in Nevada.[5] TechEFI is in the business of equipment leasing and finance and allegedly acted as an agent of Axos.[6] Everett Dorand is the managing member of TechEFI who allegedly conducted business from Nevada and was an agent of Axos.[7]

B. The Alleged RICO Scheme

Plaintiffs allege that Defendants participated in a scheme to defraud, extort, and steal by selling and financing rooftop solar energy systems. Plaintiffs allege that Gordon, supported by Garrabrants, concocted a scheme whereby Solar Defendants would market systems that purchasers could finance with what the purchasers believed to be low- or no-interest loans from Axos, brokered by TechEFI Defendants for a fee.[8] Defendants would then, through a series of misrepresentations, steer the customers into signing leases (not loans) that stripped customers of their contractual rights against Solar Experts and locked customers into paying exorbitant and perpetual "service charges" to Axos that constituted *de facto* interest at a ruinous rate.[9]

---

[4] Declaration of Kristen Phillips ("Phillips Decl.") ¶¶ 2–3, Docket No. 54-2.

[5] Am. Compl. ¶ 10.

[6] *Id.*

[7] *Id.* ¶ 11.

[8] *Id.* ¶¶ 132–33.

[9] *Id.* ¶ 133.

1.   Purchase Agreement (Solar Experts and Plaintiffs)

Plaintiffs allege that they fell victim to the scheme when, in July 2019, Miles Tech contacted Solar Experts about purchasing a solar energy system (the "system") for the roof of their building.[10] Plaintiffs allege that Widi Jr. and others misrepresented relevant facts during those initial discussions, including that the building could support 4,000 panels and that roof penetrations would not be necessary.[11] Solar Defendants and TechEFI sent Plaintiffs a proposal for purchase and installation of a SunPower solar energy system for a total purchase price of $3,819,700, payable over seven years with a 2% interest rate.[12] Axos, acting through Gordon and Pistorius, allegedly approved the proposal.[13] On July 12, 2019, Dorand and Widi Jr. contacted Miles stating that he must immediately pay TechEFI $25,000 to "lock in" the 2% interest rate.[14] Widi Jr. drove to Miles' home to pick up a personal check for $25,000.[15] TechEFI Defendants then asked Plaintiffs to provide extensive financial information to obtain approval for a loan.[16]

On July 24, 2019—after Plaintiffs paid the $25,000 to TechEFI but before any financing agreement was in place—Plaintiffs and Solar Experts entered into the "Purchase Agreement," which contained, *inter alia*, the following terms:

- Plaintiffs will pay a total purchase price of $3,819,700 with the final disbursement "when System Installed to Engineered Plans and Operational."
- The components of the system were to be delivered by the manufacturer by October 14, 2019, and Solar Experts would complete the installation in accordance with the plans by an estimated date of December 31, 2019.

---

[10] *Id.* ¶ 17.

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 18.

[13] *Id.*

[14] *Id.* ¶ 19.

[15] *Id.* ¶ 20.

[16] *Id.* ¶ 36.

- Solar Experts will "promptly correct work that does not conform to this Agreement and to the Engineered Plans" and bear the costs of such remediation.
- Solar Experts will submit documentation necessary to enroll in the state's Solar Renewable Energy Certificates program, obtain net-metering benefits from the local utility, and allow Plaintiffs to claim a federal tax credit.
- At all times, as between Solar Experts and Plaintiffs, Plaintiffs will own the system and the electricity it generated.
- Plaintiffs may assign and convey all their rights and interest in the Purchase Agreement to a third party.[17]

   2.  Lease (Axos and Plaintiffs)

On October 10, 2019, Dorand and Solar Experts provided Plaintiffs with two financing options, allegedly provided by Axos: the prior offer of a seven-year 2% option and a new five-year 0% option.[18] The documents they provided stated that the new five-year 0% option required "no capital investment" and the total cost would be $3,819,700 ("includes interest") with monthly payments of $63,662.[19] Miles selected the five-year 0% option that day.[20] Defendants allegedly did *not* tell Miles that the financing would be a lease, not a loan, and that it would require Plaintiffs to pay interest on the price of the system in the form of "service charges" *before* the term of that lease would begin.[21] Defendants also did not tell Plaintiffs that Solar Experts directed SunPower (the equipment supplier) to invoice Axos for the cost of the equipment that same day, despite the lack of any agreement yet between Plaintiffs and Axos that would have authorized this.[22]

On October 15, 2019, TechEFI Defendants sent a term sheet (the "Conditional Lease Proposal") signed by Pistorius requiring Plaintiffs to pay Axos a $63,662 deposit, which included

---

[17] *Id.* ¶¶ 24–38; Purchase Agreement §§ 3, 5, 7–8, Docket No. 50-4.

[18] Am. Compl. ¶ 37; Am. Compl. Ex. 5.

[19] Am. Compl. ¶ 38; Am. Compl. Ex. 5.

[20] Am. Compl. Ex. 5.

[21] Am. Compl. ¶ 38.

[22] *Id.* ¶ 39.

a $2,000 charge for the credit approval process.[23] The document also referred to a "Lease Rate Factor," which apparently confused Miles, who asked for clarification.[24] Dorand stated in response that it was "all legaleze [sic] in the event the loan carried an interest rate which it doesn't. The rate is fixed and does not adjust on this loan. That is the payment for the entire term."[25] Defendants allegedly did not explain that the Lease Rate Factor would be used to calculate a daily pro rata service charge *before* the lease (not loan, as Dorand stated) would begin, pursuant to a "Progress Funding Facility" that was referenced in the documents but not provided to Plaintiffs at that time.[26]

Over the next month, TechEFI Defendants continued to request and receive financial information from Plaintiffs purportedly to obtain approval of the "loan" by Axos.[27] On November 12, 2019, Plaintiffs asked Dorand about the status of the "loan" documents and were told they were "in the works."[28] Plaintiffs also asked how the disbursement of funds would work, and Dorand responded that funds would be paid to the installer only when Miles provided "a specific verbal ok, directly to the bank."[29] Dorand allegedly failed to tell Plaintiffs that this would be a lease, not a loan, and that funds would be released not on Miles' verbal assent but on Miles signing certificates containing certain representations, examples of which were not provided to Miles at that time.

---

[23] *Id.* ¶ 40.

[24] *Id.* ¶ 41; Am. Compl. Ex. 8.

[25] *Id.* ¶ 41; Am. Compl. Ex. 8.

[26] *Id.* ¶ 42; Am. Compl. Ex. 7.

[27] Am. Compl. ¶ 44.

[28] *Id.* ¶ 45; Am. Compl. Ex. 9.

[29] Am. Compl. Ex. 9.

Also on November 12, 2019, Phillips told Plaintiffs she had received an invoice from Solar Experts for a $2,200,705 deposit on the system.[30] However, the invoice she referenced was dated November 18, 2019—six days later. Furthermore, Plaintiffs had not yet signed any agreement with Axos, yet Solar Experts had sent the invoice to Axos instead of Plaintiffs.[31]

On Friday, November 15, 2019, Axos provided the final lease documentation to Solar Experts.[32] Widi Jr. encouraged Miles to sign and return the documents by the end of that day, telling Miles that if he did not do so he would lose his delivery date with SunPower, further delaying the project.[33] However, Axos did not send Plaintiffs the lease documents that day, so Miles did not sign until the following week.[34]

On November 18, 2019, Plaintiffs finally received the following documents (together, the "lease documents"):

- Master Lease Agreement between Axos and Plaintiffs,[35] which sets forth the general terms of the agreement by which Plaintiffs pay monthly rental installments over five years and then purchase the system for one dollar. The document, *inter alia*,
    - requires Plaintiffs to pay "as rent for use of the Property, aggregate rentals equal to the sum of all the Monthly Rentals (as defined in the Schedule) and other payments due under the Lease for the entire Initial Period" (defined in the Schedule as the five years following the Commencement Date);[36]
    - provides two ways to commence the lease term: Plaintiffs could sign an "Acceptance Certificate" or, where there was a "Master Progress Funding Agreement," Lessor could commence the lease at a date in its discretion on or after the most recent Authorization under the Master Progress Funding Agreement;[37]

---

[30] *Id.* ¶ 46; Am. Compl. Ex. 10.

[31] Am. Compl. ¶ 46; Am. Compl. Ex. 11.

[32] Am. Compl. ¶ 47.

[33] Am. Compl. Ex. 16.

[34] Am. Compl. ¶¶ 47, 55.

[35] Master Lease Agreement, Am. Compl. Ex. 13.

[36] *Id.* § 4.

