IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| 100 MOUNT HOLLY BYPASS et al.,<br><br>                         Plaintiffs,<br><br>v.<br><br>AXOS BANK et al.,<br><br>                     Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AXOS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, and SOLAR EXPERTS DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Case No. 2:20-cv-00856<br><br>District Judge Ted Stewart |

This case comes before the Court on Plaintiffs' Motion for Partial Summary Judgment,[1] Axos Defendants' Motion for Summary Judgment,[2] and Solar Experts Defendants' Motion for Partial Summary Judgment.[3] For the reasons discussed below, the Court will grant in part and deny in part each of the Motions.

## I. BACKGROUND

### A. Plaintiffs

100 Mount Holly Bypass, LLC ("Mount Holly") is a New Jersey LLC that owns a large commercial building in Lumberton, New Jersey. Miles Technologies, Inc. ("Miles Tech") is a

---

[1] Docket No. 167.

[2] Docket No. 183.

[3] Docket No. 170.

New Jersey corporation that occupies part of the building. Christopher Miles is the sole member of Mount Holly and the president of Miles Tech.

B. Defendants

1. "Solar Experts Defendants"

New Jersey Clean Energy Solutions, LLC d/b/a Solar Experts ("Solar Experts") is a New Jersey LLC in the business of commercial solar systems. David J. Widi, Sr. ("Widi Sr.") is the president and CEO of Solar Experts. David Widi, Jr. ("Widi Jr.") is the Director of Marketing and Sales.

2. "Axos Defendants"

Axos Bank ("Axos") is a federally chartered Federal Savings Association with an office in Utah. Defendant Gregory Garrabrants is the president and CEO of Axos Financial, Inc. and its subsidiary, Axos. Defendant Jeff Pistorius is the Senior Relationship Manager for Axos. Barry Gordon is the Vice President of Equipment Leasing for Axos and Pistorius' immediate supervisor. Defendant Kristin Phillips is the Vice President for Documentation at Axos. Axos was involved with the financing of Plaintiffs' solar system.

3. "TechEFI Defendants"

Tech Equipment Finance, LLC ("TechEFI") is in the business of equipment leasing and finance. Defendant Everett Dorand is the managing member of TechEFI. Solar Experts and TechEFI worked together to obtain the solar system and financing for Plaintiffs. TechEFI contacted Axos regarding obtaining the financing at issue, and Axos in turn agreed to pay TechEFI a commission on completion of the deal.[4]

---

[4] Docket No. 167, ¶¶ 9–10; Docket No. 194, at 7.

C. Factual Background

In their Third Amended Complaint, Plaintiffs allege that Defendants participated in a scheme to defraud, extort, and steal by selling and financing rooftop solar energy systems.[5] Plaintiffs allege that Gordon, supported by Garrabrants, concocted a scheme whereby Solar Defendants would market systems that purchasers could finance with what the purchasers believed to be low or no interest loans from Axos, which were brokered by TechEFI Defendants for a fee. Plaintiffs allege that Defendants steered customers into signing leases that stripped customers of their contractual rights and locked them into making exorbitant and perpetual "service charges" to Axos. Plaintiffs assert this purported scheme was accomplished through a number of agreements, as described below.

1. Purchase Agreement[6]

In July 2019, Miles Tech contacted Solar Experts about purchasing a solar energy system ("the solar system") for the roof of their building. Solar Experts Defendants and TechEFI Defendants offered to sell and install the solar system for $3,819,700, payable over seven years at a 2% interest rate.[7]

On July 10, 2019, Widi Jr. emailed Plaintiffs a copy of a Conditional Loan Proposal or "term sheet" created and signed by Dorand that reflected these terms.[8] There was some back and forth as to whether Plaintiffs wanted a capital lease or a loan. Plaintiffs made clear they wanted a loan. On July 12, 2019, Plaintiffs signed the proposal and later sent Dorand a $25,000 check for

---

[5] Docket No. 128, at 42–51.

[6] Docket No. 128-4.

[7] Docket No. 167, at 7.

[8] Docket No. 128-52, at 4–5; Docket No. 194, at 6.

the deposit pursuant to Widi Jr.'s direction.[9] The Conditional Loan Proposal sets out basic terms, including that the loan type would be an "Equipment Financing Agreement," that the lease rate factor would be 0.01277, and that the monthly *rental* payment amount would be $48,767.67.[10] The lease rate factor multiplied by the equipment costs results in the monthly lease payment amount.[11]

Subsequently, on July 24, 2019, after Plaintiffs paid the deposit to TechEFI, but before any financing agreement was in place, Plaintiffs and Solar Experts entered into the "Purchase Agreement," which contained, *inter alia*, the following terms:

- Plaintiffs agreed to pay a total purchase price of $3,819,700, with the final disbursement due "when System Installed to Engineered Plans and Operational."[12]

- The components of the system were estimated to be delivered by the manufacturer, SunPower, by October 14, 2019, and Solar Experts would complete the installation by an estimated date of December 31, 2019.[13]

- Solar Experts agreed to "promptly correct work that does not conform to this Agreement and to the Engineered Plans" and bear the costs of such remediation.[14]

- Plaintiffs could assign and convey all their rights and interest in the solar system to a third party without consent of Solar Experts.[15]

---

[9] Docket No. 128-3.

[10] Docket No. 128-52, at 5.

[11] Docket No. 151-1, at 8.

[12] Docket No. 128-4, at 17.

[13] *Id.* at 3.

[14] *Id.*

[15] *Id.*

After the Purchase Agreement was executed, Dorand emailed Pistorius with information about Mount Holly and the potential deal.[16] Axos agreed to pay Dorand a commission of 1.5% if the deal completed.[17]

Solar Experts and Axos Bank agreed to a discounted price under which Axos would pay $3,177,055 for the system instead of the $3,819,700 price negotiated with Plaintiffs ("the blind discount").[18] TechEFI was also aware of this discount.[19] Subsequently, two separate invoices were created. One reflected the $3.8 million amount, sent on Solar Experts letterhead to Plaintiffs, and the other that reflected the discounted price sent by Solar Experts to Axos. Other than the invoice, there is not a separate contract in the record reflecting the discount agreement between Axos and Solar Experts Defendants.

2. Lease Agreement[20]

On October 10, 2019, approximately two and a half months after the Purchase Agreement was signed, Dorand and Solar Experts provided Plaintiffs with two financing options via term sheets: the prior offer of a seven-year 2% option, and a new five-year 0% option.[21] The documents stated that the new five-year 0% option required "no capital investment," and the total cost would be $3,819,700 ("includ[ing] interest") with monthly payments of $63,662.[22] Miles chose the five-year 0% option on the same day it was offered.[23]

---

[16] Docket No. 169-8, at 4–5.

[17] *Id.* at 3.

[18] Docket No. 164-37, at 2; Docket No. 168-3 (SEALED), at 3.

[19] Docket No. 164-37, at 2; Docket No. 173-23, at 2.

[20] Docket Nos. 128-12, 128-13, 128-14, 128-15.

[21] Docket No. 128-5, at 2.

[22] *Id.* at 3.

[23] *Id.* at 2.

On October 15, 2019, TechEFI sent the Conditional Lease Proposal to Plaintiffs. The Proposal stated that it was a "net lease" and listed the lease type as a "Capital Lease."[24] The terms included a 60-month initial period and monthly rental payments of $63,662. It also included a provision that Plaintiffs could purchase the system for $1 after the end of the initial period. In an email exchange with Dorand, Miles questioned the inclusion of the lease rate factor in the Conditional Lease Proposal. Dorand responded, "that is all legaleze [sic] in the event the loan carried an interest rate which it doesnt [sic]. The rate is fixed and does not adjust on this loan. That is the payment for the entire term."[25]

The proposal also contained two other pertinent provisions: (1) that Plaintiffs may request that Axos purchase and pay for certain items prior to the commencement of the lease under which certain service charges will be charged to Plaintiffs; and (2) that Plaintiffs agree to pay a deposit of $63,662 with $2,000 to be delivered to Axos with the proposal and the balance due upon formal credit approval.[26]

Plaintiffs ultimately signed the Conditional Lease Proposal and returned it to Dorand. In a phone call with Dorand, Miles inquired, "how are you guys doing this [at] zero percent?"[27] The exact conversation thereafter is disputed. Dorand testified that he responded "the vendor and the manufacturer are subsidizing the purchase price so that [Miles would] get zero percent financing."[28] Widi Jr. testified that when Miles asked him how the financing could be 0%, he

---

[24] Docket No. 128-7, at 2–3.

[25] Docket No. 128-8, at 2.

[26] Docket No. 128-7, at 2.

[27] Docket No. 195-1, at 373:24–374:17.

[28] *Id.* at 374:10–13.

told Miles it was a subsidized rate.[29] Miles testified that when he previously asked about the 2%
rate, Widi Jr. and Dorand represented that there were federal incentives for banks in the green
energy space, and Miles assumed the same thing about the 0% loan.[30]

On Friday, November 15, 2019, Axos provided the final lease documentation to Plaintiffs
via email.[31] Whether Axos provided all documents at that time is disputed.[32] Plaintiffs allege that
Widi Jr. pressured Miles to sign the documents and return them the same day. In an email
exchange, Widi Jr. told Miles that if he did not do so, Miles would risk losing his delivery date
for the materials from SunPower and bump out the project considerably.[33] Plaintiffs discussed
paying SunPower directly in order to keep the delivery date, but it was not ultimately
necessary.[34] Axos re-sent the documents on Monday, November 18, 2019, and Miles signed and
sent them back the same day. The executed documents included the following:

- The Master Lease Agreement[35] which sets forth the general terms of the
  agreement by which Plaintiffs would pay monthly equipment rental installments
  over five years and then purchase the system for one dollar at the end of the lease
  term. The Agreement also:

  o required Plaintiffs to pay "as rent for use of the Property, aggregate rentals
    equal to the sum of all the Monthly Rentals (as defined in the Schedule)
    and other payments due under the Lease for the entire Initial Period"

---

[29] Docket No. 206-1, at 299:6–300:5.

[30] Docket No. 172-21, 99:13–101:14.

[31] Docket No. 201-2.

[32] See Docket No. 203 (SEALED), at 11.

[33] Docket No. 128-16.

[34] Docket No. 201-1, at 285:3–286:12; Docket No. 128-16, at 3-4.

[35] Docket No. 128-13.

(defined in the Schedule as the five years following the Commencement Date);[36]

o   transferred ownership of the solar system to Axos;[37]

o   disclaimed any warranty or liability on Axos' part, required Plaintiffs to indemnify Axos, and waived any and all rights Plaintiffs might have under the Utah Uniform Commercial Code or other laws "[t]o the extent permitted by applicable law;"[38]

o   stated that "[i]f Lessee fails to sign and deliver an Acceptance Certificate, then except as otherwise provided in Section 6(a) hereof, the Acceptance Date shall be a date determined by the Lessor which shall be no sooner than the date Lessee receives substantially all of the Property;"[39]

o   included an integration clause stating that the lease documents superseded all prior communications, representations, and agreements;[40] and

o   defined "Master Progress Funding Agreement" as "[a]n agreement under which (i) Lessee accepts items of Property by signing an Authorization, (ii) Lessor agrees to purchase said items of Property, and (iii) Lessee agrees to pay service charges, all prior to the [commencement of the lease term]."[41]

---

[36] *Id.* ¶ 4.