[37] *Id.* § 6(a).

o  defines "Master Progress Funding Agreement" as "[a]n agreement under which (i) Lessee accepts items of Property by signing an Authorization, (ii) Lessor agrees to purchase said items of Property, and (iii) Lessee agrees to pay service charges, all prior to the [commencement of the lease term]";[38]

o  transfers ownership to Axos; states Plaintiffs will have no right, title, or interest therein; and transfers to Axos all right, title, and interest free and clear of all liens, security interests, and encumbrances;[39]

o  requires Plaintiffs to notify Axos immediately of damage or loss to the property;[40]

o  disclaims any warranty or liability on Axos's part, requires Plaintiffs to indemnify Axos, and waives any and all rights Plaintiffs might have under the Utah Uniform Commercial Code or other laws "[t]o the extent permitted by applicable law";[41]

o  proclaims Plaintiffs' obligations absolute and the contract non-cancelable;[42]

o  places all the risk of "theft, damage, non-delivery or destruction" on Plaintiffs and requires them to repair or replace any damaged property;[43]

o  states that Plaintiffs will be in default if, *inter alia*, they "fail to sign . . . any document or record requested by [Axos] in connection with" the lease, or "fail to do anything determined by [Axos] to be necessary or desirable to effectuate the transaction contemplated by" the lease;[44]

o  includes an integration clause stating that "EACH LEASE, TOGETHER WITH THE ACCEPTANCE CERTIFICATE AND MASTER PROGRESS FUNDING AGREEMENT (AND AUTHORIZATIONS THEREUNDER), IF APPLICABLE . . . SHALL SUPERSEDE ALL PRIOR COMMUNICATIONS, REPRESENTATIONS, AGREEMENTS, AND UNDERSTANDINGS, INCLUDING BUT NOT LIMITED TO OFFER LETTERS, PROPOSAL LETTERS, COMFORT LETTERS, COMMITMENT LETTERS AND THE LIKE, AND CONSTITUTE THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE LESSOR AND LESSEE WITH REGARD TO THE SUBJECT MATTER HEREOF AND THEREOF, AND THERE IS NO UNDERSTANDING OR AGREEMENT, ORAL OR WRITTEN, WHICH IS NOT SET FORTH HEREIN OR THEREIN";[45]

o  identifies Utah as the choice of forum and Utah law as the choice of law.[46]

---

[38] Master Lease Agreement Ex. A, Docket No. 50-13 at 10.

[39] *Id.* § 8(a).

[40] *Id.* §§ 8(d), 16(c).

[41] *Id.* §§ 9(a)–(b), 10, 15.

[42] *Id.* § 10.

[43] *Id.* § 12.

[44] *Id.* § 16(j).

[45] *Id.* § 20(a).

[46] *Id.* § 20(d).

- <u>Lease Schedule No. 001</u>,[47] which incorporates the terms of the Master Lease Agreement and supersedes it. The document, *inter alia*:
  - o states that the monthly rental will be $63,662;
  - o states that the total cost will not exceed $3,819,700;
  - o defines the "Lease Rate Factor" as 0.016666754;
  - o authorizes Axos to electronically transfer monthly rental payments "and other monies due under this Schedule" from Plaintiffs' bank account.
- <u>Master Progress Funding Agreement</u> between Axos and Plaintiffs,[48] by which Axos agrees to make payments against the purchase price for items of property that will eventually be the subject of the lease. The document, *inter alia*:
  - o provides that Axos will make payments ("Progress Payments") against the purchase price for items as directed by Plaintiffs in "Partial Acceptance and Authorization for Progress Payment Certificates";
  - o assigns Plaintiffs' right, title, and interest in such items to Axos;
  - o assigns Plaintiffs' purchase orders and contracts to Axos;
  - o assigns all risk of loss and liability to Plaintiffs;
  - o requires Plaintiffs to pay a daily pro-rata "service charge" "in consideration of each Progress Payment," provides the formula for calculating the charges, and specifies that the charges will continue until the property is finally accepted by Plaintiffs as evidenced by execution and delivery of the "Acceptance Certificate";
  - o states that if Plaintiffs do not sign the Acceptance Certificate within three months after the first Progress Payment, Axos may commence the lease for the items paid under the Progress Payments.
- <u>Authorization for Pre-Authorized Payments</u>,[49] or "ACH Authorization," by which Plaintiffs authorize Axos to make electronic withdrawals from their bank account "for all rental payments and other sums required to fulfill Lessee's contractual obligation under the Master Lease and the Lease Schedules." Plaintiffs may cancel the authorization upon written notice to Axos.

Miles allegedly felt some pressure to sign immediately. Widi Jr. told Miles that if funding from Axos did not come through right away then Miles would have to front $1.4 million to pay SunPower or lose its place in SunPower's line, further delaying the project.[50] Miles signed the documents the day he received them.

---

[47] Am. Compl. Ex. 12.

[48] Am. Compl. Ex. 14.

[49] Am. Compl. Ex. 15.

[50] Am. Compl. Ex. 16.

3.   Progress Funding Phase and Service Charges

A few days later, on November 21, 2019, Axos presented Plaintiffs with two Partial Acceptance Certificates authorizing it to pay out approximately $1.4 million to SunPower and $1.4 million to Solar Experts under the Master Progress Funding Agreement.[51] Miles signed the certificates and Axos wired the funds to the recipients the next day.[52]

On December 10, 2019, Miles emailed Pistorius asking him to explain several ACH drafts on his bank statement, including a charge of $12,355.31 labeled "BOFI FBO LEASING."[53] Pistorius explained that this was the "progress funding fee" on the amount Axos disbursed in November.[54] Miles replied, "please explain the funding fee. No one ever explained it to me."[55] Pistorius did not reply to that query.[56]

Meanwhile, it must have been clear that the estimated December 2019 completion date would not be met. Progress on the installation was slow. Worse, within months, the still-uncompleted system began to cause problems with the building's roof, including leaks into the occupied spaces below.[57] By mid-2020, Plaintiffs concluded that Solar Experts had not properly installed the system and was not remediating noted problems. When in June 2020 Pistorius asked Miles to sign for the final disbursement to Solar Experts and to sign a final Acceptance Certificate so that the lease term could commence, Miles replied that "[t]he project is NOT complete, NOT

---

[51] Am. Compl. Exs. 17 and 18.

[52] Am. Compl. Ex. 19.

[53] Am. Compl. Ex. 19.

[54] *Id.*

[55] *Id.*

[56] Am. Compl. ¶ 61.

[57] Am. Compl. Exs. 23–29.

up and running, and NOT producing energy."[58] He indicated he would not authorize the final payment to Solar Experts or sign the final Acceptance Certificate until he had verified the "safety, compliance, and completion of the project."[59] In or after late July 2020, Widi Jr. appeared at Miles' office demanding payment and informing Miles that he was only hurting himself because as long as he refused to pay Solar Experts he would have to continue paying monthly service charges to Axos.[60] It was at this point that Miles realized that the large monthly payments he had been making—described on statements as "leasing" payments—were not, in fact, payments on the lease.[61]

Between July and September 2020, Plaintiffs continued to notify Solar Experts and Axos of serious problems with the system that they identified themselves or that had been identified by both the contractor's own engineer and Plaintiffs' consulting engineer.[62] Plaintiffs told Axos not to make the last disbursement of about $545,000 to Solar Energy and indicated that they intended to hire another contractor to finish the project.[63] Axos did not make the disbursement but also told Plaintiffs it would not consent to hiring another contractor because it feared Solar Experts would file a mechanic's lien against the equipment that would put its security interest in the equipment at risk.[64] Solar Experts allegedly continued to falsely maintain and to represent to Axos that the project was in fact complete and properly installed and then abandoned the project.[65]

---

[58] Am. Compl. Ex. 24.

[59] Am. Compl. ¶ 69; Am. Compl. Ex. 24.

[60] Am. Compl. ¶ 73.

[61] *Id.*

[62] Am. Compl. ¶¶ 70–88; Am. Compl. Exs. 26, 28–29.

[63] Am. Compl. Exs. 33 and 37.

[64] Am. Compl. ¶ 108; Am. Compl. Ex. 35.

[65] Am. Compl. ¶¶ 78, 84, 95, 103.