[37] *Id.* ¶ 8.

[38] *Id.* ¶¶ 7, 12.

[39] *Id.* ¶ 20(f).

[40] *Id.* ¶ 20(a).

[41] *Id.* at 10.

- <u>Lease Schedule No. 001</u>[42] which incorporated the terms of the Master Lease Agreement and superseded it. The Schedule includes the following terms:

  - the monthly rental amount is $63,662;

  - the total cost of the system will not exceed $3,819,700;

  - the "Lease Rate Factor" is set at 0.016666754; and

  - Axos is authorized to electronically transfer monthly rental payments "and other monies due under this Schedule" from Plaintiffs' bank account.

- <u>The Master Progress Funding Agreement</u>[43] between Axos and Plaintiffs, in which Axos agreed to make progress payments against the purchase price for items that would eventually be the subject of the lease. The Agreement includes the following terms:

  - Axos agrees to payments against the purchase price for items as directed by Plaintiffs in "Partial Acceptance and Authorization for Progress Payment Certificates;"

  - Plaintiffs assign right, title, and interest in such items to Axos;

  - Plaintiffs assign purchase orders and contracts to Axos;

  - all risk of loss and liability is assigned to Plaintiffs;

  - Plaintiffs are required to pay a daily pro-rata "service charge" "in consideration of each Progress Payment," calculated by "multiplying the 'Lease Rate Factor' specified in the applicable Lease Schedule times the amount of such Progress Payment divided by 30. Daily service charges

---

[42] Docket No. 128-12.

[43] Docket No. 128-14.

shall accumulate and be payable monthly . . . and shall begin on the date Lessee authorizes Lessor to disburse the Progress Payment;"[44]

- o  if Plaintiffs do not sign the Acceptance Certificate within three months after the first Progress Payment, Axos could, *inter alia*, commence the lease for the items paid under the progress payments; and

- o  Plaintiffs' failure to sign the Acceptance Certificate within three months of the first progress payment would constitute a default under the lease.

- •  <u>Authorization for Pre-Authorized Payments</u>[45] or "ACH Authorization," by which Plaintiffs authorized Axos to make electronic withdrawals from their bank account "for all rental payments and other sums required to fulfill [Axos'] contractual obligation under the Master Lease and the Lease Schedules."[46]

### 3. Partial Acceptance Certificates[47]

Subsequently, on November 21, 2019, Axos presented Plaintiffs with Partial Acceptance and Authorization for Progress Payment Certificates Nos. 1 and 2, which authorized Axos to pay SunPower and Solar Experts approximately $1.3 million each.[48] Miles signed the Certificates, and Axos wired the funds to the recipients the next day. Both Certificates included invoices reflecting the amounts authorized. There was an additional invoice, not provided to Plaintiffs, reflecting the negotiated blind discount between Solar Experts and Axos that made $880,938.50

---

[44] *Id.* at 2.

[45] Docket No. 128-15.

[46] *Id.* at 2.

[47] Docket Nos. 128-17, 128-18, 164-15, 164-16, 128-24, at 9.

[48] Docket Nos. 128-17, 128-18.

due instead of $1.3 million.[49] At the same time, Axos presented Plaintiffs with a Master Broker Agreement and Acknowledgment, which Plaintiffs executed and returned.[50] In the Agreement, Axos, Plaintiffs, and TechEFI agreed that TechEFI was an independent contractor with no authority to bind Axos.[51]

On December 10, 2019, Miles emailed Pistorius asking him to explain drafts on his bank statement for $61,622 and $12,355.31, dated November 20, 2019 and December 10, 2019, respectively, labeled "BOFI FBO LEASING."[52] Pistorius explained that it was a "progress funding fee."[53] Miles replied, "please explain the funding fee. No one ever explained it to me."[54] Pistorius did not respond.

The solar system was not up and running by the estimated completion date of December 31, 2019. In February 2020, Axos and Solar Experts asked Plaintiffs to approve Partial Acceptance Certificate No. 3[55] for $250,000 to be paid to Cooper Electric Supply Company ("Cooper Electric") for electrical supplies. Plaintiffs authorized this additional advance, even though it was not included in the original payment schedule. On April 29, 2020, based on Solar Experts' representation that the installation was complete and awaiting final inspection by the township, Plaintiffs asked Axos to commence the lease on May 1, 2020. However, Axos would not commence it until July 1, 2020, in congruence with the Master Lease Agreement, which states that the Commencement Date is the first day of the calendar quarter following the one in

---

[49] Docket No. 128-11, at 2; Docket No. 204-1 (SEALED), at 2.

[50] Docket No. 201-3; Docket No. 164-63.

[51] Docket No. 164-63 ¶ 3.

[52] Docket No. 128-19.

[53] *Id.*

[54] *Id.*

[55] Docket No. 164-15.

which the Acceptance Date falls.[56] On May 18, 2020, Plaintiffs executed Partial Acceptance Certificate No. 4 for $350,000.[57]

4. Breakdown of the Agreements

In June 2020, Pistorius asked Miles to sign for the final disbursement to Solar Experts and to sign a final Acceptance Certificate and commence the lease on July 1, 2020. Miles replied that "[t]he project is NOT complete, NOT up and running, and NOT producing energy."[58] He indicated that he would not authorize the final payment to Solar Experts or sign the final Acceptance Certificate until he had verified the "safety, compliance, and completion of the project."[59] At some point, there was an inspection of the solar system, however there is a dispute as to whether Miles was notified about the date or time.[60] It is undisputed that he was not present at the inspection.

Prior to the installation, the structural engineer for the project, Timothy Czarnik, reviewed Solar Experts' proposed plans and identified issues with overweighting the roof of the building.[61] There was a disagreement between the structural engineer and Solar Experts about the installation; however, the facts surrounding that disagreement are in dispute.[62] At his

---

[56] Docket No. 128-13, at 10.

[57] Docket No. 164-16; Docket No. 164-2, at 321:12–15.

[58] Docket No. 128-24, at 4.

[59] *Id.*

[60] Docket No. 203 (SEALED), at 19; Docket No. 201-5, at 2; Docket No. 206-2 ¶ 18. The inspection was ordered by Axos Bank, and the inspector testified at his deposition that the reason for the inspection was to "verify if this equipment that was the subject of a lease that they had was actually in place." Docket No. 172-20, at 68:9–69:22.

[61] Docket No. 172-45, at 139:1–13.

[62] Docket No. 206-4 (Widi Sr. Deposition); Docket No. 172-45 (Timothy Czarnik deposition).

12

deposition, Czarnik testified that the roof now meets the criteria required by the building code.[63]
Solar Experts also agreed in the Purchase Agreement to install a Gaco roof coating in a manner
appropriate to obtain a 20-year labor warranty and a 50-year material warranty from the
manufacturer.[64] Roof coating is applied on top of the roof and meant to increase the longevity of
the roof.[65] After the roof coating was installed by a subcontractor, the solar panels and
accompanying hardware were installed on top of it. Gaco later voided the warranty for reasons
disputed by the parties involving alleged damage to the roof, improper use of materials, and
unapproved installers.[66]

Widi Jr. came to Miles in late July 2020 for final payment. Plaintiffs allege that this was
the first time Miles learned about the progress funding fees and that they were not leasing
payments.[67] Miles later emailed Widi Jr., Widi Sr., and Pistorius identifying eight issues with the
system that needed to be remedied before he would make the final payment, including roof
leaks.[68] In the same email, Miles directed Pistorius not to make any payments to Solar Experts
without his permission.[69] In August 2020, Pistorius emailed Plaintiffs a spreadsheet detailing all
progress payments Plaintiffs made to Axos, totaling approximately $350,000 from December
2019 to August 2020.[70] The Solar System was up and running in September 2020.

---

[63] Docket No. 172-45, at 143:10–144:6.

[64] Docket No. 128-4 ¶ 6.

[65] Docket No. 171-2, at 622:4–7, 622:24–623:13.

[66] *Id.* at 624:22–625:4.

[67] Docket No. 167 ¶ 77.

[68] Docket No. 128-26, at 2.

[69] *Id.*

[70] Docket No. 174-3.

In the meantime, Axos and Plaintiffs' counsel exchanged phone calls and emails in an effort to resolve the dispute. Counsel continued to notify Axos of alleged issues with the roof. At some point, Axos and Plaintiffs agreed that Plaintiffs would bring the account current, and Axos would prepare closing documents and commence the lease on October 1, 2020. Plaintiffs paid Axos a total of $207,997.70, which included $144,335.80 for the July through September 2020 progress payments and $63,662 for the October 2020 lease payment. Axos provided Plaintiffs with an Acceptance Certificate that included general release language to which Plaintiffs objected. Plaintiffs allege that the Acceptance Certificate contained false statements. Axos refused to commence the lease without Plaintiffs signing the Acceptance Certificate. Plaintiffs allege that Axos would not allow them to hire a new contractor to remediate issues with the system; however, in November 2020, Plaintiffs fired Solar Experts and hired Robert Hoxit. Plaintiffs have continued to send monthly lease payments to Axos since October 2020, totaling approximately $2,037,184 through May 2023.[71]

5. Liens

In December 2020, Cooper Electric levied a lien against Plaintiffs' property for $164,668.39 for unpaid work on the solar project.[72] It is undisputed that Plaintiffs previously authorized payment to Cooper Electric, and that Axos sent $250,000 to Solar Experts to complete such payment. It is also undisputed that Solar Experts failed to pay Cooper Electric.[73] Following the lien, Cooper Electric filed suit against Plaintiffs, Solar Experts, and Axos. In December 2020, Solar Experts levied a lien against Plaintiffs for $545,910.00, the remaining

---

[71] Docket No. 203 (SEALED), at 25 ("The Lease term ha[s] not commenced. Though Axos Bank offered to commence the Lease term, the Miles Parties refused to execute the proffered documents and accept the offer.").

[72] Docket No. 173-20.