Meanwhile, Axos continued to invoice service charges of nearly $50,000 per month. When Miles discovered he had been paying monthly service charges instead of lease payments, he terminated the ACH Authorization and sought a settlement with Axos. Axos purportedly agreed to commence the lease early, freeing Plaintiffs of the monthly service charges. Axos issued invoices showing service charges through September 2020 and then lease payments for October 2020 through January 2021, which Plaintiffs paid.[66] However, Axos also informed Plaintiffs that it would not commence the lease until Plaintiffs signed a final Acceptance Certificate which, among other things, would have unconditionally accepted the property, affirmed that it was free and clear of liens, and released Axos from liability.[67] Plaintiffs refused to do so, stating that they could not affirm that the project was complete and unencumbered because it was not.[68] Axos therefore withdrew the agreement to commence the lease and returned the project to the funding phase, recharacterizing the lease payments Plaintiff had already made as service charges.[69]

Defendants' alleged house of cards finally collapsed around Plaintiffs in late 2020. Solar Experts had failed to pay its sub-contracted electrician, Cooper Electric, even though Axos had allegedly disbursed funds to Solar Experts for that purpose.[70] In October 2020, Cooper Electric filed a construction lien against the property.[71] In December 2020, Plaintiffs unsuccessfully requested that Axos pay the lien amount.[72] Cooper Electric initiated a collections action against

---

[66] *Id.* ¶¶ 96–99, 102, 113; Am. Compl. Ex. 32.

[67] Am. Compl. ¶ 100; Am. Compl. Exs. 34, 35.

[68] Am. Compl. Ex. 31.

[69] Am. Compl. ¶ 126; Am. Compl. Ex. 46.

[70] Am. Compl. ¶ 115.

[71] Am. Compl. Ex. 33.

[72] Am. Compl. ¶ 115.

Solar Defendants in December 2020[73] and a separate action on the construction lien against Mount

Holly, Miles Tech, Solar Experts, Axos, and unnamed others in January 2021.[74] On December 5,

2020, Solar Experts filed a construction lien against the property as well, allegedly falsely asserting

that the work had been completed on November 10, 2020.[75] The lien documentation also included

an allegedly fabricated invoice to Mount Holly for the lien amount; Plaintiffs assert they never

received such an invoice and that all invoices had been directed to Axos.[76]

Plaintiffs sued in this court on December 4, 2020[77] and amended their complaint on

February 24, 2021.[78] Axos Defendants, Solar Defendants, Garrabrants and Phillips, and TechEFI

Defendants all submitted motions to dismiss on March 10, 2021.[79] The motions are now fully

briefed and ready for resolution.

## II. DISCUSSION

### A.  Axos Defendants' Motion to Dismiss

Axos Defendants move to dismiss all the claims against them for failure to state a claim

under Fed. R. Civ. P. 12(b)(6). They also argue that because Plaintiffs fail to state a federal claim,

the state-law claims should be dismissed for lack of subject-matter jurisdiction under Fed. R. Civ.

P. 12(b)(1). Because the Amended Complaint adequately pleads the RICO claims and most of the

state-law claims, the motion will be denied in part. The court will grant the motion only as to the

breach of contract claim.

---

[73] Case No. MID-L-008532-20 (Sup. Ct. N.J., filed December 11, 2020), Docket No. 50-41.

[74] Case No. BUR-L-000019-21 (Sup. Ct. N.J., filed January 5, 2021), Docket No. 50-48 at 67.

[75] Am. Compl. ¶ 119.

[76] *Id.* ¶ 120.

[77] Docket No. 2.

[78] Docket No. 50.

[79] Docket Nos. 52, 53, 54, 55.

1. Motion to Dismiss Standard

When evaluating a complaint under Rule 12(b)(6), the court accepts all well-pleaded factual allegations, as distinguished from conclusory allegations, as true and views them in the light most favorable to the non-moving party.[80] The plaintiff must provide "enough facts to state a claim to relief that is plausible on its face,"[81] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[82] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[83]

2. RICO Claims (Counts I–IV)

"'RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct.'"[84] It encompasses many traditional common-law fraud claims "if the requisite pattern and entity requirements are met. The Mafia, of course, is the quintessential racketeering enterprise, but normal businesses can also fall under" RICO.[85] 18 U.S.C. § 1692(c) and (d) provide:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

---

[80] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[81] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[82] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[83] *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).

[84] *Robert L. Kroenlein Trust* ex rel. *Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

[85] *Id.*

In short, "[a] RICO plaintiff must prove '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity'"[86] or conspiracy to do the same. For clarity, the court will address the elements in a different order than they appear in the statute.

    a.   Enterprise

Section 1961(4) of RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The Supreme Court has emphasized that "enterprise" should be read broadly.[87] Where the alleged enterprise is an "association-in-fact"—that is, comprised of actors not formally or legally affiliated with one another—the enterprise must have (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose."[88] Here, Plaintiffs adequately allege an enterprise both as a legal entity (Counts I and II) and as an association-in-fact (Counts III and IV).

Count I alleges that Axos is an enterprise, and as a legal entity it clearly is so under the statutory definition. Axos Defendants argue that Axos cannot be an enterprise because the non-Axos Defendants were not allegedly involved in Axos's business separate from the racketeering activity and there are not sufficient allegations about Axos's control over the non-Axos Defendants. This is irrelevant to whether Axos was an enterprise; whether the other defendants participated in that enterprise is a separate question, discussed below.

---

[86] *Id.*

[87] *Boyle v. United States*, 556 U.S. 938, 949 (2009) (contrasting a RICO "enterprise" with other statutes that target organized crime, which define the relevant organizations with more specificity); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) (defining an association-in-fact as "a group of persons associated together for a common purpose of engaging in a course of conduct").

[88] *Boyle*, 556 U.S. at 946.

Axos Defendants also protest that Axos cannot be an enterprise because it is also a defendant. They point to case law stating that there must be a "defendant person" who is "an entity distinct from the alleged enterprise" who must have associated with or participated in the enterprise and its activities.[89] But Plaintiffs have alleged exactly that: Defendants Garrabrants, Gordon, Phillips, Pistorius, NJCES, Widi Sr., Widi Jr., TechEFI, and Dorand all allegedly participated in the conduct or affairs of the alleged Axos enterprise.

Count III alleges an association-in-fact enterprise consisting of all the Defendants. Plaintiffs clearly allege the enterprise's purpose: to defraud customers with a bait-and-switch scheme, steering them into a purchase contract and then a financing contract that would deprive them of their rights under the purchase contract yet require them to continue to make payments under the financing contract. Plaintiffs also clearly define the relationships among the Defendants—Solar Defendants were the contractors/vendors, TechEFI Defendants were the brokers, and Axos Defendants were the financers. And Plaintiffs adequately allege longevity: the alleged scheme to defraud Plaintiffs has lasted  two years—from mid-2019 to the present—and Defendants said they had done similar deals in the past.[90] Thus, the Amended Complaint pleads an association-in-fact enterprise.

Axos Defendants challenge the sufficiency of Plaintiffs' allegations about the structure of the association-in-fact enterprise, asserting lack of clarity about the hierarchy and decision-making structure and about Gordon's alleged leadership.[91] Axos Defendants rely on outdated case law. In

---

[89] Axos Defs' Mot. at 10 n.8 (citing *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998)); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

[90] Am. Compl. ¶ 32.

[91] Axos Defs' Mot. at 11 (citing *United States v. Sanders*, 928 F.2d 940, 943–44 (10th Cir. 1991)).

2009, the Supreme Court rejected lower courts' attempts to impose such specific requirements on the enterprise inquiry in favor of the three-part test outlined above, which Plaintiffs satisfy.[92] Axos Defendants also argue that the Amended Complaint's factual allegations about the enterprise are conclusory.[93] On the contrary, the factual allegations are detailed and plausible, and at this stage, the court accepts them as true.

In sum, Plaintiffs adequately allege both an enterprise and an association-in-fact enterprise.

b.   Racketeering Activity

Section 1961 of RICO defines "racketeering activity" to include any of a long list of "predicate acts."[94] Among others, these include some state-law felonies and acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1512 (tampering with a witness, victim, or an informant), and 1952 (racketeering).

The Amended Complaint specifically alleges predicate racketeering acts by all the Axos Defendants, including the following:

- October 10, 2019: Gordon, Pistorius, and others prepared, approved, or transmitted an email containing false and misleading information (wire fraud).
- October 15, 2019: Garrabrants, Gordon, and Pistorius prepared, approved, or authorized a Commercial Lease Proposal emailed to Plaintiffs containing false and misleading information and falsely represented the meaning of terms in the proposal (wire fraud).
- November 12, 2019: Phillips sent an email falsely representing that Axos had received an invoice from Solar Experts for a $2,200,705 deposit (wire fraud).
- November 17, 2019: Garrabrants, Gordon, and Pistorius approved, authorized, and directed the mailing of lease documents containing false and misleading representations (mail fraud).

---

[92] *Boyle*, 556 U.S. at 947–49; *United States v. Hutchinson*, 573 F.3d 1011, 1019–22 (10th Cir. 2009) (explaining that, after *Boyle*, "an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity.").