[73] *See* Docket No. 205, at 21; Docket No. 203 (SEALED), at 25–26.

amount due under the Purchase Agreement.[74] Subsequently, Solar Experts filed an action in New Jersey state court to foreclose on this lien. Plaintiffs, Solar Experts, and Cooper Electric entered into a settlement agreement in June 2021, in which: Axos paid Solar Experts, who in turn paid Cooper Electric for the outstanding lien amount; Cooper Electric released the lien and dismissed its claims; Solar Experts dismissed their third-party complaint and cross claim and agreed to only refile, if at all, after the resolution of the present case; the parties agreed to a stay of the remaining claims; and Solar Experts agreed to stay their claims and dismiss Cooper Electric.[75] Further, Solar Experts agreed that the lien amount paid by Axos to Cooper Electric would be considered part of the total cost of the system and credit it accordingly.[76]

6. Claims

Plaintiffs assert ten claims against Defendants as follows:

- Count 1: RICO § 1962(c) against Garrabrants, Gordon, Phillips, Pistorius, Solar Experts Defendants, and TechEFI Defendants, alleging Axos as the enterprise;

- Count 2: RICO § 1962(d) against Garrabrants, Gordon, Phillips, Pistorius, Solar Experts Defendants and TechEFI Defendants, alleging Axos as the enterprise in a conspiracy;

- Count 3: RICO § 1962(c) against all Defendants as the enterprise;

- Count 4: RICO § 1962(d) against all Defendants as the enterprise in a conspiracy;

- Count 5: Fraud against all Defendants;

- Count 6: Civil Conspiracy against all Defendants;

- Count 7: Breach of Contract and Covenant of Good Faith and Fair Dealing against Solar Experts;

---

[74] Docket No. 173-21.

[75] Docket No. 112-7, at 3–5.

[76] *Id.* The parties approximate that the remaining amount due is $295,910.

- Count 8: Breach of Contract and Covenant of Good Faith and Fair Dealing against Axos;

- Count 9: Breach of Fiduciary Duty against Axos;

- Count 10: Declaratory Judgment against Axos.

Axos filed three counterclaims against Plaintiffs: (1) breach of contract; (2) breach of guaranty; and (3) replevin.[77] As discussed below, the parties filed competing motions for summary judgment on each of the claims and counterclaims, save for the RICO claims under which only Defendants move for summary judgment.

## II. LEGAL STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[78] In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[79] "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."[80] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[81]

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact."[82] "Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an

---

[77] Docket No. 131.

[78] Fed. R. Civ. P. 56(a).

[79] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[80] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[81] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[82] *Adler*, 144 F.3d at 670–71.

essential element of the nonmovant's claim."[83] Once a movant has carried its initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[84]

## III. DISCUSSION

The Court will address each claim and the parties' respective arguments for summary judgment below.

### A. RICO Claims

Axos and Solar Experts Defendants move for summary judgment on Plaintiffs' RICO claims. "RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct."[85] RICO can encompass many "traditional common law fraud claims if the requisite pattern and entity requirements are met. The Mafia, of course, is the quintessential racketeering enterprise, but normal businesses can also fall under RICO's broad criminal and civil rubric."[86] Pursuant to RICO:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.[87]

Plaintiffs assert four RICO claims: two alleging that Axos is an enterprise and two claims asserting that Defendants formed an association in fact enterprise. Axos moves for summary

---

[83] *Id.* at 671; *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[84] *Adler*, 144 F.3d at 671 (quoting Fed. R. Civ. P. 56(e)).

[85] *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

[86] *Id.*

[87] 18 U.S.C. § 1962(c).

judgment on each of the RICO claims (Counts I-IV) and Solar Experts join in Axos' arguments.[88]

To prove their claims under RICO, Plaintiffs must show that Defendants "'(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"[89]

A "pattern," requires at least two racketeering acts committed within ten years of each other.[90] "The term "pattern" itself requires the showing of a relationship between the predicates and of the threat of continuing activity."[91]

"Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."[92] Defendants argue that Plaintiffs do not demonstrate either open-ended or closed-ended continuity.[93] The Court agrees.

"Open-ended continuity requires a clear threat of future criminal conduct related to past criminal conduct."[94] "Plaintiffs can establish open-ended continuity by showing that the racketeering acts involved implicit or explicit threats of repetition, that they formed the

---

[88] Docket No. 170, at 13.

[89] *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022) (quoting *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016)).

[90] 18 U.S.C. § 1961(5).

[91] *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (internal quotation marks and citations omitted).

[92] *Id.* at 241 (internal quotation marks and citation omitted).

[93] Docket No. 185 (SEALED), at 49–52.

[94] *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1273 (10th Cir. 1989) (citing *H.J. Inc.*, 492 U.S. at 241).

operations of an association that exists for criminal purposes, or that they were the defendants' regular way of conducting a legitimate enterprise."[95]

Plaintiffs assert that what occurred was part of Axos' business model because conditional lease proposals and lease agreements are standard lease documents approved by Axos' legal department and the omission of mandatory service charges from the conditional lease proposal given to Plaintiffs was "based on a deliberate corporate decision."[96] Plaintiffs further assert that "Axos has a corporate policy that it is acceptable to conceal such critical information when seeking business through use of conditional lease proposals."[97] Plaintiffs do not cite to the record to support these statements. Plaintiffs also fail to support the existence of any other similar scheme that would show this was Defendants' regular way of conducting business or that it threatens future repetition. Therefore, Plaintiffs fail to establish open-ended continuity.

"[C]losed-ended continuity requires 'a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months are insufficient.'"[98] "A single scheme to accomplish one discrete goal, directed at a finite group of individuals, with no potential to extend to other persons or entities, rarely will suffice to establish a threat of continuing activity."[99]

---

[95] *Johnson*, 56 F.4th at 859–60 (citing *H.J. Inc.*, 492 U.S. at 242–43).

[96] Docket No. 212, at 42.

[97] *Id.*

[98] *Phelps*, 886 F.2d at 1273 (quoting *H.J. Inc.*, 492 U.S. at 242).

[99] *Erikson v. Farmers Grp., Inc.*, 151 F. App'x 672, 677–78 (10th Cir. 2005).

The Tenth Circuit has concluded that when determining closed-ended continuity, a district court should consider both duration and the extensiveness of the scheme.[100] Duration "requires a series of related racketeering acts over a 'substantial period of time.'"[101]

And "[w]hen evaluating extensiveness, [the Court] consider[s] 'the number of victims, the number of racketeering acts, the variety of racketeering acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature or character of the enterprise.'"[102] While none of these factors must be present to find continuity, consideration of each is meant to guide the Court to "a natural and commonsense result."[103]

In weighing these factors, the Court finds Plaintiffs have not sufficiently supported the "extensiveness" factor. Plaintiffs have not demonstrated that there was more than one victim (the Plaintiffs) or that this was a large or complex scheme. In assessing the complexity of the scheme, the Tenth Circuit has looked to "the number of perpetrators involved, the extent of the planning required to perform the scheme, the extent of the management required to run the scheme, the sophistication of products involved in running the scheme, and the amount of money involved."[104] Consideration of each of these factors weighs against complexity.

The alleged scheme involved the participants marketing solar systems for sale for low or no interest loans and then presenting Plaintiffs with lease documentation, "concealing" service charges—which were clearly disclosed in the final financing documentation provided to

---

[100] *Johnson*, 56 F.4th at 860 ("[U]nder our precedent, duration alone may not establish closed-ended continuity—we also consider the extensiveness of the alleged racketeering scheme.").

[101] *Johnson*, 56 F.4th at 860 (quoting *H.J. Inc.*, 492 U.S. at 242).

[102] *Id.* (quoting *United States v. Smith*, 413 F.3d 1253, 1272 (10th Cir. 2005)).

[103] *Id.* at 861 (quoting *Resol. Tr. Corp v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993)).

[104] *Id.* (citation omitted).

Plaintiffs—and refusing to commence the lease until Plaintiffs signed an Acceptance Certificate.[105] This does not entail extensive planning or management, and there are not sophisticated products involved. Further, while the amount Plaintiffs spent on service charges, $446,609.49, is not an insignificant amount of money, it is not large, especially in light of the cost of the underlying project and the Plaintiffs' financial situation.

Finally, the nature and character of the enterprise does not support finding extensiveness. Plaintiffs' supported facts do not demonstrate that Defendants have committed this alleged scheme more than once. In his deposition, Miles states that Axos represented to him that they had worked with Solar Experts previously; however, there are no facts before the Court supporting that any of those instances were part of a similar scheme.[106] In *Johnson*, the Tenth Circuit reiterated that "[w]ithout a threat of continued illegal activity, a single scheme rarely supports finding continuity."[107] And where the allegations amount to "a single scheme to accomplish 'one discrete goal,' directed at one individual with no potential to extend to other persons or entities,"[108] there is no threat of continued illegal activity. Here, Plaintiffs do not point to evidence that supports that there were any other similar schemes involving the Defendants, either before or after this alleged scheme. Because Plaintiffs have filed to make a sufficient showing of "extensiveness," they have failed to make a sufficient showing of continuity to survive summary judgment.

Plaintiffs argue that Axos improperly shifts the burden under Fed. R. Civ. P. 56 by asserting that Plaintiffs, as the nonmoving party, cannot demonstrate that a pattern of

---

[105] Docket No. 128, at 42–44.

[106] Docket No. 212-7 ¶ 11.

[107] *Johnson*, 56 F.4th at 862 (citing *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990)).

[108] *Sil-Flo, Inc.*, 917 F.2d at 1516.

racketeering activity occurred.[109] The Supreme Court addressed this in *Celotex Corp. v. Catrett*: "[i]n our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[110] The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the portions of the record which "demonstrate the absence of a genuine issue of material fact;" however, as in this case, where the nonmoving party bears the burden at trial, there is no requirement that the moving party supports its motion with affidavits or the like to negate its opponents claims.[111] Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[112] Here, Axos and Solar Experts Defendants may be the moving parties but Plaintiffs bear the burden of persuasion at trial and must rebut Defendants claims by demonstrating that there is evidence to support the essential elements of their claims. Accordingly, Axos does not improperly shift the burden in their Motion for Summary Judgment. Plaintiffs fail to support the pattern element of their RICO claims and, therefore, the Court finds Defendants are entitled to summary judgment.

Plaintiffs also contend that the Court has already considered and rejected Axos' argument regarding continuity in the Court's prior order regarding Axos' Motion to Dismiss. There, the

---

[109] Docket No. 212, at 36.

[110] *Celotex Corp.*, 477 U.S. at 322.

[111] *Id.* 323; *accord Salo v. Tyler*, 2018 UT 7, ¶ 26, 417 P.3d 581 ("A movant who seeks summary judgment on a claim on which it will bear the burden of persuasion at trial cannot seek summary judgment without producing affirmative evidence in support of the essential elements of its claim. But a movant who seeks summary judgment on a claim on which the nonmoving party bears the burden of persuasion may show that there is no genuine issue of material fact without producing its own evidence.").

[112] *Celotex Corp.*, 477 U.S. at 323–24.

Court stated that "[b]y pleading nearly two years of prior racketeering activity and a clear threat of future racketeering activity, Plaintiffs satisfactorily plead continuity."[113] The Court further stated that there was an obvious risk that the scheme Plaintiffs alleged, that Defendants "have developed a method of luring victims into interrelated contracts that deprive them of their money and their contractual rights," could turn other customers into victims.[114] These statements were based on Plaintiffs' allegations that "it received information that Defendants' had done similar deals in the past, and the structure of the alleged scheme is exportable to other victims."[115] Now, post-discovery, Plaintiffs' only argument in support of future threat of harm is that Axos' business approach "assures there likely have been other victims in the past, and certainly likely more in the future."[116] Plaintiffs do not support this with evidence in the record.