[93] Reply on Axos Defs' Mot. at 5, Docket No. 65 (citing *D. Penguin Bros. Ltd. V. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014)).

[94] 18 U.S.C. § 1961(1) (defining "racketeering activity"); *see also Kroenlein Trust*, 764 F.3d at 1274.

- November 18, 2019: Axos, Gordon, Pistorius, and Phillips falsely represented that the ACH Authorization would be used to withdraw monthly lease payments from Plaintiffs' bank account (wire fraud).
- November 21, 2019: Gordon, Phillips, and Pistorius approved, authorized, and directed the transmission by email of two certificates of "Partial Acceptance and Authorization for Progress Payment" payable to SunPower (wire fraud).
- November 21, 2019: Gordon and Pistorius told Miles that Solar Experts had a strong balance sheet and that Axos had previously done a number of similar sized commercial transaction with Solar Experts (wire fraud).
- December 10, 2019: Pistorius falsely represented by email the nature of an ACH charge and ignored Plaintiffs' request to explain the "funding fee" (wire fraud).
- December 2019–July 2020: Axos improperly made monthly service charges against Plaintiffs' ACH Authorization, misleadingly describing them as "Leasing Payments" (wire fraud and bank fraud).
- June 24–26, 2020: Phillips, Pistorius, and Gordon sent or directed a series of emails and voicemails demanding that Plaintiffs make final payment to Solar Experts and sign an acceptance certificate containing false information together with a general release, while falsely representing that the system had been "inspected by the state" and making other false statements (wire fraud).
- August 12, 2020: Gordon and Pistorius left a voicemail falsely representing that Plaintiffs' termination of the ACH Authorization was an event of default under the Master Lease Agreement (wire fraud).
- August 13, 2020: Gordon and Pistorius left a voicemail falsely representing that Axos had "put out almost four million dollars" and that the service charges were "not even 4%" (wire fraud).
- August–September, 2020: Garrabrants, Gordon, Pistorius, Phillips, and others participated in telephone calls in an effort to induce Plaintiffs to pay the balance of the purchase price notwithstanding the many known deficiencies (wire fraud).
- September 25, 2020: Garrabrants told in-house counsel, Gordon, and Pistorius to tell Plaintiffs that the service charges would continue until Plaintiffs paid the balance of the purchase price (wire fraud and extortion).
- October 27, 2020: Phillips, at the direction of Garrabrants, Gordon, and Pistorius, transmitted by email an Acceptance Certificate and Affirmative Letter (wire fraud).
- November 18, 2020: Gordon sent an email threatening that if Plaintiffs did not execute and return the Acceptance Certificate and Affirmation Letter "we will be forced to move payments back to progress payments until the forms are executed" (wire fraud and extortion).
- November 23, 2020: Phillips, at the direction of Garrabrants, Gordon, and Pistorius, transmitted an email threatening to return to "the progress funding phase until Miles Technologies authorizes payment for the final payment due to New Jersey Clean Energy Solutions" (wire fraud).
- January 25, 2021: Axos threatened by email to revoke the October lease activation and recharacterize the intervening five months' lease payments as service charges unless Plaintiffs signed the Acceptance Certificate (wire fraud and extortion).

- January 25, 2021: Axos's counsel transmitted to Plaintiffs' counsel bank documents purporting to be "revised" invoices converting prior invoices for lease payments into invoices for progress payments (wire fraud and extortion).[95]

Axos Defendants argue that any claim that Axos Defendants committed racketeering acts is implausible because Plaintiffs are sophisticated commercial parties, Plaintiffs themselves pursued the opportunity to purchase the system, and Plaintiffs contractually agreed to the terms of the Master Lease Agreement. But surely sophisticated parties or those who seek out goods or services or those who enter into contractual relationships can be victims of racketeering.

Axos Defendants also point out that the Master Lease Agreement contains an integration clause that renders irrelevant any statements made before or after. But an integration clause is not enforceable where there was fraud, as is alleged here, for obvious public policy reasons,[96] so this is no basis for dismissal.

Finally, Axos Defendants assert that they acted properly under the contract because the service charges Plaintiffs complain of were unambiguously spelled out in the Master Progress Funding Agreement, Plaintiffs paid the service charges and authorized Axos to make progress payments to vendors, and Plaintiffs have not yet given final acceptance of the system. These arguments might defend against a breach of contract claim but not a RICO claim. They ignore Plaintiffs' allegation that the Master Lease Agreement was part of a larger scheme to defraud that included predicate acts by Axos Defendants both before and after the lease documents were signed. An allegation that Axos was merely acting in accordance with the contract is thus no defense to the allegation of predicate acts of racketeering.

---

[95] Am. Compl. ¶¶ 62, 68–69, 76–77, 106, 127, 135.

[96] *Lamb v. Bangart*, 525 P.2d 602, 607 (Utah 1974).

c.   Conduct or Participation

The Supreme Court in *Reves v. Ernst & Young* explained that to maintain a § 1964(c) claim, a plaintiff must allege facts showing that the defendant "participate[d] in the operation or management of the enterprise itself."[97] The Tenth Circuit has clarified that "a plaintiff can easily satisfy *Reves*' operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs."[98]

Axos Defendants' primary argument for dismissal is that Plaintiffs have not sufficiently alleged acts by the defendants that would constitute participation.[99] But Plaintiffs have alleged at least one act by each Axos Defendant as described above. Each of these acts was allegedly done in furtherance of the association-in-fact's scheme to defraud, satisfying the participation requirement for Count III. As for Count I, in which the alleged enterprise is Axos, it is somewhat less clear how the non-Axos Defendants' actions worked in favor of Axos (rather than simply their own interests). However, everyone's actions allegedly contributed to locking Plaintiffs into endless exorbitant service charges to Axos. Making all reasonable inferences in favor of the Plaintiffs, the participation allegations suffice under Count I as well.

Axos Defendants protest that all their alleged actions were done in the regular course of business, arguing that this cannot constitute participation in a RICO enterprise. Axos misreads cases holding that a RICO defendant must do more than merely provide its regular goods and services that only incidentally benefit the enterprise. These cases pertain to "outsider" defendants whose actions, while helpful to the enterprise, were not done in furtherance of the alleged RICO

---

[97] *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

[98] *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1252 (10th Cir. 2016).

[99] Axos Defs' Mot. at 12–14.

scheme. For example, in *Safe Streets Alliance v. Hickenlooper*,[100] the Tenth Circuit explained that an allegation that a contractor delivered water to a marijuana grower's operation would be insufficient to show that the contractor participated in the enterprise.[101] The Tenth Circuit contrasted this with the defendants who had allegedly agreed to grow marijuana, which the court held plausibly satisfied the participation requirement.[102] Similarly, in *BancOklahoma Mortgage Corp. v. Capital Title Co.*,[103] the Tenth Circuit explained that title companies that merely provided their regular services of title insurance commitments and recording documents did not, in so doing, participate in a RICO enterprise.[104] In *Reves* itself, the Supreme Court held that an accounting firm hired to audit an organization's records did not "participate in management or operation" of the alleged enterprise, even if the audit included representations that were helpful to the enterprise.[105] According to the allegations in the Amended Complaint, the Defendants did not simply perform routine business tasks that were only incidentally helpful.[106] Each Defendant allegedly committed at least one predicate act in furtherance of the enterprise.

Axos Defendants point to one allegation that they argue cannot support the participation element because the document underlying the allegation is protected by judicial privilege.[107] Even

---

[100] 859 F.3d 865 (10th Cir. 2017).

[101] *Id.* at 884.

[102] *Id.*

[103] 194 F.3d 1089, 1100 (10th Cir. 1999).

[104] *Id.* at 1100–03.

[105] *Reves*, 507 U.S. at 185–86.

[106] *Cf. Luttrell v. Brannon*, No. 17-2137-JWL, 2018 WL 3032993, at *4 (D. Kan. June 19, 2018) ("According to plaintiff's allegations, [defendant] was not simply a disinterested party who did nothing more than supply a good that ultimately benefited the enterprise; rather, plaintiff has alleged that [defendant] joined with others in a scheme to benefit its owner.").

[107] Axos Defs' Mot. at 14.

if the document is protected, there are sufficient other alleged acts constituting participation to support the claim.

In sum, the Amended Complaint adequately pleads participation by Axos Defendants.