Based on the finding that Plaintiffs failed to demonstrate a pattern under RICO, the Court need not address the remaining elements and will enter summary judgment in favor of all Defendants on each of Plaintiffs' RICO claims.[117]

B. Fraud

Plaintiffs, Axos Defendants, and Solar Experts Defendants move for summary judgment on Plaintiffs' fraud claim. The parties apply Utah law and as the result is the same under both

---

[113] Docket No. 69, at 23.

[114] *Id.* at 24.

[115] *Id.* at 23.

[116] Docket No. 212, at 43.

[117] Though TechEFI Defendants did not move for summary judgment, entry of judgment in their favor on Plaintiffs' RICO claims is appropriate for the same reasons.

Utah and New Jersey law, the Court will apply Utah law in analyzing the claims pertaining to both Axos and Solar Experts.[118]

Plaintiffs' fraud claims are barred by the economic loss rule. "[W]hen a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and the parties are not permitted to assert actions in tort."[119] "Utah courts have repeatedly found that the economic loss rule bars tort claims based on a party's pre-contract misrepresentations or failure to perform where the subject of such tort claims overlaps with the terms of a contract."[120] "When the subject matter of the inducing promises are later negotiated for and included in the contract,"[121] this makes "the contract . . . the exclusive means of obtaining recovery."[122] Here, the terms Plaintiffs claim to be fraudulent are explicitly included in the terms of the written financing documents that Plaintiffs signed and returned. The claims all relate to the terms and performance of the finance agreements. Therefore, the Court finds that the economic loss doctrine bars the fraud claims and as such Defendants are entitled to summary judgment on the claims. The Court also finds that the economic loss doctrine also bars the fraud claims against TechEFI Defendants.

---

[118] Regardless, the elements for fraud under New Jersey law are essentially the same as under Utah law. *See Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005) ("To establish common-law fraud, a plaintiff must prove: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.") (internal quotation marks and citation omitted).

[119] *Reighard v. Yates*, 2012 UT 45, ¶ 20, 285 P.3d 1168 (internal quotation marks and citation omitted).

[120] *Preventive Energy Sols., LLC v. nCap Ventures 5, LLC*, No. 21-4099, 2023 WL 7148434, at * 11 (10th Cir. Oct. 31, 2023).

[121] *Health Banc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 19, 435 P.3d 193.

[122] *Ludvik Elec. Co. v. Vanderlande Indus., Inc.*, No. 2:21-cv-00462-DBB-CMR, 2023 WL 8789379, at *7 (D. Utah Dec. 19, 2023) (quoting *Reighard*, 2012 UT 45, ¶ 20).

Even if the economic loss doctrine did not bar Plaintiffs' fraud claims, Plaintiffs fail to demonstrate the claims amount to fraud as a matter of law. The elements of fraud under Utah law are as follows:

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either *(a) knew to be false, or (b) made recklessly,* knowing that he [or she] had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his [or her] injury and damage.[123]

"Misrepresentation may be made either by affirmative statement or by material omission, where there exists a duty to speak."[124] "Such a duty will not be found where the parties deal at arm's length, and where the underlying facts are reasonably within the knowledge of both parties."[125] "Under such circumstances, the plaintiff is obligated to take reasonable steps to inform himself, and to protect his own interests."[126]

Particularly significant here, "a plaintiff must demonstrate that he or she, acting reasonably and in ignorance of the statement's falsity, did in fact rely upon the misrepresentation."[127] In circumstances where "a plaintiff executes a written agreement in reliance upon verbal promises that the contrary written provision is not operative, or where a plaintiff is induced to refrain from reading the contract[,]" courts have found a plaintiff's reliance on terms contrary to the written terms to be reasonable.[128] However, "[a]s a general proposition

---

[123] *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 12, 21 P.3d 219 (alteration in original) (citation omitted).

[124] *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980).

[125] *Id.*

[126] *Id.*

[127] *Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah App. 1987).

[128] *Id.*

courts have adhered to the theory that one sui juris in possession of all his faculties and dealing at arms length is not permitted by law to rely exclusively upon the representations of the other contracting party as to the contents of a written contract."[129] In fact, under Utah law, "a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information."[130] Where nothing is

> said or done which would be reasonably calculated to disarm a reasonably prudent person so that he would sign the contract without reading it and in the absence of some act or artifice in inducing the other party to refrain from reading the contract relief from the fraud is often denied.[131]

Whether reliance is reasonable is normally a matter for a jury, however, "there are instances where courts may conclude that as a matter of law, there was no reasonable reliance."[132]

Plaintiffs fail to produce sufficient evidence to support reasonable reliance. The majority of their fraud claims are contradicted by the written and signed lease agreements, and Plaintiffs fail to demonstrate that they were improperly induced to refrain from reading or relying on the contract.

Plaintiffs also claim fraud regarding Defendants' blind discount, however, courts have held that "commercial merchants generally are under no obligation to disclose their underlying costs or profits."[133] Further, the Master Lease Agreement provides that any negotiated payment

---

[129] *Johnson v. Allen*, 158 P.2d 134, 137 (Utah 1945).

[130] *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1068 (Utah 1996) (citing *Rubey v. Wood*, 373 P.2d 386, 387–88 (Utah 1962)).

[131] *Conder*, 739 P.2d at 638 (quoting *Johnson*, 158 P.2d at 137).

[132] *Gold Standard, Inc.*, 915 P.2d at 1067.

[133] *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 482–83 (S.D.N.Y. 2013) (citing *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) ("Money is just a commodity . . . . Neiman Marcus does not tell customers what it paid for the clothes they buy,

terms between Axos and the manufacturer or vendor "shall not affect [Plaintiffs'] obligations to pay rent as specifically set forth in any Schedule and shall not affect [Plaintiffs'] obligations under this Master Lease."[134] Therefore, even if the economic loss doctrine does not apply, the Court finds that Plaintiffs' fraud claim is unsupported and summary judgment in favor of Defendants is warranted.

### C. Civil Conspiracy

Plaintiffs, Axos, and Solar Experts move for summary judgment on Plaintiffs' civil conspiracy claim. To prove civil conspiracy under Utah law, a plaintiff must show "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[135]

"The claim of civil conspiracy 'require[s], as one of [its] essential elements, an underlying tort.'"[136] Plaintiffs assert six underlying torts in their Third Amended Complaint: mail fraud, wire fraud, extortion, common law fraud, civil theft, and conversion. In their Motion, Plaintiffs move for summary judgment on fraud based on Defendants "present[ing] five-year 0% financing while knowing that, to the contrary, Plaintiffs would be charged monthly funding fees

---

nor need an auto dealer reveal rebates and incentives it receives to sell cars. . . . Nor need the bank . . . explain to customers how it profits from the float on funds . . .")).

[134] Docket No. 128-13 ¶ 10.

[135] *Hatfield v. Cottages on 78th Cmty. Ass'n*, Nos. 21-4035; 21-4042; 21-4045, 2022 WL 2452379, at *4 (10th Cir. July 6, 2022) (quoting *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987)). Applying New Jersey law would yield the same result. *See Gandi*, 876 A.2d at 263 ("In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.") (internal quotation marks and citations omitted).

[136] *Puttuck v. Gendron*, 2008 UT App 362, ¶ 21, 199 P.3d 971 (alteration in original) (quoting *Coroles v. Sabey*, 2003 UT App 339, ¶ 36, 79 P.3d 974).

amounting to thousands of dollars, which were concealed from Plaintiffs in commercial presentations, in the Conditional Lease Proposal and during the ensuing months after the lease documentation was signed."[137] As discussed above, Plaintiffs fail to produce evidence that meets the elements of fraud. Since Plaintiffs cannot prove fraud as an underlying tort, civil conspiracy claim based on fraud fails as a matter of law. The Court will therefore deny Plaintiffs' Motion.

Plaintiffs also allege that the Defendants worked together to create a false inspection report.[138] Plaintiffs argue that Defendants used the inspection report as a pretext to send the Acceptance Certificate to Plaintiffs for final payment. However, Plaintiffs fail to apply this to the elements of any other unlawful overt act. Further, Plaintiffs do not appear to have reasonably relied on any alleged fraudulent misrepresentation here. Therefore, the Court will deny Plaintiffs' Motion.

Because Plaintiffs' fraud claims fail for the reasons discussed above, the Court will grant Axos and Solar Experts' Motions for Summary Judgment as to the civil conspiracy claim. For the same reasons, the Court will enter summary judgment for TechEFI Defendants on this claim.

D. Breach of Contract and Implied Covenant of Good Faith Against Solar Experts

Plaintiffs seek summary judgment against Solar Experts for breach of the Purchase Agreement.[139] Solar Experts seek summary judgment on damages pertaining to these claims. The Purchase Agreement states that it is governed by the laws of New Jersey.[140]

> [New Jersey] law imposes on a plaintiff [bringing a breach of contract claim] the burden to prove four elements: first, that the parties entered into a contract containing certain terms; second, that plaintiffs did what the contract required

---

[137] Docket No. 167, at 40–41.

[138] *Id.* at 41.

[139] Docket No. 128-4.

[140] New Jersey law shall govern the Purchase Agreement "and the rights and obligations of the Parties thereto." *Id.* ¶ 23.

them to do; third, that defendants did not do what the contract required them to do, defined as a breach of contract; and fourth, that defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs.[141]

Solar Experts first argue that Plaintiffs have no right to enforce the Purchase Agreement because they assigned their rights to Axos. After the Purchase Agreement was executed on July 24, 2019, Plaintiffs assigned their right, title, and interest in the property, defined as the solar panels and related equipment[142] to Axos in the Master Progress Funding Agreement.[143] However, there is nothing in the Master Progress Funding Agreement to suggest that Plaintiffs assigned their right to sue Solar Experts for breach of the Purchase Agreement. Solar Experts further argue that the Purchase Agreement does not allow for the assignment of rights. This is inaccurate as the Purchase Agreement clearly allows Plaintiffs to assign their rights.[144] Further, as Plaintiffs point out and Solar Experts fail to address, there is a New Jersey statute directly on point addressing third party redress under a contract claim, which states, "[a] person for whose benefit a contract is made, either simple or sealed, may sue thereon in any court . . . ."[145] The

---

[141] *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal quotation marks and citation omitted).

[142] Docket No. 128-12, at 2.

[143] Docket No. 128-14, at 2 ("Upon Lessor's payment of any Progress Payment, all of Lessee's right, title and interest in the Property shall vest in Lessor, and Lessee hereby sells and assigns its purchase orders and contract and all of its right, title and interest to such items of Property to Lessor.").

[144] *See* Docket No. 128-4 ¶ 8 ("At any time, without the consent of Solar Contractor, Purchaser may transfer and assign the Solar System to any third party. Upon any such transfer and assignment, the transferee or assignee shall obtain all rights and benefits under this Agreement that belong to Purchaser.").