> d.  Pattern

The RICO statute defines a "pattern of racketeering activity" as at least two acts of racketeering activity within a ten-year period.[108] The Supreme Court has clarified that two predicate acts are necessary but not sufficient to show a pattern.[109] A pattern also requires "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."[110] Continuity requires that the predicate acts extend over a "'substantial period of time'" and that "'the predicates themselves involve a distinct threat of long-term racketeering activity . . . [or] are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise.'"[111] The court examines "both the duration of the related predicate acts and the extensiveness of the RICO enterprise's scheme."[112] The extensiveness of the enterprise's scheme is determined by considering several sub-factors: "the number of victims, the number of the racketeering acts, the variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity."[113]

---

[108] 18 U.S.C. 1961(5).

[109] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236–39 (1989).

[110] *Id.* at 239.

[111] *Tal v. Hogan*, 453 F.3d 1244, 1268 (10th Cir. 2006) (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993)).

[112] *Id.* at 1268.

[113] *Resolution Trust*, 998 F.3d at 1543–44 (internal citations omitted).

Here, the alleged predicate acts are interrelated pieces of a sophisticated scheme to defraud. The activity is also continuous. There were allegedly dozens of predicate acts occurring throughout Plaintiffs' now two-year relationship with the Defendants and they are allegedly ongoing, as Axos continues to refuse to commence the lease unless Plaintiffs essentially give up their right to a functioning system and give in to allegedly extortive demands such as releasing Axos from liability and affirming an untruth (that the project is free of liens).[114] Plaintiffs also plausibly allege that other customers are at risk of falling victim to the same racket, alleging that it received information that the Defendants had done similar deals in the past, and the structure of the alleged scheme is obviously exportable to other victims. By pleading nearly two years of prior racketeering activity and a clear threat of future racketeering activity, Plaintiffs satisfactorily plead continuity.

Axos Defendants attempt to thwart the "pattern" allegations by asserting that Plaintiffs allege a single scheme with a single result and a single victim.[115] This is an inappropriate standard: the Supreme Court firmly rejected the notion that there must be multiple "schemes" to constitute a RICO "pattern."[116] Furthermore, this is not a case that alleges "a single scheme to accomplish one discrete goal, directed at a finite group of individuals, with no potential to extend to other

---

[114] *Cf. id.* at 1544 (10th Cir. 1993) (finding that, where scheme was extensive, between seven and eighteen months was sufficient duration to show continuity for RICO purposes); *United States v. Smith*, 413 F.3d 1253, 1270–72 (10th Cir. 2005) (finding five criminal acts over a three-year period sufficiently continuous for RICO purposes); *Wade v. Gaither*, 623 F. Supp. 2d 1277, 1286 (D. Utah 2009) (finding that two or three instances of extortion over a period of nearly twelve months sufficient to establish continuity); *Hansen v. Native Am. Refinery Co.*, No. 2:06CV00109, 2007 WL 1108776, at *4 (D. Utah Apr. 10, 2007) ("Three and one-half years is well beyond the few weeks or months the Supreme Court [in *H.J. Inc.*] stated would be insufficient to show a threat of future criminal conduct and substantially longer than the seven to eighteen month scheme that the Tenth Circuit found satisfied the requirements of close-ended continuity in *Resolution Trust*.").

[115] Axos Defs' Mot. at 9–10.

[116] *H.J. Inc.*, 492 U.S. at 237, 240–41 (explaining that Congress intended the term "pattern" to encompass multiple predicates within a single scheme, not to require multiple schemes).

persons or entities."[117] Plaintiffs allege that Defendants have developed a method of luring victims into interrelated contracts that deprive them of their money and their contractual rights. There is obvious risk that such a scheme could turn other customers into victims. Plaintiffs have amply alleged a pattern.

Because the Plaintiffs adequately allege all the elements of a RICO claim, the motion to dismiss for failure to state a RICO claim will be denied.

e.   RICO Conspiracy

To prove a RICO conspiracy under § 1962(d), "'it suffices that [a defendant] adopt the goal of furthering or facilitating the criminal endeavor,' so long as that endeavor would, '*if completed,* . . . satisfy all the elements of a substantive criminal offense.'"[118]

Axos Defendants argue that Plaintiffs' conspiracy claims under § 1962(d) (Counts II and IV) should be dismissed because the substantive claims based on § 1962(c) are deficient.[119] However, as explained above, the § 1962(c) claims are not deficient. Axos Defendants also claim that "[t]he Amended Complaint is devoid of facts to allow the Court to reasonably infer that the Axos Defendants conspired to defraud Miles."[120] On the contrary, Plaintiffs allege facts from which the court can reasonably infer a meeting of the minds to defraud them. They allege that the Defendants "fashioned the Purchase Agreement to interface with Axos' lease documents so as to constitute an integrated written agreement"[121] and did not disclose that their plan from the

---

[117] *Pagel v. Washington Mut. Bank, Inc.*, 153 F. App'x 498, 502 (10th Cir. 2005) (citations omitted) (unpublished).

[118] *United States v. Harris*, 695 F.3d 1125, 1133 (10th Cir. 2012) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

[119] Axos Defs' Mot. at 17–18 (citing *Edwards v. First Nat'l Bank, Bartlesville, Okla.*, 872 F.2d 347, 352 (10th Cir. 1989)).

[120] *Id.* at 18.

[121] Am. Compl. ¶ 32.

beginning was for Plaintiffs to sign the Purchase Agreement under the false impression that they would own the system and commit to a financing arrangement before they understood that they would be giving up ownership.[122] A meeting of the minds is a reasonable inference from these allegations.

Plaintiffs have successfully pleaded all RICO claims against Axos Defendants and the motion to dismiss these claims will be denied.

3. State-Law Claims

Axos Defendants argue that because the Amended Complaint fails to state any RICO claim, the court lacks supplemental jurisdiction over the remaining state-law claims.[123] Because the RICO claims are adequately pleaded, dismissal of the state-law claims is not appropriate on that basis.

Axos Defendants also argue that the state-law claims should be dismissed for failure to state a claim.[124] The court will address each claim in turn.

a. Fraud (Count V)

Fraud is "a knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment."[125] The elements of fraud under Utah law are

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either *(a) knew to be false, or (b) made recklessly,* knowing that he [or she] had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his [or her] injury and damage.[126]

---

[122] *Id.* ¶ 34.

[123] Axos Defs' Mot. at 18–19.

[124] *Id.* at 19–25.

[125] *Fraud*, Black's Law Dictionary (11th ed. 2019).

[126] *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200 ¶ 12, 21 P.3d 219, 223 (citations omitted).

Axos Defendants first argue that Plaintiffs fail to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).[127] This is not so. Plaintiffs plead a long list of allegedly fraudulent acts complete with names, dates, supporting documentation, and explanations of how the acts constituted false representations that induced Plaintiffs to enter into the contracts to their detriment.[128] Axos Defendants also assert essentially that the lease documents prove there was no fraud,[129] but the lease documents cannot prove there was no fraud in the contract negotiations or the course of conduct of the contract, as Plaintiffs allege there was.

Because Axos Defendants fail to identify any basis for dismissal of the fraud claim, the motion will be denied on that claim.

### b. Civil Conspiracy (Count VI)

Axos Defendants argue that Plaintiffs fail to plausibly allege that Defendants had a meeting of the minds to defraud Plaintiffs.[130] On the contrary, as explained above, Plaintiffs allege facts from which to reasonably infer a meeting of the minds. Axos Defendants also argue that there is no basis for a conspiracy claim without any underlying tort.[131] However, since Plaintiffs adequately pleaded fraud, this argument also fails.

### c. Breach of Contract and Covenant of Good Faith and Fair Dealing (Axos) (Count VIII)

Plaintiffs sue Axos for breach of contract and the implied covenant of good faith and fair dealing.[132] Count VIII alleges that Axos

---

[127] Axos Defs' Mot. at 19.

[128] Am. Compl. ¶ 160.

[129] Axos Defs' Mot. at 19.

[130] *Id.* at 20.

[131] *Id.*

[132] Am. Compl. ¶¶ 174–77.

(i)  represent[ed] that [Solar Experts] was a capable Contractor, with which Axos was familiar from prior experience, with the financial strength and ability to complete the installation of the Solar System in accordance with the requirements of the Purchase Agreement

(ii)  charg[ed] Plaintiffs amounts not authorized by the ACH Authorization

(iii)  fail[ed] to commence the term of the lease in accordance with the Master Lease Agreement

(iv)  act[ed] in the interests of [Solar Experts] and contrary to the interests of Plaintiffs . . . by (a) insisting the project was satisfactorily completed and the balance of the purchase price was due to [Solar Experts], notwithstanding its knowledge of numerous deficiencies with the installation, and (b) insisting that Plaintiffs were not permitted to engage other contractors to satisfactorily complete the project and correct the deficiencies caused by [Solar Experts] but instead must pay only [Solar Experts] under the terms of the Lease Agreements.