[145] N.J. Stat. Ann. § 2A:15-2 (West 2013); *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 579 (D. N.J. 2010) ("In New Jersey, a third party beneficiary is entitled to sue for a breach of contract intended to benefit him" "including the implied covenant [of good faith].."); *Gold Mills, Inc., v. Orbit Processing Corp.*, 297 A.2d 203, 204 (N.J. Super. Ct. Law Div. 1972) ("The essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties. Unless such a conclusion can be derived from the contract or surrounding facts, a third party has no right

contract here is clearly for the benefit of Plaintiffs. Therefore, the Court finds that Plaintiffs have met the first element that Plaintiffs and Solar Experts Defendants entered into a contract.

Next, under the second element, Solar Experts assert that Plaintiffs failed to follow the purchase price payment terms by not paying $381,970 at signing and by delaying financing.[146] However, Solar Experts do not dispute that they were paid approximately 70% of the total amount due, which was the agreed upon amount to be paid prior to the completion of the system. Therefore, the Court finds that the undisputed facts demonstrate that Plaintiffs performed under the contract.

Next, Plaintiffs must prove that Solar Experts breached the contract. In their Third Amended Compliant, Plaintiffs assert seven instances of breach against Solar Experts.[147] Plaintiffs seek summary judgment on only four of the alleged breaches: (1) although the Purchase Agreement required installation by December 31, 2019, Solar Experts did not start installation until sometime in March or April 2020;[148] (2) Solar Experts failed to perform all work in a good, work-man-like fashion (3) Solar Experts failed to install the solar system in accordance with the engineered plans;[149] and (4) Solar Experts failed to convey title of the solar system that was free of liens, security interests, or other encumbrances.[150]

---

of action under that contract despite the fact that he may derive an incidental benefit from its performance.") (citations omitted).

[146] Docket No. 128-4, at 17; Docket No. 218, at 7; Docket No. 205, at 31.

[147] Docket No. 128 ¶ 183.

[148] Docket No. 167, at 43–44. The Third Amended Complaint asserts that Solar Experts failed to "complete installation by December 31, 2019 or within a reasonable time thereafter." Plaintiffs do not use this language in their Motion. *See* Docket No. 128 ¶ 183.

[149] Docket No. 167, at 44.

[150] *Id.* at 45–46.

As to the first alleged breach, Solar Experts argue that December 31, 2019, was an estimated date.[151] The Purchase Agreement states that SunPower, the manufacturer and distributor of the solar system components, estimated it would deliver the components by October 14, 2019.[152] There is no dispute that the components were delayed and did not get delivered until December 2019.[153] Both the completion date and the delivery date were estimated dates and there is no evidence that the delivery delay was caused by Solar Experts. Further, there is no time is of the essence clause in the Purchase Agreement. If a contract "provides a clear understanding that time is of the essence, then it is well-settled that prompt performance is essential, and the date contained in the contract . . . will be strictly enforced."[154] Here, as there is no time is of the essence clause and no evidence that the parties later agreed to one, Plaintiffs fail to show that this breach was material. Accordingly, the Court will deny Plaintiffs' Motion for Summary Judgment as to this breach.

Turning to the second alleged breach, Solar Experts agreed to complete the installation in a good, workman-like manner.[155] Plaintiffs assert that Solar Experts failed to do so and therefore breached the agreement. Under New Jersey law, "a contract for the provision of services . . . includes an implicit promise that the services will be performed in a workmanlike manner and

---

[151] Solar Experts also argue that they were unable to complete the project by December 31, 2019, because Plaintiffs filed to timely sign the financing documents. This argument is not supported by the record.

[152] Docket No. 128-4 ¶ 7(b).

[153] Docket No. 171-2, at 683:7–13; Docket No. 171-3, at 153:16–24.

[154] *Marioni v. 94 Broadway, Inc.*, 866 A.2d 208, 217 (N.J. Sup. Ct. App. Div. 2005) (internal quotation marks and citations omitted).

[155] Docket No. 128-4 ¶ 10.

that the results will be fit for its intended purpose."[156] Neither party addresses this standard, and the evidence presents genuine issues of material fact that prevents summary judgment. Emails show that Solar Experts were working to remedy the issues with the roof on site at least through August 2020 and were working with Gaco for a solution until November 2020 when Plaintiffs terminated Solar Experts.[157] Solar Experts argue that Plaintiffs have prevented them from performing by hiring third parties to complete installation. Further, the parties dispute whether the roof was leaking at the time Solar Experts was terminated from the project and before Robert Hoxit took over. Finally, the parties dispute facts material to issues regarding the roof coating and the related damages attributable to Solar Experts. Therefore, the Court will deny summary judgment as there are material facts in dispute concerning the work done by Solar Experts, and both parties fail to apply the applicable legal standard.

As to the third alleged breach, the parties agreed in the Purchase Agreement that Solar Experts would install the solar system in accordance with the engineered plans.[158] Additionally, the parties agreed that they would have the option of modifying the agreement or entering into a supplemental agreement if an engineer or architect determined that the building was unsound or could not structurally hold the system.[159] Plaintiffs argue that Solar Experts failed to install the solar system in accordance with the engineered plans. Widi Sr. testified at his deposition that there was an engineering plan for the panel installation created in July 2019, after which there

---

[156] *Duall Bldg. Restoration, Inc. v. 1143 E. Jersey Ave., Assoc., Inc.*, 652 A.2d 1225, 1235 (N.J. Super. Ct. App. Div. 1995).

[157] *See* Docket No. 212-12 (emails chronicling the repairs between Plaintiffs and Solar Experts); Docket No. 173-55 (Widi Jr. email to Pistorius and Dorand stating he got approval from Gaco "on affixing the mechanical fastening points in a manner that would not disturb the roof warranty.").

[158] Docket No. 128-4 ¶ 7(d).

[159] *Id.* ¶ 2.

were revisions.[160] He testified that at some point, Timothy Czarnik, the structural engineer

working for Solar Experts, marked up these plans due to overloading on the roof.[161] Widi Sr.

stated that Czarnik, Solar Experts, and SunPower were then able to create a plan without

overloading and without using anchors or having to remove any panels before beginning the

installation in spring 2020.[162] Widi Sr. testified that Czarnik approved this plan but that he did

not have a copy of the revised plan because SunPower is out of business.[163] Plaintiffs assert that

Czarnik never approved such a plan. They point to Czarnik's testimony that he does not

remember approving any plans for the project between December 2019 and August 2020.[164]

Czarnik also stated at his deposition that he typically would email his approval of plans but not

always.[165] This presents "a genuine controversy over a material fact,"[166] as to whether the solar

system was installed according to engineered plans precluding summary judgment. Accordingly,

the Court will deny Plaintiffs' Motion as to this claim.

Finally, Plaintiffs assert that Solar Experts breached the contract by failing to keep the

property free of liens. The Purchase Agreement states:

> Solar Contractor further warrants that upon request for payments, all work and
> materials covered by each such request and all work and materials in connection
> with any prior requests and payments previously issued shall, to the best of Solar
> Contractor's knowledge, be free and clear of liens, security interest, or other
> encumbrances adverse to [Plaintiffs'] interests.[167]

---

[160] Docket No. 173-11, at 365:6–21.

[161] *Id.* at 382:16–9.

[162] *Id.* at 382:18–384:9, 386:17–387:1.

[163] *Id.* at 387:2–391:2.

[164] Docket No. 172-45, at 187:5– 189:9.

[165] *Id.* at 187:17–191:6

[166] *Eagle v. La. & S. Life Ins. Co.*, 464 F.2d 607, 608 (10th Cir. 1972).

[167] Docket No. 128-4 ¶ 15.

It is not disputed that Solar Experts failed to pay Cooper Electric resulting in a lien being placed on Plaintiffs' property.[168] Solar Experts merely argue that they did not have the necessary funds to pay Cooper Electric because Plaintiffs failed to follow the payment schedule.[169] As discussed above, however, the undisputed material facts support that Plaintiffs completed payments as required in the Purchase Agreement. Solar Experts' failure to keep the property free of liens was therefore a breach of the Purchase Agreement.

As to this breach, Plaintiffs seek damages in the form of attorney's fees to defend against and remove the Cooper Electric lien. As part of the settlement agreement in the New Jersey state court case between Plaintiffs, Solar Experts, and Cooper Electric, Axos paid Solar Experts approximately $164,000. In turn, Solar Experts paid Cooper Electric for the outstanding lien amount. Cooper Electric released the lien and Solar Experts dismissed their complaint, involving their $545,910.00 lien against Plaintiffs. Solar Experts agreed that the $164,000 would be credited towards the total remaining amount due as they failed to pay the original $250,000 amount.[170] While Plaintiffs demonstrate they were damaged by Solar Experts breach, they do not demonstrate the amount of damages. As such, the Court will grant summary judgment as to this claim of breach of contract; however, the Court declines to determine an amount of damages and leaves the issue for trial.

In addition to their breach of contract claims, Plaintiffs seek summary judgment on their claim of breach of good faith and fair dealing claim against Solar Experts. Plaintiffs do not provide any legal basis or specific facts to support such a finding. Solar Experts also do not

---

[168] Docket No. 205, at 21.

[169] *Id.*

[170] Docket No. 112-7, at 3–5.

address this claim. Therefore, the Court will deny summary judgment as to both Plaintiffs' and Solar Experts Defendants' Motions on this claim.

Solar Experts argue that, assuming Plaintiffs can prove breach, Plaintiffs cannot prove damages, and therefore Solar Experts are entitled to summary judgment.[171] Solar Experts move for summary judgment on damages relating to (1) roof damage; (2) delay damage; and (3) damages stemming from the failure to perform an arc flash study. The Court will address each issue below.

First, Solar Experts argue that Plaintiffs cannot prevail on a breach of contract claim relating to the work on the roof because an expert is required to testify as to the cause of the leaks. Solar Experts argue that the subject of roof leaks and damages is "so esoteric that jurors of common judgment and experience cannot form a valid conclusion," and therefore an expert is required.[172] To support this, they cite to cases wherein experts were used in roof leak cases.[173] These cases do not stand for the proposition that an expert is required to testify as to what caused a roof leak. Many of the cases involve negligence claims and do not support Solar Experts' claim

---

[171] Docket No. 170, at 14–24.

[172] *Id.*, at 16 (quoting *Wyatt by Caldwell v. Wyatt*, 526 A.2d 719, 725 (N.J. Supr. Ct. App. Div. 1987)).