Axos Defendants object that Plaintiffs do not separate the breach of contract claim from the implied covenant of good faith and fair dealing claim, arguing that this renders the claims "duplicative."[133] However, the case Axos Defendants cite does not state that the claims must be pleaded separately to be valid; rather, it states that there can be no separate claim for breach of the implied covenant where the basis for the claim is identical to the breach of contract claim.[134] That is not the case here, where the allegations clearly support a separate claim for breach of the implied covenant beyond any contractual breach, as explained below. Thus, the mere failure to separate these claims in the Amended Complaint is not fatal.

i.   Breach of Contract

Under Utah law, a breach of contract claim requires (1) the existence of a contract, (2) performance of the contract by the party asserting the claim, (3) breach of the contract by the other party, and (4) damages.[135] The existence of a contract and damages are undisputed. However, Axos

---

[133] Axos Defs' Mot. at 21 (citing *Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1111 (D. Utah 2005)).

[134] *Canopy Corp.*, 395 F. Supp. 2d at 1111.

[135] *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1151 (10th Cir. 2013) (affirming dismissal where plaintiff failed to how explain "how [defendant] breached the contract, which contractual provisions were

asserts that the Amended Complaint fails to allege that Plaintiffs performed their obligations under the lease documents or that Axos breached the contract.

The Amended Complaint lacks a clear statement that Plaintiffs fulfilled their obligations under the lease. However, the Amended Complaint clearly implies this. Plaintiffs allege that they executed an ACH Authorization as required by the lease documents; made efforts to ensure that Solar Experts paid its vendors so the property could be free of liens as required by the lease documents; notified Axos that one of Solar Experts' vendors filed a construction lien claim, as required by the contract; notified Axos when Solar Experts failed to pay another vendor's invoice; signed four Partial Acceptance and Authorization for Progress Payment Certificates pursuant to the contract; brought issues relating to the allegedly defective installation of the system to Axos's attention as required by the contract; submitted an invoice for an engineering consultation to Axos as allegedly allowed by the contract; and made all the payments the contract required and more. Furthermore, the Amended Complaint includes a copy of Plaintiffs' crossclaim against Axos in New Jersey, which alleges that they "fulfilled their obligations under the Lease Documentation."[136] The allegations asserting compliance with the lease satisfy the low bar of notice pleading on this element of the breach of contract claim.

Axos Defendants also argue that Plaintiffs do not allege Axos breached the lease. Axos is correct. Plaintiffs' allegations in Count VIII (i) (that Axos represented that Solar Experts was a capable and financially sound contractor) and (iv) (that Axos put Solar Experts' interests above Plaintiffs') are not breaches of contract because no provision of the lease documents required Axos to do otherwise. As for (iii), failure to commence the lease term was not a violation of the lease

---

violated, and how [plaintiff] upheld her end of the agreement") (citing *Bair v. Axiom Design, L.L.C.*, 2001 UT 20. ¶ 14, 20 P.3d 388).

[136] Am. Compl. Ex. 49 at 14, Docket No. 50-49 at 15.

because the lease does not require Axos to do so; it merely gives Axos the option to do so "in its sole discretion."[137]

As for (ii), Axos's use of the ACH Authorization to deduct monthly service charges did not violate the lease. The Master Lease Agreement, the Progress Funding Agreement, and Lease Schedule No. 001 all contemplate such payments. The Master Lease Agreement expressly incorporates the Progress Funding Agreement[138] and explains that under the Progress Funding Agreement "[Axos] agrees to purchase said items of Property" (payments for which are known as "Progress Payments"[139]) and "Lessor agrees to pay service charges."[140] The Progress Funding Agreement, signed the same day, explains these service charges further:

> Lessee agrees that in consideration of each Progress Payment made by Lessor pursuant to this Agreement, Lessee shall pay to [Axos] a daily pro-rata "service charge" calculated by multiplying the "Lease Rate Factor" specified in the applicable Lease Schedule times the amount of such Progress Payment divided by 30.[141]

In other words, as long as the project stayed in the funding phase, Axos was entitled to charge a fee on the money Axos laid out to build the project.

As it happened, the project stayed in the funding phase through the entirety of the relevant time period. The Master Lease Agreement identified two ways by which the project could move out of the funding phase and into the lease term. First, Plaintiffs could sign an Acceptance Certificate,[142] in which case the lease would commence on the date specified in the Acceptance

---

[137] Master Lease Agreement ¶ 6.

[138] Master Lease Agreement § 1.

[139] Master Progress Funding Agreement.

[140] Master Lease Agreement Ex. A.

[141] Master Progress Funding Agreement.

[142] Master Lease Agreement § 6(a).

Certificate so long as Axos agreed.[143] The lease did not commence this way because Plaintiffs never signed a final Acceptance Certificate. In the absence of a signed Acceptance Certificate, the Master Lease Agreement gave Axos the option to, "by written notice to Lessee," declare all Plaintiff's Authorizations under the Master Progress Funding Agreement to constitute an Acceptance Certificate and determine the Acceptance Date in its discretion, subject to certain limitations.[144] On the allegations in the Amended Complaint, Axos never issued a written notice to Plaintiffs declaring all prior Authorizations to constitute the final Acceptance Certificate. There are vague emails, some telephone calls about commencing the lease, and a letter of October 27, 2020, stating that the "Lease was recently finalized," but there is nothing in the Amended Complaint suggesting that Axos gave written notice that all prior Authorizations constituted the Acceptance Certificate. Neither party exercised its option to commence the lease, so the lease never commenced. Because the lease never commenced, the project continued in the funding phase and the payments Plaintiffs made were properly characterized as service charges rather than lease payments. Thus, charging the service fees was not a breach of contract.

Axos was also entitled to use the ACH authorization to deduct these payments. Paragraph 12 of Lease Schedule No. 001 states,

> Lessee authorizes Lessor or its assigns to electronically transfer all Monthly Rental payments and other monies due under this Schedule from Lessee's account maintained with its financial institution, and Lessee agrees to execute and deliver a written "Authorization for Pre-Authorized Payments" form to Lessor to affect such transfers.

The phrase "under this Schedule" must be read to include the Master Lease Agreement, since Lease Schedule No. 001 expressly incorporates the Master Lease Agreement, so the service

---

[143] Master Lease Agreement Ex. A.

[144] Master Lease Agreement § 6(a).

charges can be said to be "other monies due under this Schedule." The actual ACH Authorization states that Axos may make electronic debit payments "for all rental payments and other sums required to fulfill Lessee's contractual obligation under the Master Lease and the Lease Schedules."[145] Since Plaintiffs were contractually obligated to pay the service charges, it was no violation of the authorization for Axos to deduct them. In short, Axos's charging of the monthly service fees was not a breach of contract.

Because Plaintiffs have not identified any breach of contract by Axos, the motion to dismiss will be granted on the breach of contract claim.

### ii. Covenant of Good Faith and Fair Dealing

Both the Utah Uniform Commercial Code and Utah common law impose a covenant of good faith and fair dealing in all contractual relationships.[146] "Under the covenant of good faith and fair dealing, each party promises not to intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract, and to comply, a party must act consistently with the agreed common purpose and the justified expectations of the other party."[147] The reasoning underlying this duty is that "'no one would reasonably accede to a contract that left him vulnerable to another's opportunistic interference with the contract's fulfillment.'"[148] In evaluating a potential breach of the implied covenant, "both the contract language and the course of dealings between the parties should be considered to determine the parties' purpose, intentions, and expectations."[149]

---

[145] Am. Compl. Ex. 15.

[146] Utah Code Ann. § 70A-1a-304; *Blakely v. USAA Cas. Inc. Co.*, 633 F.3d 944, 947 (10th Cir. 2011); *Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876.

[147] *Rawson*, 2001 UT 24, ¶ 44 (internal quotation marks and citations omitted).

[148] *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 9, 266 P.3d 814.

[149] *Rawson*, 20 P.3d at 885.

Here, the "agreed common purpose" of this contract was to finance Plaintiffs' purchase of the system. Axos allegedly refused to do what was necessary to get the system installed satisfactorily and refused to commence the lease on good-faith terms when the installation problems dragged on, requiring Plaintiffs to make massive service charges each month instead of making payments on the lease. The lease documents—which Axos drafted—granted Axos discretion to declare the prior Authorizations sufficient and commence the lease if Plaintiffs did not sign a final Acceptance Certificate. Axos not only refused to do so but insisted that Plaintiffs sign a final Acceptance Certificate that was against Plaintiffs' interests in material respects. Construed in the light most favorable to Plaintiffs, the allegations not only plead breach of the implied duty but exemplify the reason the duty exists.[150] The motion to dismiss will be denied on this claim.