[173] *Id.* (citing *Millar v. United Advert. Corp*, 35 A.2d 717 (N.J. 1944) (relying on an expert to determine the source of water coming from the roof); *Bowen v. Godfrey*, 154 A. 191 (N.J. 1931) (per curiam) (finding no expert was needed when there was no leak prior to the work done on the roof and immediately thereafter it leaked in many places); *Jacobsen v. Iavarone*, No. A-0640-07T2, 2009 WL 2208414 (Sup. Ct. N.J. App. Div. July 27, 2009) (affirming trial court's finding that plaintiffs failed to produce evidence as to damages, including failure to produce an expert witness to testify as to the need to replace the roof); *D'Alessandro v. Hartzel*, 29 A.3d 1112 (Sup. Ct. N.J. App. Div. 2011) (determining in a negligence case that expert testimony of deficiencies in design or construction was required to show the condition was dangerous as the matter was so specialized, "jurors of common judgment and experience [could] not form a valid conclusion."); *Wean v. U.S. Home Corp*, No. A-5521-17T3, 2020 WL 1082327 (N.J. Sup. Ct. App. Div. Mar. 6, 2020) (affirming summary judgment where a plaintiff's construction expert could not link construction defects and water infiltration to the presence of mold in the plaintiff's home under a negligence claim)).

35

that the absence of expert testimony here is fatal to Plaintiffs' breach of contract claim.[174] It appears that Miles and other witnesses can testify as to the timing of the leaks related to Solar Experts' and subsequent contractors' work on the roof. Solar Experts do not demonstrate that the issue of roof leaks is so outside of common judgment and experience as to preclude a valid conclusion. As such, the Court will deny Solar Experts' summary judgment as to these damages.

Solar Experts next assert that Plaintiffs are not entitled to damages for loss of Solar Renewable Energy Certificates ("SRECs") from the state between January 2020 to September 2020. These alleged damages result from Plaintiffs loss of the SREC credits due to the delay in installation. For the reasons discussed above, Plaintiffs' claim related to these damages is not supported. Plaintiffs fail to allege facts demonstrating that the delay in installation was a breach of contract as a matter of law. The Court will therefore grant Solar Experts' Motion as to delay damages.

Solar Experts also seek summary judgment as to the damages resulting from failure to conduct an arc flash study. Arc flash hazard warnings labels are required under the 2014 National Electric Code ("NEC") for systems, like the solar system at issue, that may be worked on while the system is energized.[175] A short circuit study is required per the 2014 NEC and must be performed by a licensed professional engineer.[176] Solar Experts assert that because the local utility company and the Township of Lumberton issued permission for the solar system to operate on August 25, 2020, Plaintiffs were not damaged by Solar Experts' failure to conduct an

---

[174] Further, under New Jersey law, even in negligence cases there is no bright line rule requiring an expert to testify to prove claims involving roof leaks or roof related issues. *See Butler v. Acme Mkts., Inc.*, 445 A.2d 1141, 1147 (N.J. 1982) ("As to the absence of expert testimony, except for malpractice cases, there is no general rule or policy *requiring* expert testimony as to the standard of care.").

[175] Docket No. 171-12, at 8.

[176] *Id.*

arc flash study.[177] Plaintiffs counter that Solar Experts had a separate contractual duty to install

the system to code and failed to do so.[178] Plaintiffs assert that they had to retain Triad Consulting

Engineers to perform the Power System and Arc Flash Study that should have been performed

by Solar Experts and had to pay $14,100 to Triad. Solar Experts argue in their reply that the

Purchase Agreement only required the arc flash hazard warning, and the study was not required

under the plans.[179] The Court finds that there is a genuine dispute as to whether the study was

required under the contract and therefore a genuine material dispute as to the damages. As such,

the Court will deny Solar Experts' Motion as to the damages for this breach of contract claim.

E. Breach of Contract and Implied Covenant of Good Faith Axos

Plaintiffs allege that Axos breached the Master Lease Agreement, Lease Schedule No.

001, the Master Progress Funding Agreement, and the ACH Authorization (collectively the

"Lease Agreements").[180] Plaintiffs and Axos filed cross motions for summary judgment on this

claim.

Under Utah law, a breach of contract claim requires (1) the existence of a contract, (2)

performance of the contract by the party asserting the claim, (3) breach of the contract by the

other party, and (4) damages.[181] Turning to the first two elements, there is no dispute that the

contracts at issue existed, and Axos does not dispute that Plaintiffs performed under the

contracts.

---

[177] Docket No. 170, at 24–25.

[178] Docket No. 196, at 47–48.

[179] Docket No. 219, at 20.

[180] Docket No. 128 ¶ 186.

[181] *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1151 (10th Cir. 2013) (affirming dismissal where plaintiff failed to explain "how [defendant] breached the contract, which contractual provisions were violated, and how [plaintiff] upheld her end of the agreement") (citing *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001)).

In the Third Amended Complaint, Plaintiffs allege four breaches.[182] Plaintiffs move for summary judgement on only two of those alleged breaches: (1) Axos "failed to make payments against the purchase price for such items of Property as directed in the Authorization as required by the Funding Agreement;"[183] and (2) Axos charged a service charge based on the amount authorized by Plaintiffs, and not the actual amount paid to Solar Experts by Axos.[184]

Authorization No. 1 directs Axos to "make a deposit payment against the purchase price of the Property" to Solar Experts in the amount of $1,330,790.[185] Plaintiffs argue that when Axos paid Solar Experts $880,938.50 pursuant to the negotiated blind discount between Axos and Solar Experts, that breached the Funding Agreement. The Funding Agreement states that "Lessor agrees to make payments against the purchase price for such items of Property as directed in the Authorization."[186] Axos argues this is not a breach since the amount paid reflects the blind discount—in essence the $880,938.50 satisfied the $1,330,790 invoice.[187] Plaintiffs argue that "it was not correct to add any portion of the blind discount because no portion of the blind discount was due and payable until commencement of the lease."[188] However, they fail to provide a basis for this assertion, and given the existence of the invoice for $880,938.50 from Solar Experts to Axos reflecting the blind discount, this does not appear to be accurate. Further, under the Master Lease Agreement, the parties manifestly agreed that Axos' "negotiated payment terms to any manufacturer or vendor, including the date of payment and discounts, shall not affect [Plaintiffs']

---

[182] Docket No. 128 ¶ 187.

[183] Docket No. 167, at 34.

[184] *Id.* at 35.

[185] Docket No. 128-17, at 2

[186] Docket No. 128-14, at 2.

[187] Docket No. 212, at 8.

[188] *Id.*

obligations under th[e] Master Lease."[189] Plaintiffs do not demonstrate that this is a breach as a matter of law. Instead, the undisputed facts demonstrate that Axos is entitled to summary judgment on this claim.

Turning to the second alleged breach, Plaintiffs argue that Axos Bank charged a service charge based on the $1,330,790 amount instead of on the blind discount amount of $880,938.50. The Funding Agreement states that "Lessee agrees that in consideration of each Progress Payment made by Lessor pursuant to this Agreement, Lessee shall pay to Lessor a daily pro-rata 'service charge.'"[190] Plaintiffs rely on both Phillips' and Gordon's deposition testimony which reflected this. In response, Axos points to Phillips' Declaration[191] in which, after the deposition, Phillips states that she was mistaken in her testimony at the deposition and that Axos Bank calculated the service charges based on $880,938,50 instead of $1,330,790.[192] Phillips states that after reviewing the actual invoices and calculating the service charges based on the monthly lease rate factor, she has confirmed that she was mistaken in her previous testimony. Additionally, Axos presents evidence via Gordon's declaration[193] in which he echoes Phillips' declaration that the service charge was calculated based on the $880k amount.[194]

Plaintiffs argue that the Court should disregard these subsequent inconsistent affidavits. However, Plaintiffs' proposed test is whether the contrary affidavit seeks to create a "sham fact

---

[189] Docket No. 164-1 ¶ 10.

[190] Docket No. 128-14, at 2.

[191] Docket No. 164-18.

[192] *Id.* at 5–7.

[193] Docket No. 164-19.

[194] *Id.* at 6.

issue,"[195] which is not the case here. The record instead shows that the affidavits were a correction to deposition testimony, filed before the motions for summary judgment, and are based upon invoices and calculations that were provided to the Court.[196] The record before the Court does not demonstrate that this was a breach of contract and therefore, the Court will grant Axos Defendants' Motion and deny Plaintiffs' Motion as to this claim.

Axos moves for summary judgment on the remaining allegations of breach of contract on the grounds that the Court already addressed and dismissed them. These alleged breaches are: (1) representing Solar Experts was a capable contractor; and (2) acting in the interests of Solar Experts and Axos, and contrary to the interests of Plaintiffs.[197] The Court did indeed dismiss these claims in its Order granting in part and denying in part Axos' Motion to Dismiss.[198] There, the Court concluded that these were not breaches of contract because no provision of the lease documents required Axos to do otherwise. Accordingly, the Court will grant Axos' Motion as to these claims.

Plaintiffs and Axos both move for summary judgment on Plaintiffs' claim that Axos breached the implied covenant of good faith and fair dealing. Plaintiffs assert Axos breached the covenant "by refusing to commence the lease on good-faith terms when [Solar Experts] failed to

---

[195] *See Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995) ("Courts will disregard a contrary affidavit when they conclude that is constitutes an attempt to create a sham fact issue. To determine whether a contrary affidavit seeks to create a sham fact issue, we determine whether: (1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain") (internal quotation marks and citation omitted).

[196] Docket No. 223, at 14–16.

[197] Docket No. 128 ¶ 187.

[198] Docket No. 69, at 28–29.

timely and properly install the Solar System, requiring Plaintiffs to pay hefty service charges instead of making payments on the lease."[199]

Both the Utah Uniform Commercial Code and Utah common law impose a covenant of good faith and fair dealing in all contractual relationships.[200] "Under the covenant of good faith and fair dealing, each party promises not to intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract, and to comply, a party must act consistently with the agreed common purpose and the justified expectations of the other party."[201] The reasoning underlying this duty is that "no one would reasonably accede to a contract that left him vulnerable to another's opportunistic interference with the contract's fulfillment."[202] In evaluating a potential breach of the implied covenant, "both the contract language and the course of dealings between the parties should be considered to determine the parties' purpose, intentions, and expectations."[203]

In *Velocity Press v. Key Bank, N.A.*, the Tenth Circuit affirmed this Court's finding that a bank defendant breached the covenant of good faith and fair dealing.[204] In that case, the plaintiff and supplier entered into a contract for the manufacture and installation of a printing press. The plaintiff agreed to make four installation payments during various points of manufacture and

---

[199] Docket No. 167, at 35.

[200] Utah Code Ann. § 70A-1a-304; *Blakely v. USAA Cas. Ins. Co.*, 633 F.3d 944, 947 (10th Cir. 2011) ("In Utah, a plaintiff may sue on a contract for: (1) breach of the contract's express terms; and/or (2) breach of the covenant of good faith and fair dealing, which is an implied duty that inheres in every contractual relationship."); *Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876; *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991) ("[E]very contract is subject to an implied covenant of good faith.").

[201] *Rawson*, 2001 UT 24, ¶ 44 (internal quotation marks and citations omitted).

[202] *Young Living Essential Oils v. Marin*, 2011 UT 64, ¶ 9, 266 P.3d 814.