### d.  Breach of Fiduciary Duty (Count IX)

A fiduciary relationship is one which "imparts a position of peculiar confidence placed by one individual in another. . . . Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary."[151] "There is no invariable rule which determines the existence of a fiduciary relationship, but . . . there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."[152]

---

[150] *See generally* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369 (1980).

[151] *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (internal quotation marks and citation omitted).

[152] *Id.* (internal quotation marks and citation omitted).

Axos argues that the breach of fiduciary duty claim should be dismissed because the parties to a contract do not share a fiduciary relationship and there is no fiduciary relationship between a lender and a borrower.[153] However, Plaintiffs do not allege either of these relationships as the basis for the fiduciary duty. Rather, Plaintiffs argue that Axos's status as the assignee of Plaintiff's rights and obligations under its contract with Solar Experts gave Axos a fiduciary duty to Plaintiffs.[154] Indeed, Plaintiffs assigned all their rights under the Purchase Agreement to Axos and relied on Axos to defend their interests. When the interests under the Purchase Agreement were allegedly threatened—for example, when it became clear that Solar Experts was not properly installing the system—Axos had a duty to defend Plaintiffs' interests. Plaintiffs allege that Axos did not, and in fact sided with Solar Experts. The breach of fiduciary duty claim is adequately pleaded.

Axos protests that the lease documents expressly impose the obligation to ensure proper performance by Solar Experts on Plaintiffs, not Axos. Axos misses the point, which is that Plaintiffs could not ensure performance by Solar Experts without Axos's cooperation because Plaintiff had assigned all contractual rights against Solar Experts to Axos. For example, Plaintiffs allege that they asked Axos to commence the lease early while they hired a different contractor to properly finish installing the system, and Axos refused. Plaintiffs had only as much leverage over Solar Experts as Axos allowed them.

Axos makes the argument that Plaintiffs were not without the ability to enforce the Purchase Agreement because they sued Solar Experts in this court.[155] The right to sue in court is hardly the same as a contractual right; Axos's interpretation of fiduciary duty would effectively

---

[153] Axos Defs' Mot. at 22–23, Docket No. 53 at 23–24.

[154] Resp. to Axos Defs' Mot. at 22–23, Docket No. 60 at 26–27.

[155] Reply on Axos Defs' Mot. at 10 n.14.

eviscerate it, since the vulnerable party presumably always has a right to sue a third party in court where the fiduciary refuses to defend the vulnerable party's interests. This argument cannot stand.

In sum, Plaintiffs have alleged both a fiduciary duty and that Axos breached that duty.

e.   Declaratory Judgment (Count X)

Plaintiffs request a declaratory judgment under the Utah Declaratory Judgment Act, Utah Code Ann. §§ 78B-6-401 and 70A-2-302 and 28 U.S.C. § 2201.[156] Plaintiffs ask the court to declare that the liability limitations in Section 15 of the Master Lease Agreement and the Acceptance Certificate to Lease Schedule No. 001 are unconscionable under Utah law and against the public policy embodied in the RICO statute.[157] Axos Defendants argue for dismissal of this claim on the basis that the provisions are not unconscionable; rather, they reflect a reasonable allocation of risk between sophisticated contracting parties.

As a general rule, "under Utah law a contract clause limiting liability will not be applied in a fraud action. The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy. A contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud."[158] If, after further factual development, no fraud is proven, the court might uphold this limitation. At this juncture, the court cannot do so because there are allegations of fraud in the negotiations leading up to the contract and the course of the parties' actions under the contract. Therefore, the motion to dismiss the declaratory judgment claim will be denied.

---

[156] Am. Compl. ¶¶ 189–198.

[157] *Id.* ¶ 198.

[158] *Lamb*, 525 P.2d at 608.

B. Solar Defendants' Motion to Dismiss

    1. Personal Jurisdiction

Solar Defendants argue that the claims against them should be dismissed for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). In determining whether a federal court has personal jurisdiction over a defendant in a case arising under federal law, the court must determine "(1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process."[159] The plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant.[160] Where there has been no evidentiary hearing, as here, that burden is a light one; the plaintiff need only make a prima facie showing of personal jurisdiction.[161] In evaluating the plaintiff's showing, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[162]

The RICO statute provides for nationwide service of process in a civil action as follows:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any [RICO action] in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and

---

[159] *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006) (internal quotations and citation omitted).

[160] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069–70 (10th Cir. 2008)).

[161] *Id.* at 1239; *see also Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

[162] *Wenz*, 55 F.3d at 1505 (internal quotations and citations omitted).

process for that purpose may be served in any judicial district of the United States by the marshal thereof.[163]

Section (a) concerns venue, allowing an action to "'be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.'"[164] Section (b) then authorizes nationwide jurisdiction over other defendants in that district when "the ends of justice require" it.[165] The "ends of justice" has no precise definition; it is "a flexible concept uniquely tailored to the facts of each case" and must be analyzed in light of RICO's purpose of eradicating organized crime.[166]

Here, the court has undisputed personal jurisdiction over Axos, Pisotorius, and Gordon.[167] Exercising jurisdiction over the other defendants, including Solar Defendants, will serve the ends of justice because Utah is the only forum in which Plaintiffs may sue Axos pursuant to the Utah forum selection clause in the Master Lease Agreement. Solar Defendants allegedly played a major role in the RICO enterprise, and the only practical option for Plaintiffs to obtain relief is to sue them together with Axos. Thus, Plaintiffs have made a prima facie showing of personal jurisdiction over Solar Defendants.

Solar Defendants respond by arguing that the "ends of justice" are not served by requiring them to litigate in Utah when New Jersey is the proper venue.[168] They point out that Solar Defendants and all the Plaintiffs are located in New Jersey, all the alleged actions taken by Solar

---

[163] 18 U.S.C. § 1965.

[164] *Hart v. Salois*, 605 F. App'x 694, 699 (10th Cir. 2015) (citing *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1230 (10th Cir. 2006)) (unpublished).

[165] *Id.* (quoting *Cory*, 468 F.3d at 1231).

[166] *Cory*, 468 F.3d at 1232.

[167] Resp. to Solar Defs' Mot. at 7, Docket No. 61 at 11.

[168] Reply on Solar Defs' Mot. at 3–5, Docket No. 63 at 3–5.

Defendants took place in New Jersey, and evidence is located in New Jersey.[169] But the Tenth Circuit has specified that courts should not reduce the "ends of justice" inquiry to a mere venue analysis or a question of judicial economy.[170] The Tenth Circuit also highlighted the risk of allowing RICO violations to go unpunished merely because of the geographic locales of the defendants.[171]

Having found that nationwide service of process is valid, the court must still assure itself that the exercise of jurisdiction comports with due process. The defendant bears the burden of showing that exercising jurisdiction would offend due process by making the litigation "so gravely difficult and inconvenient" that they would be "at a severe disadvantage in comparison to their opponent."[172] The Tenth Circuit instructs district courts as follows:

> In evaluating whether the defendant has met his burden of establishing constitutionally significant inconvenience, courts should consider the following factors: (1) the extent of the defendant's contacts with the place where the action was filed; (2) the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business, including (a) the nature and extent and interstate character of the defendant's business, (b) the defendant's access to counsel, and (c) the distance from the defendant to the place where the action was brought; (3) judicial economy; (4) the probable situs of the discovery proceedings and the extent to which the discovery proceedings will take place outside the state of the defendant's residence or place of business; and (5) the nature of the regulated activity in question and the extent of impact that the defendant's activities have beyond the borders of his state of residence or business.[173]

Even where a defendant demonstrates that jurisdiction would be unduly inconvenient, a court may still exercise jurisdiction where "the federal interest in litigating the dispute in the chosen forum

---

[169] *Id.*

[170] *Cory*, 468 F.3d at 1232.

[171] *Id.*

[172] *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000).

[173] *Id.* at 1212 (internal quotation marks and citations omitted).

outweighs the burden imposed on the defendant."[174] The Tenth Circuit emphasized that "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern."[175]

As to (1), "to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"[176] Solar Defendants allegedly worked with Axos in the past to finance solar energy systems for their customers and directed Plaintiffs to Axos as well, participated in a scheme that included committing Plaintiffs to a Utah forum-selection clause, communicated with Axos's Utah office and received communications from Axos's Utah office about the lease documentation, invoiced Axos's Utah office for work on the system, and received payments of $1,930,790.00 from Axos's Utah office. These allegations and the supporting documentation[177] show minimum contacts with Utah.