[203] *Rawson*, 2001 UT 24, ¶ 44.

[204] 570 F. App'x 783 (10th Cir. 2014).

installation. To secure financing, the plaintiff entered into an agreement with the bank defendant for a loan and a revolving line of credit. Prior to the closing of the loan, the bank made changes to plaintiff's contract with the equipment manufacturer/supplier without the plaintiff's knowledge. The supplier agreed to change the timing of the third progress payment to give the bank, rather than the supplier, a first position security interest in the initial parts and materials purchased to construct the printing press, and that supplier would have to obtain a letter of credit to secure the second progress payment. The plaintiff argued that the bank breached the implied covenant of good faith and fair dealing by renegotiating plaintiff and supplier's contract without the plaintiff's knowledge and requiring supplier to have a letter of credit in place before the second progress payment.[205] The Tenth Circuit affirmed this Court in its finding that "[the bank] continued to prevent [the plaintiff] from receiving the fruits of its contract" and therefore breached the implied covenant.[206]

Here, the "agreed common purpose" of the leasing agreements was to finance Plaintiffs' purchase of the solar system. Axos prevented Plaintiffs from receiving the fruits of the contract, i.e., commencing the lease of the solar system. On April 29, 2020, Plaintiffs asked Axos to commence the lease on May 1, but to hold $200,000 in escrow pending final inspection.[207] Based on the Master Lease Agreement, Axos told Plaintiffs it would commence the lease on July 1, 2020.[208] Thereafter, an inspection took place after which, Axos sent a Partial Acceptance Certificate for the final disbursement to Solar Experts and an Acceptance Certificate stating that

---

[205] *Id.* at 790.

[206] *Id.*

[207] Docket No. 203 (SEALED) ¶ 65.

[208] The Master Lease defines "commencement date" as "where the Acceptance Date for such Schedule falls on the first day of a calendar quarter, and in any other case, the first day of the calendar quarter following the calendar quarter in which such Acceptance Date falls." Docket No. 128-13, at 10.

the solar system was "fully and completely installed."[209] Plaintiffs refused to sign the Acceptance Certificate, stating that the system was not complete or producing energy. Between July 2020 and September 2020, Plaintiffs continued to be charged for and pay progress payments totaling approximately $144,335.80. In what Axos asserts are "settlement discussions," they asked Plaintiffs to pay $207,997.80 to bring the account current, which included the $144,335.80 in July through September 2020 progress payments and $63,662 for the first lease payment for October 2020, which Plaintiffs paid.[210] Axos provided an Acceptance Certificate to Plaintiffs that would provide a general release to Axos.[211] Plaintiffs refused to sign it, stating that it contained false statements about the status of the project.[212] Axos has still not commenced the lease, despite Plaintiffs paying Lease payments through at least May 2023, for 32 total lease payments of $63,662 each.[213]

The Master Lease Agreement states that

> Lessee's failure to execute and deliver an Acceptance Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has signed and delivered a Master Progress Funding Agreement, Lessor may in its *sole discretion*, at any time by written notice to Lessee, declare all prior Authorizations . . . signed in connection with the Master Progress Funding Agreement to be and constitute the Acceptance Certificate for all purposes under the Lease, and the Acceptance Date of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Authorization.[214]

Per this provision, it is within Axos' discretion when to commence the lease, and contrary to their arguments, a signed Acceptance Certificate was not required for them to commence it.

---

[209] Docket No. 167, at 18.

[210] Docket No. 203 (SEALED) ¶¶ 92–95.

[211] *Id.* ¶ 98.

[212] *Id.* ¶ 106.

[213] *Id.* ¶¶ 109, 112.

[214] Docket No. 128-13 ¶ 6(a) (emphasis added).

When a party retains discretion under a contract, they can exercise that power in a way that breaches the covenant of good faith and fair dealing.[215] "Instances inevitably arise in which one party exercises discretion retained in a way that denies the other a reasonably expected benefit of the bargain."[216] "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[217] Deferred decisions in which one party has discretion as to the time of performance often must be made in good faith.[218]

Axos argues that Plaintiffs' refusal to sign the Acceptance Certificate in August 2020 contradicts Plaintiffs' arguments regarding breach of good faith and fair dealing.[219] They argue they cannot be liable for failure to commence the Lease term when Plaintiffs refused to commence the Lease term by signing the Acceptance Certificate due to serious concerns regarding Solar Experts' installation. This is not persuasive as the Master Lease Agreement contemplated this scenario and gave Axos sole discretion to determine whether to commence the lease upon execution of the Master Lease.

Axos also contends that the Court's prior statement that "failure to commence the lease term was not a violation of the lease because the lease does not require Axos to do so"[220] precludes the Court from now finding a breach of the covenant of good faith and fair dealing. In

---

[215] *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 450 (Utah App. 1994).

[216] *Id.* (citation omitted).

[217] Restatement (Second) of Contracts § 205 cmt. a. (1979); *see also* Steven J. Burton, *Breach of Contract and Common Law Duty to Perform in Good Faith*, 94 Harvard L. Rev. 369, 383 (1980).

[218] Burton, *supra* note 214, at 382.

[219] Docket No. 203 (SEALED), at 30.

[220] *Id.* at 32 n.9.

support Axos asserts that "this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante."[221]

Utah courts have addressed these concerns: "[w]here the contract allows discretion but does not provide any express standard for exercising that discretion, the covenant imposes an objective standard of reasonableness."[222] "If, on the other hand, the parties have bargained for the precise formula or test under which discretion will be exercised, the court cannot use the covenant to add to or alter the terms of that express agreement."[223]

Here, the contract does not impose a standard or test under which Axos' discretion to commence the lease should be governed, aside from the Master Lease Agreement being "signed and delivered" by Plaintiffs.[224] Therefore, "the imposition of a standard of objective reasonableness does not run afoul of the express contract terms."[225] While the failure to commence the lease may not be a breach of the express terms of the contract, as the Court previously concluded, the Court finds that such failure is a breach of the implied covenant of good faith and fair dealing and Plaintiffs are entitled to judgment as a matter of law. Accordingly, the Court will deny Axos' Motion as to this claim and grant Plaintiffs' Motion.

---

[221] *See id.* (quoting *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226).

[222] *Markham v. Bradley*, 2007 UT App 379, ¶ 21, 173 P.3d 865; *see also Backbone Worldwide, Inc. v. LifeVantage Corp.*, 2019 UT App 80, ¶ 17, 443 P.3d 780, 785 ("These situations necessarily involve contracts that do not impose definitional limits on the party's exercise of discretion, and therefore implying 'good faith' or 'reasonableness' requirements through the covenant is not at all inconsistent with any express contractual terms").

[223] *Markham*, 2007 UT App 379, ¶ 21; *see also Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 20, 84 P.3d 1154 ("[T]he degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and imposed limitations on the exercise of discretion through express contract terms.").

[224] Docket No. 128-13 ¶ 6.

[225] *Markham*, 2007 UT App 379, ¶ 24 (citing *Oakwood Vill. LLC*, 2004 UT 101, ¶ 45).

F. Breach of Fiduciary Duty Axos

Both Plaintiffs and Axos Defendants move for summary judgment on Plaintiffs' breach of fiduciary duty claim. Plaintiffs assert that Axos owed a fiduciary duty to Plaintiffs when Plaintiffs' rights were assigned to Axos via the Lease Documents.[226]

"A claim for breach of fiduciary duty requires proof of four elements: (1) a fiduciary relationship; (2) breach of the fiduciary's duty; (3) causation, both actual and proximate; and (4) damages."[227] A fiduciary relationship is one that "imparts a position of peculiar confidence placed by one individual in another . . . . Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary."[228] "There is no invariable rule which determines the existence of a fiduciary relationship, but . . . there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts, or other conditions, giving to one advantage over the other."[229]

"A bank typically does not owe a fiduciary duty to its customers, but a fiduciary relationship may arise if a customer 'place[s] particular confidence in' the bank, if the bank was 'in a position to have and exercise influence over' the customer."[230] This influence may be found "if the customer placed property in the bank's charge, if there was 'overmastering influence,

---

[226] Docket No. 167, at 47.

[227] *Old Republic Nat'l Title Ins. Co. v. Home Abstract & Title Co.*, No. 1:12cv00171, 2014 WL 2918551, at *15 (D. Utah June 27, 2014) (citing *Shaw Res. v. Pruit, Gushee & Bachtell*, 2006 UT App 313, ¶ 22, 142 P.3d 560).

[228] *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (citation omitted).

[229] *Id.* (citations omitted).

[230] *Velocity Press,* 570 Fed. App'x at 791 (alteration in original) (quoting *First Sec. Bank N.A.*, 786 P.2d at 1333).

dependence, or trust justifiably (and with mutual understanding) reposed' or 'weakness of age, mental strength, business experience, or intelligence' on the part of the customer."[231] "In Utah, a fiduciary or confidential relationship will be found when one party, having gained the trust and confidence of another exercises extraordinary influence over the other party."[232]

 To support their claim that a fiduciary duty existed, Plaintiffs cite to the language of the Master Progress Funding Agreement, which reads:

> Upon Lessor's payment of any Progress Payment, all of Lessee's right, title and interest in the Property (including any claims Lessee may have to the Property through vendor, and any licenses from vendor) shall vest in Lessor, and Lessee hereby sells and assigns its purchase orders and contracts and all of its right, title and interest to such items of Property to Lessor. From the date risk of loss passes from a vendor as to items of Property paid for by Lessor, Lessee shall bear all risk of loss and liability, and Lessee shall assume and be responsible for all of Lessee's obligations with respect to items of Property as specified in the Lease.[233]

In addition to this language, Plaintiffs cite to two emails. First, an email from Pistorius to Miles in which Pistorius replies to Miles' list of concerns and refusal to pay Solar Experts the final sum.[234] Pistorius states that he will look into the issues Miles has raised. And second, an email in which Bryce Huff, an Axos Credit officer, emails Solar Experts and states "[s]ince we are the funding source we now have the leverage to make sure all parties complete the project."[235]

 The undisputed facts here demonstrate that Axos did not owe a fiduciary duty to Plaintiffs. "[O]rdinarily there is no fiduciary relation in case of a contract duty, since the rights and duties of parties to a contract may generally be freely transferred, parties may act for their

---

[231] *Id.* (quoting *First Sec. Bank N.A.*, 786 P.2d at 1333).

[232] *State Bank of S. Utah v. Troy Hygro Sys., Inc.*, 894 P.2d 1270, 1275 (Utah Ct. App. 1995) (international quotation marks and citation omitted).

[233] Docket No. 128-14, at 2.

[234] Docket No. 167, at 49.

[235] *Id.* at 48.

own interests during the execution of a contract, and they have no duty of loyal representation of the opposing party."[236] Plaintiffs fail to show how the assignment of rights and interests under the Master Funding Agreement or the emails result in a contractual relationship falling outside the general rule that banks do not owe customers a fiduciary duty.