As to (2), Utah is far from New Jersey and unquestionably inconvenient for Solar Defendants. However, this factor deserves little weight here. The forum is equally inconvenient for Plaintiffs, who are also New Jersey residents, so Solar Defendants are at no comparative disadvantage. Furthermore, most discovery in this case can be accomplished electronically.

As to (3), judicial economy works in favor of Utah jurisdiction, as the forum selection clause of the Master Lease Agreement requires litigation in Utah. Piecemeal litigation against Axos Defendants in Utah and Solar Defendants in New Jersey is not practical; the heart of the Amended Complaint is a single RICO scheme in which both groups of defendants allegedly participated.

---

[174] *Id.* at 1213.

[175] *Id.* at 1212–13 (internal quotation marks and citations omitted).

[176] *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[177] Am. Compl. ¶¶ 167–73.

As to (4), discovery against these defendants will largely be in New Jersey, but again, this is likely to be mostly electronic. "Certainly, in this age of instant communication and modern transportation, the burdens of litigating in a distant forum have lessened."[178]

Finally, as to (5), Solar Defendants' alleged activities had impacts in Utah as Solar Defendants directed clients to Axos for financing, invoiced Axos and received payments from Axos, and purportedly conspired with Axos Defendants.

Even if exercising personal jurisdiction raised serious concerns, these would be outweighed by the interest of the federal courts in exercising jurisdiction over parties alleged to have participated in a common RICO scheme. In a case alleging that defendants from multiple states on opposite sides of the country worked together to conduct a racketeering operation, any forum will be unduly inconvenient for someone, yet the case must be litigated somewhere.

Because the RICO statute authorizes nationwide service of process and exercising personal jurisdiction over Solar Defendants is consistent with due process, the motion to dismiss under Fed. R. Civ. P. 12(b)(2) will be denied.

### 2. Venue

Solar Defendants also argue that the claims against them should be dismissed under Rule 12(b)(3) because Utah is an improper venue.[179] Solar Defendants point to Section 14 of their contract with Plaintiffs, which compels arbitration in New Jersey on "any dispute arising out of or relating to this Agreement" and states that the parties waive any right to a jury trial or to have "any dispute that arises hereunder resolved through litigation."[180] Plaintiffs respond, correctly, that a

---

[178] *Peay*, 205 F.3d at 1212–13 (internal quotation marks and citations omitted).

[179] Solar Defs' Mot at 4–8.

[180] *Id.* at 2–3 (citing Solar Defs' Mot. Ex. 1, Docket No. 52-1).

forum selection clause does not render venue in another forum "improper" under Rule 12(b)(3).[181] A forum selection clause should be enforced by way of a motion to transfer under 28 U.S.C. § 1404(a), not a motion to dismiss under Rule 12(b)(3).[182] Defendants concede that Plaintiffs are correct and indicate that they plan to reserve their arguments about the forum selection clause for a future motion to transfer. Thus, the motion will be denied.

### C. Garrabrants and Phillips' Motion to Dismiss

#### 1. Garrabrants

Garrabrants argues for dismissal under Rule 12(b)(5) for insufficient service of process, claiming he was not properly served with the summons, initial complaint, or Amended Complaint. Valid service of process is a prerequisite for personal jurisdiction over a defendant.[183] Federal Rule of Civil Procedure 4(e)(2)(C) allows for service by delivering a copy of the summons and complaint with "an agent authorized by appointment or by law to receive service of process." The process server left the complaint and summons at Garrabrants' office.[184] The process server indicated that the receptionist said Garrabrants was not there so she called another individual who looked over the documents, signed the process server's slip, and left. It is reasonable to assume based on this series of events that this individual was authorized to receive process on Garrabrants' behalf. Garrabrants' declaration is silent on whether this individual had authority to receive process; Garrabrants merely states in his reply that the individual "is not a surrogate for

---

[181] Resp. to Solar Defs' Mot. at 14 (citing *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. D. Tex.*, 571 U.S. 49, 59 (2013)).

[182] *Niemi v. Lasshofer*, 770 F.3d 1331, 1351 (10th Cir. 2014).

[183] *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Peay* at 1209–1210 (explaining that service of process is grounded in the Federal Rules of Civil Procedure and personal jurisdiction in the Due Process Clause of the Constitution).

[184] Docket No. 56.

Garrabrants."[185] Given the essentially unrefuted inference of authority to receive process on Garrabrants' behalf, the court finds service sufficient.

The court also denies Garrabrants' request for an evidentiary hearing on this issue.[186] Even if the court held a hearing and found that Garrabrants had not been properly served, the proper remedy would be simply to extend the time to serve Garrabrants and order service. This would waste judicial resources where there has already been a showing of valid service and it is clear Garrabrants received notice of the claim against him. The court declines to engage in such a redundant exercise.

### 2. Phillips

Phillips argues for dismissal on the basis that she does not have sufficient contacts with Utah to support jurisdiction here. Phillips resided in Utah until June 1, 2020—approximately six months before this lawsuit was filed—at which time she moved to California and began work at Axos's San Diego office.[187] She avers that it would impose a hardship on her to participate in extended discovery and a trial in Utah.[188] She argues that she never directed any allegedly offending activity at any resident of Utah.[189]

As explained above, the RICO statute authorizes nationwide service of process, and the ends of justice require it in this case. Furthermore, the exercise of such jurisdiction does not offend due process. Phillips maintains extensive contacts with Utah; despite living and working in California, she continues to serve as Axos's Vice President of Commercial Leasing Operations,

---

[185] Reply on Garrabrants and Phillips' Mot., Docket No. 64 at 6.

[186] Garrabrants and Phillips' Mot. at 4 n.3.

[187] Phillips Decl. ¶¶ 2–3.

[188] Id. ¶ 5.

[189] Garrabrants and Phillips' Mot. at 6–7.

which operates out of the Salt Lake City office.[190] As for inconvenience, it would not be overly inconvenient for Phillips to have to defend against a Utah action. California is not prohibitively far from Utah and it is much closer than New Jersey is, so the distance is no relative disadvantage. Judicial economy favors consolidated rather than piecemeal litigation. Some discovery is likely to take place in California since Axos is headquartered there, and discovery in Utah should not overburden Phillips given her continued business ties to Utah. In light of these factors, there is no constitutional concern with exercising nationwide jurisdiction over Phillips.

### D. TechEFI Defendants' Motion to Dismiss

TechEFI Defendants argue for dismissal for lack of personal jurisdiction, incorporating the points and authorities in Garrabrants and Phillips' motion. Dorand resides in Nevada and argues that the exercise of personal jurisdiction by a Utah court would offend due process.[191] Not so. Plaintiffs allege that Dorand participated in a racketeering enterprise that included residents of four states and, as explained above, the ends of justice require that the claim be adjudicated in Utah. The Amended Complaint alleges that Dorand brokered the deal between Plaintiffs and Axos, a Utah bank; it is reasonable to infer that this involved at least some activity directed at Utah. Judicial economy favors adjudication of the alleged RICO violations against all defendants in a single action. Utah is adjacent to Nevada so the distance is not prohibitive. And Dorand's business is national, not local, so he can reasonably expect litigation in other states. In sum, nationwide service of process and the exercise of personal jurisdiction over TechEFI Defendants in Utah does not offend due process.

---

[190] Resp. to Garrabrants and Phillips' Mot. Ex. A, Docket No. 58-1 at 10.

[191] Reply on TechEFI Defs' Motion to Dismiss, Docket No. 62 at 2–4.

TechEFI Defendants also argue for dismissal under 12(b)(1) and 12(b)(6), incorporating the points and authorities in the Axos Defendants' motion. For the reasons fully explained above, those arguments fail. Specifically, as regards TechEFI Defendants' participation, the Amended Complaint alleges that TechEFI Defendants made various false representations to entice Plaintiffs to enter into a financing agreement and induce them to pay $25,000 to "lock in" the 2% interest rate on a loan, constituting a predicate act of wire fraud.[192] This adequately alleges TechEFI's participation on the RICO enterprise and therefore there is no basis for dismissal under 12(b)(1) or 12(b)(6).

### III. CONCLUSION

It is therefore ORDERED that Axos Defendants' Motion to Dismiss (Docket No. 53) is GRANTED IN PART AND DENIED IN PART. The breach of contract claim is dismissed without prejudice and the motion is otherwise denied.

It is FURTHER ORDERED that Solar Defendants' Motion to Dismiss (Docket No. 52), Garrabrants and Phillips' Motion to Dismiss (Docket No. 54), and TechEFI Defendants' Motion to Dismiss (Docket No. 55) are DENIED.

DATED this 27th day of July, 2021.

BY THE COURT:

Ted Stewart
United States District Judge

---

[192] Am. Compl. ¶ 135(a).