The Court previously concluded under Fed. R. Civ. P. 12(b)(6) that in assigning their rights to Axos and relying on Axos to defend their interests, Plaintiffs sufficiently pleaded that Axos owed Plaintiffs a fiduciary duty.[237] However, now under the summary judgment standard, Plaintiffs fail to demonstrate that Axos owed them such a fiduciary duty. Further, even if Axos did owe Plaintiffs a fiduciary duty based upon the finance lease agreement, their argument that Axos breached its duty of loyalty and care by failing to induce Solar Experts to address the deficiencies is not particularly supported as Axos has still not paid out the final amount owed under the agreement to Solar Experts. The Court will therefore grant Axos Defendants' Motion as to this claim and find that the undisputed facts demonstrate that Axos did not owe Plaintiffs a fiduciary duty.

G. Declaratory Relief Axos

Plaintiffs move for summary judgment against Axos under the Utah Declaratory Judgment Act.[238] Plaintiffs ask the Court to declare Sections 9, 15, and 19 of the Lease Agreement and the Final Acceptance Certificate unconscionable and against public policy.[239]

---

[236] *Semenov v. Hill*, 1999 UT 58, ¶ 8, 982 P.2d 578 (quoting 17 C.J.S. *Contracts*, § 1(2) (1963)).

[237] Docket No. 69, at 33–34.

[238] Utah Code Ann. §§78B-6-401, 70A-2-302l; 28 U.S.C. § 2201; Docket No. 167, at 50.

[239] Docket No. 167, at 51.

They also ask the Court to declare that the Broker Agreement is unconscionable and void.[240]

Axos also seeks summary judgment on Plaintiffs' claim for declaratory relief.

Section 9(b) of the Master Lease states that "[Axos] shall not be liable to [Plaintiffs] . . . for consequential, incidental, special or exemplary damages arising out of or related to the transaction."[241] Section 15 states that "[Plaintiffs] shall indemnify and hold [Axos] harmless from and against any claims . . . arising out of or in any manner connected with or resulting from the Lease, the Property, or use of the Property."[242] Section 19 states that as permitted by law, "[Plaintiffs] hereby waive[] any and all rights and remedies conferred upon [Plaintiffs] by Sections 70A-2A-508 through 70A-2A-522 of the Utah Uniform Commercial Code."[243]

As a general rule, under Utah law "a contract clause limiting liability will not be applied in a fraud action. The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy. A contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud."[244] Plaintiffs assert that they are entitled to summary judgment on their declaratory judgment claim because they demonstrated they were "fraudulently induced to enter into the Conditional Lease Proposal and subsequently, the Lease Documents, through multiple acts of fraud."[245] Plaintiffs cannot prevail on a claim for declaratory judgment as a matter of law without prevailing on their fraud claim. Because Plaintiffs did not prevail on their fraud claim as discussed above, the Court will grant summary judgment in favor of Axos Defendants as to this claim.

---

[240] *Id.*

[241] Docket No. 164-1, ¶ 9(b).

[242] *Id.* ¶ 15.

[243] *Id.* ¶ 19.

[244] *Lamb v. Bangart*, 525 P.2d 602, 608 (Utah 1974).

[245] Docket No. 167, at 51.

H. Axos Counterclaims

Plaintiffs and Axos both seek summary judgment on Axos' counterclaims for breach of lease, guaranty, and replevin.[246]

Plaintiffs and Axos seek summary judgment on Axos' counterclaim for breach of the lease.[247] Axos asserts that Plaintiffs defaulted on their obligations under the lease by: (1) failing to deliver the Acceptance Certificate within three months after the first Progress Payment as required under the Master Progress Funding Agreement; (2) failing to keep the Property and Axos' interest under the lease free and clear of all liens and encumbrances as required in paragraph 8(b) of the Master Lease; (3) taking action to impair co-lessees' performance under the lease in violation of paragraph 16(n) of the Master Lease; and (4) failing to indemnify and hold Axos harmless from and against claims and damages (including attorney's fees) it has incurred in defending against claims connected to the lease and property. Axos argues that because of these breaches, it is entitled to exercise all remedies under the Lease including making due the total Casualty Loss Value in the amount of $3,610,381.31. The Court will address each argument in turn below.

First, Axos asserts that Plaintiffs breached the lease by failing to deliver the Acceptance Certificate within three months after the first progress payment on November 22, 2019. Plaintiffs argue that they did not deliver the Acceptance Certificate because (1) there was no Acceptance Certificate sent to them by Axos until June 24, 2020, and (2) when it was offered it contained false statements, including that the solar system was up and running when it was not operational.[248] The Master Progress Funding Agreement states that Plaintiffs agree that "if the

---

[246] *Id.* at 52.

[247] *Id.*

[248] *Id.* at 52–53.

Property is not accepted by [Plaintiffs] under a Lease as evidenced by [Plaintiffs'] signature on the Acceptance Certificate within three (3) months after the first Progress Payment is made," Axos may act, including by commencing the lease without an acceptance, and exercise rights and remedies under the lease as this event would be considered an "Event of Default" under the lease.[249]

Section 6(a) of the Master Lease Agreement states that "[a]fter [Plaintiffs] receive[] and inspect[] any Property and [are] satisfied that the Property is satisfactory, [Plaintiffs] shall execute and deliver to [Axos] an Acceptance Certificate in the form provided by Lessor; provided however, the [Plaintiffs'] failure to execute and deliver an Acceptance Certificate for any Property shall *not* affect the validity and enforceability of the Lease with respect to the Property."[250]

The Master Progress Funding Agreement states that "[i]n the event of a conflict between provisions of this Agreement and the Lease, the provisions of the Lease shall govern."[251] Unlike the funding agreement, nothing in the Lease requires delivery of an Acceptance Certificate within three months of the first progress payment. Therefore, the Court finds that Plaintiffs are entitled to summary judgment as to this claim.

Second, Axos asserts that Plaintiffs breached the lease agreements by failing to keep the property and Axos' interest under the lease free and clear of all liens and encumbrances as required in paragraph 8(b) of the Master Lease. There is no dispute that the Cooper Electric lien is on Plaintiffs' real property and not the solar system itself.[252] The Master Lease states that it is

---

[249] Docket No. 128-14, at 2.

[250] Docket No. 128-13 ¶ 6(a) (emphasis added).

[251] Docket No. 128-14, at 2.

[252] Docket No. 173-20, at 3; Docket No. 212, at 31; Docket No. 223 (SEALED), at 12.

an event of default if the Plaintiffs "permit[] a judgment or other claim to become a lien upon any or all of [Plaintiffs'] assets or upon the Property."[253] Along with this claim, Axos states that it is a breach that Plaintiffs failed to indemnify them against the Cooper Electric lien and the lien litigation. To support this Axos states that they were required to pay $164,668.39 to Cooper Electric to resolve the Cooper lawsuit.[254] Axos fails to demonstrate that this was a breach by Plaintiffs as Plaintiffs instructed Axos to pay Cooper Electric in February 2020 and authorized payment. It was Solar Experts who failed to pay Cooper Electric and caused the lien to be issued in December 2020. Accordingly, the Court finds that this was not a breach by Plaintiffs and will deny Axos' Motion and grant Plaintiffs' Motion as to this claim.

Axos' final claim of breach of the lease is that Plaintiffs caused them to believe in good faith that the prospect of payment or performance under the Lease was impaired and caused Axos to feel insecure in continuing to fund the lease.[255] The Master Lease states that it is an event of default if Axos "believes in good faith for any other reason that the prospect of payment or performance has become impaired . . . . or otherwise causes [Axos] to feel insecure in funding or continuing to fund the Lease or any Schedule."[256] Axos asserts that by filing this suit, Plaintiffs caused them to believe that Plaintiffs do not intend to perform as required by the Lease.[257] However, the undisputed facts establish that Plaintiffs have continued to make lease payments each month from October 2020 through at least May 2023.[258] As such, Axos fails to

---

[253] Docket No. 128-13 ¶ 16(a).

[254] Docket No. 223 (SEALED), at 12.

[255] Docket No. 185 (SEALED), at 25.

[256] Docket No. 128-13 ¶ 16(n).

[257] Docket No. 203 (SEALED), at 53.

demonstrate they are entitled to summary judgment as a matter of law, and based on their continuing payments, the Court will grant Plaintiffs' Motion for Summary Judgment as to this claim.

Axos asserts five additional breaches in their Motion for Summary Judgment. These alleged breaches were not included in their Amended Answer and Counterclaim filed in response to Plaintiffs' Third (and final) Amended Complaint.

While the Supreme Court has mandated a liberal standard for pleadings under Fed. R. Civ. P. 8(a), "[e]fficiency and judicial economy require that the liberal pleading standards . . . are inapplicable after discovery has commenced."[259] Thus, at the summary judgment stage, it is improper for a plaintiff or counter plaintiff to assert new facts to support their claim. The Court therefore declines to address these alleged breaches.

Axos also asserts breach of guaranty and replevin counter claims against Plaintiffs. Plaintiffs executed a Guaranty in November 2019, which states that Plaintiffs "unconditionally guarantee[] the full, complete and prompt payment, performance, and observance of all . . . obligations under each Lease."[260] The Guaranty states that Plaintiffs are in breach if Plaintiffs default in the prompt performance of any provision in the Guaranty, including any of the event of default provisions in the Master Lease.[261] Plaintiffs argue that these claims stem from the same breaches as above and therefore fail as a matter of law. The Court agrees and will deny Axos' Motion and grant summary judgment in favor of Plaintiffs.

---

[258] *Id.* ¶ 112 (SEALED) (Axos does not dispute that Plaintiffs have paid $63,662.00 for at least 32 months, they only dispute that those are lease payments as according to them, the lease has not commenced).

[259] *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004).

[260] Docket No. 164-7, at 2.

[261] *Id.* at 4.

Finally, to prevail on a claim of replevin, a party must show: "(1) that the plaintiff [or defendant asserting a counterclaim] is entitled to possession; and (2) that the defendant [or plaintiff] wrongfully detains the property."[262] Axos Defendants argue that, under the Master Lease, they may repossess the property upon default by the lessees. As discussed above, Axos Defendants do not demonstrate that Plaintiffs breached the lease and therefore Plaintiffs are not in default. Accordingly, the Court will grant Plaintiffs' Motion and deny Axos' Motion as to the replevin claim.

## V. CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 167) is GRANTED in part and DENIED in part; It is further

ORDERED that Solar Experts Defendants' Motion for Partial Summary Judgment (Docket No. 170) is GRANTED in part and DENIED in part; It is further

ORDERED that Axos Defendants' Motion for Summary Judgment (Docket No. 183) is GRANTED in part and DENIED in part.

The Court will further order the parties participate in a settlement conference and will refer this matter to a Magistrate Judge to conduct the conference in a separate order.

DATED April 22, 2024.

BY THE COURT:

_____

TED STEWART
United States District Judge

---

[262] Utah R. Civ. P. 64B.