IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| 100 MOUNT HOLLY BYPASS, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AXOS BANK, et al., <br><br> Defendants. | FINDINGS OF FACT AND CONCLUSIONS OF LAW <br><br><br> Case No. 2:20-cv-00856-TS-CMR <br><br> District Judge Ted Stewart <br> Magistrate Judge Cecilia M. Romero |

This matter came before the Court for a two-day bench trial that began on September 22, 2025, to determine when the lease agreement between Plaintiffs 100 Mount Holly Bypass, LLC, Miles Technologies, Inc. and Christopher Miles and Defendant Axos Bank should have commenced, and any damages flowing therefrom. Having heard the evidence presented at trial, reviewed the materials submitted by the parties, and being otherwise fully informed, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

The Parties

1. Plaintiff Miles Technology, Inc. ("Miles Tech") is an information technologies services provider that is controlled by its founder and Chief Executive Officer ("CEO"), Plaintiff Christopher Miles.

2. Plaintiff 100 Mount Holly Bypass, LLC ("Mount Holly") is a limited liability company that was formed by Miles for the purpose of purchasing a large commercial building located at 100 Mount Holly Bypass in Lumberton, New Jersey.

3. Since Miles purchased the building in 2018, Miles Tech occupied a portion of the building.

4. New Jersey Clean Energy Solutions, LLC, d/b/a Solar Experts ("Solar Experts") is a New Jersey limited liability company in the business of commercial solar systems. During the time relevant to this case, David J. Widi, Sr. was the President and CEO of Solar Experts, and David Widi, Jr. was the Director of Marketing and Sales.

The Purchase Agreement

5. In July 2019, Miles Tech contacted Solar Experts about purchasing a solar energy system for the roof of the building owned by Mount Holly and occupied by Miles Tech.

6. Solar Experts offered to sell and install the solar system for a total cost of $3,819,700.00, payable over seven years at a 2% interest rate.

7. After the purchase price was negotiated, Solar Experts contacted Everett Dorand of Tech Equipment Finance, LLC ("TechEFI"), a broker engaged in the business of equipment leasing and financing, to seek financing for the purchase on behalf of Plaintiffs.

8. On July 12, 2019, Plaintiffs executed a Conditional Loan Proposal with TechEFI, which set out the proposed basic terms for the financing agreement.

9. On July 24, 2019, in conjunction with the execution of the Conditional Loan Proposal, Plaintiffs sent a $25,000 deposit check to TechEFI that Miles believed "would be applied to the loan."[1]

10. On July 24, 2019, Plaintiffs executed the Solar System Purchase Agreement ("Purchase Agreement") with Solar Experts, in which Plaintiffs agreed to purchase the Solar System for a total cost of $3,819,700.00, which included installation of the system.

---

[1] Trial Tr. Vol. 1, at 31:9.

11. Pursuant to the terms of the Purchase Agreement, Solar Experts agreed to "install the Solar System in accordance with the Engineered Plans" and to "take all action necessary so that the installation and operation of the Solar System is approved by the relevant authorities and will operate in the manner contemplated under the Agreement, including the generation of electricity in accordance with the specifications and the Engineered Plans."[2] The Agreement also included an estimated completion date of December 31, 2019.

12. The Purchase Agreement provided the payment terms for the purchase price as follows: 10% disbursement at signing to cover engineering, permitting and interconnection; 30% disbursement for "Prep Phrase;" 30% disbursement for the Solar System equipment; and 30% disbursement when the Solar System installed to engineered plans and operational.[3]

The Conditional Lease Proposal

13. After the Purchase Agreement was executed, TechEFI contacted Jeff Pistorius at Axos Bank ("Axos") with information about the potential deal with Plaintiffs.

14. At the time, Pistorius was a Senior Relationship Manager for Axos Bank, who worked with equipment brokers to develop equipment leasing opportunities and manage the relationships between Axos and lessees.

15. Axos Bank agreed to provide financing for the deal and also agreed to pay TechEFI a commission of 1.5% if the deal was completed.

---

[2] Plaintiffs Ex. 16, ¶ 7(d).

[3] *Id.* Ex. B.

16. On October 15, 2019, Plaintiffs executed the Conditional Lease Agreement with Axos wherein the terms stated that the total purchase price of the Solar System would be $3,819,700 with 60 monthly payments of $63,622.00 each.

17. On October 22, 2019, Axos received a $2,000 check from TechEFI on Plaintiffs' behalf as the payment required under the Conditional Lease Proposal. This was a portion of the $25,000 deposit Plaintiffs paid to TechEFI.

18. The remaining $23,000 from the deposit is still in the possession of TechEFI.[4]

19. This transaction was the first and only solar panel financing deal done by Axos.

The Lease Agreement

20. On November 18, 2019, Plaintiffs executed the final lease documentation (the "Lease") with Axos, which included the Master Lease Agreement, Lease Schedule No. 001, the Master Progress Funding Agreement, Authorization for Pre-Authorized Payments, and the Guaranty Agreement.

21. The foregoing documents, together with UCC financing statements and all other supporting documentation, are defined in the Master Lease Agreement as the "Lease."

22. On or about November 20, 2019, Axos withdrew $61,622.00 by ACH transfer from Plaintiffs as the remaining balance of the required deposit. Axos combined this amount with $2,000.00 it had received earlier from TechEFI, which would equal a lease payment of $63,622.00. These amounts have been recorded as part of the 60 payments received by Axos from Plaintiffs.

23. The Lease governs the relationship between Plaintiffs and Axos and superseded the preceding Conditional Loan Proposal and the Conditional Lease Proposal.

---

[4] Trial Tr. Vol 1, at 125:19–23.

24. The Master Lease Agreement sets forth the general terms of the Lease under which Axos would fund the purchase price of and own the Solar System. Axos would then lease the Solar System to Plaintiffs, and Plaintiffs would pay monthly equipment rental installments over a five-year period and then have the option to purchase the system for one dollar at the end of the Lease term. Additional relevant provisions of the Master Lease Agreement include the following:

   a. Section 6(a) states "[a]fter Lessee receives and inspects any Property and is satisfied that the Property is satisfactory, Lessee shall execute and deliver to Lessor an Acceptance Certificate in a form provided by Lessor; provided, however, that Lessee's failure to execute and deliver an Acceptance Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has signed and delivered a Master Progress Funding Agreement, Lessor may, in its sole discretion, at any time by written notice to Lessee, declare all prior Authorizations (defined in the Master Progress Funding Agreement) signed in connection with the Master Progress Funding Agreement to be and constitute the Acceptance Certificate for all purposes under the Lease, and the Acceptance Date of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Authorization."[5]

   b. Section 20(f) states that "[i]f Lessee fail to sign and deliver an Acceptance Certificate, then except as otherwise provided in Section 6(a) hereof, the

---

[5] Plaintiffs Ex. 3 § 6(a).

Acceptance Date shall be a date determined by [Axos] which shall be no sooner than the date Lessee receives substantially all of the Property."[6]

c.  As defined in Exhibit A to the Master Lease Agreement, the term "Acceptance Date" means "[e]xcept as otherwise provided in Section 6(a) of the Master Lease Agreement . . . the date Lessee accepts the Property as set forth in any Acceptance Certificate signed by Lessee which is acceptable to Lessor."[7] If the Acceptance Date falls on a date within a calendar quarter, the "Commencement Date" for the Lease term shall be "the first day of the calendar quarter following the calendar quarter in which such Acceptance Date falls."[8]

d.  Section 10 states that Axos "shall have no obligation to install, erect, test, adjust or service any Property."[9]

e.  Section 9 provides that Plaintiffs acknowledge that Axos is not the manufacturer of the Property subject to the Lease, that the Property is "of a size, design, capacity, description and manufacture selected by Lessee," and that "Lessee is satisfied that the Property is suitable and fit for its purposes."[10] Plaintiffs further acknowledge pursuant to Section 9 that Axos makes no warranty regarding the Property. If the Property is not properly installed or is unsatisfactory for any reason, Plaintiffs are still obligated to pay all sums payable under the Lease regardless of the existence of any such claim.

---

[6] *Id.* § 20(f).

[7] *Id.* at Ex. A.

[8] *Id.*

[9] *Id.* § 10.

[10] *Id.* § 9.

25. Lease Schedule No. 001 incorporates the terms and conditions of the Master Lease Agreement and sets out the monthly rental amount ($63,662.00), the Lease term (60 months starting on the Commencement Date), the Lease Rate Factor (0.016666754) and the total cost of the Solar System ($3,819,700.00).

26. Lease Schedule No. 001 further provides that the Property governed by the Lease refers to the "[s]olar panels and related equipment and other Property" that "shall be more fully and completely described on the Exhibit A to the Acceptance Certificate which shall be later executed by Lessee in connection with [Lease Schedule No. 001]."[11]

a. As part of the June 24, 2020 Acceptance Certificate that Axos provided to Plaintiffs, "the Property was more fully and completely described" in Exhibit A to the Acceptance Certificate as follows:[12]

| Vendor: | Description of Property: | Invoice Total: |
|---|---|---|
| New Jersey Clean Energy Solutions (Solar Experts) | Sunpower 395 panels including the following components: Two (2) SMA STP core 162.5 US inverters; one (1) SMA STP core 50-us inverter; one (1) Sunpower helix tilt racking system; and installation, engineering, permitting and commissioning services and charges | $2,476,700.00 |
| SunPower Corporation | Solar panel installation kit and supplies | $1,343,000.00 |

28. The Master Progress Funding Agreement allows Plaintiffs to request that Axos purchase certain items prior to the commencement of the Lease "Progress Payments" subject to certain daily pro rata service charges,[13] known as "Progress Funding Fees."

---

[11] Plaintiffs Ex. 4, at 1.

[12] Plaintiffs Ex. 33, at 5.

[13] Plaintiffs Ex. 5.

29. The Progress Funding Fees are calculated by multiplying the Lease Rate Factor identified in Lease Schedule No. 001 times the amount of the funded Progress Payment divided by 30. The daily charges accumulate and are payable on the last day of each month. The charges begin "on the date Lessee authorizes Lessor to disburse the Progress Payment and shall continue until all items of Property specified in the Lease are installed, tested, and are finally accepted by Lessee as evidenced by Lessee's execution and delivery of the 'Acceptance Certificate' required under the Lease."[14]

30. Pursuant to the Master Progress Funding Agreement, Axos agreed to advance funds as directed by Plaintiffs in the form of a "Partial Acceptance and Authorization for Progress Payment Certificate."[15]

31. The Authorization for Pre-Authorized Payments authorized Axos to make electronic withdrawals from Plaintiffs' bank account for all lease payments and other sums, including Progress Funding Fees, required under the Lease.[16]

32. The Guaranty Agreement is a document individually executed by Miles, wherein Miles personally guaranteed the obligations of Miles Tech and Mt. Holly under the Lease.[17]

Partial Acceptance Certificates and Progress Funding Fees

33. On November 21, 2019, Axos forwarded to and Plaintiffs executed the Partial Acceptance and Authorization for Progress Payment Certificate No. 1 ("Authorization No. 1") in the amount of $1,330,700 for payment to Solar Experts against the purchase price of the Solar System, and Partial Acceptance and Authorization for Progress

---

[14] *Id.*

[15] *Id.*

[16] Plaintiffs Ex. 6.

[17] Plaintiffs Ex. 11.

Payment Certificate No. 2 ("Authorization No. 2") in the amount of $1,343,000 for payment to the manufacturer of the Solar System, SunPower, for the equipment.

34. On the same day, Plaintiffs signed and returned Authorization Nos. 1 and 2.

35. Upon execution of these Progress Payment Certificates, Axos began charging monthly progress payment fees to Plaintiffs.

36. In mid-December 2019, SunPower delivered the Solar System to Plaintiffs.

37. On February 21, 2020, Plaintiffs executed Partial Acceptance and Authorization for Progress Payment Certificate No. 3 ("Authorization No. 3") at the request of Axos and Solar Experts, for $250,000 to be paid to Cooper Electric Supply Company ("Cooper Electric") for electrical supplies.

38. This payment was not required under the Purchase Agreement payment schedule.

39. On February 28, 2020, Axos paid Solar Experts $250,000. Solar Experts did not pay Cooper Electric.

40. Axos withdrew, via the ACH Authorization, progress funding fees in the following amounts: $12,355.31 on December 10, 2019; $38,301.47 on January 10, 2020; $38,301.47 on February 10, 2020; $37,080.42 on March 10, 2020; $42,607.06 on April 10, 2020; $41,232.64 on May 10, 2020; and $45,329.30 on June 10, 2020.[18] Between December 2019 and December 2020, Axos withdrew a total of $255,207.67 as progress funding fees.

Breakdown of relationship

41. On April 29, 2020, Miles informed Axos that based on Solar Experts' representation, the installation of the Solar System was complete and awaiting final inspection by the

---

[18] Plaintiffs Ex. 25.

9

township. Miles requested that Axos release the remaining funds but withhold $200,000.00 of the funds in an escrow account to be paid to Solar Experts following the final inspection.

42. Because the Master Lease Agreement provided quarterly commencement of the Lease, Axos would not agree to commence the Lease until July 1, 2020, at the earliest.

43. Barry Gordon, Axos' Vice Present of Sales in Equipment and Leasing, emailed Kristen Phillips, Vice President of Documentation, asking for a commencement date of May 1, 2020. He stated that Miles would be willing to execute back dated documents to do so. He testified that Axos refused to do so.

44. Phillips emailed that "[a] condition of the approval is not to process the final payment until after [Axos] verif[ies] [the Solar System] is fully operational."[19]

45. On May 18, 2020, Axos forwarded to Plaintiffs and Plaintiffs executed the Partial Acceptance and Authorization for Progress Payment Certificate No. 4 ("Authorization No. 4"), directing Axos to make a payment of $350,000.00 to Solar Experts.

46. Axos Bank agreed to hold the remaining $350,000.00 until the system was operational.

47. A Credit Memorandum prepared by Axos Bank on May 14, 2020, listed the commencement date as July 1, 2020, and noted that the project was slightly delayed due to the Covid-19 pandemic impacting labor and inspections.

48. On June 18, 2020, Pistorius sent Gordon and others at Axos the Township of Lumberton's inspection papers, stating that "[t]he solar project is up and running and providing power to the building."[20]

---

[19] Plaintiffs Ex. 82, at 2.

[20] Plaintiffs Ex. 84.

10

49. On June 22, 2020, Aspen Field Services conducted an inspection of the Solar System on behalf of Axos, and provided a report of its inspection on June 23, 2020.

50. As noted in the Aspen Field Services report, the Solar System was in good condition, fully assembled, and operational upon inspection.

51. After receiving the report, Pistorius requested an invoice for the broker fee less the $23,0000 deposit from TechEFI, which was submitted the same day.

52. TechEFI's invoice reflected the total amount due to TechEFI: $47,655.82 minus the 23,000.00 "applied to Miles Technologies" resulting in a $24,655.83 "net amount due to [TechEFI]."[21]

53. On June 24, 2020, Axos asked Plaintiffs via email to execute the proposed Partial Acceptance and Authorization for Progress Payment Certificate No. 5 (Authorization No. 5), which would authorize final disbursement of funds to Solar Experts in the amount of $545,910.00.

54. Axos also requested that Plaintiffs execute a proposed final Acceptance Certificate. The Acceptance Certificate required that Plaintiffs certify that the Solar System was "fully and completely installed," "suitable and ready for use," and "unconditionally and irrevocably accepted."[22]

55. Miles responded that he would not authorize the release of additional funds until his own inspection by Triad Consulting Engineers, Inc. verified the safety and compliance of the project.

---

[21] Plaintiffs Ex. 95

[22] Plaintiffs Ex. 33, at 4.

11

56. On July 26, 2020, Pistorius told Miles that Axos was "trying to get the lease documentation in place to commence [on] July 1, 2020[,] which benefits everyone involved."[23] He closed the email by stating "Chris, we are asking you to allow us to commence this lease July 1, 2020[,] and in order to do this we need the documents recently sent to you signed and returned so we can produce the closing documents."[24]

57. Miles responded to Pistorius that there were issues with Solar Experts' installation of the Solar System. Miles emailed Pistorius that the Solar System was not complete, not producing energy, and that Axos was not authorized to release any additional funds to Solar Experts.

58. Pistorius testified that the Acceptance Certificate is important to protect Axos. He testified that if the equipment is not working, then the customer is less motivated to pay for nonworking equipment.[25]

59. Phillips testified that the Acceptance Certificate was important because the Solar System at issue was expected to generate revenue for Plaintiffs. As such, Axos wanted Plaintiffs to certify that the Solar System was fully accepted and working properly for Plaintiffs' purposes, which would make it more likely that Plaintiffs would make monthly Lease payments and minimize the risk for Axos.[26]

60. Plaintiffs terminated ACH authorization prior to the August 2020 progress funding fee withdrawal.

---

[23] Plaintiffs Ex. 30, at 3.

[24] *Id.* at 4.

[25] Trial Tr. Vol. 1, at 217:16–218:25.

[26] *Id.* at 255:22–257:4.

61. Between July 2020 and October 2020, Plaintiffs' attorney, Daniel Haggerty, corresponded with Axos in an effort to resolve the dispute between the parties. Plaintiffs continued to be charged for progress funding fees totaling approximately $144,335.00.

62. Bryce Huff, the Chief Credit Officer of the equipment finance unit of Axos, and Gordon worked to resolve the dispute and allow for commencement of the Lease.

63. On August 18, 2020, Axos prepared a Credit Memorandum indicating that the solar panels "are installed, connected to the grid and final engineering inspection has been performed," and that the Lease was expected to commence on October 1, 2020.[27]

64. Plaintiffs disputed the progress funding fees and the quality of the installation of the Solar System performed by Solar Experts. On August 31, 2020, Haggerty sent a letter to Pistorius (Axos) describing omissions related to the financing and installation problems.

65. On September 2, 2020, Pistorius responded and agreed that Axos would commence the Lease, apply the $23,000.00 deposit to the first monthly payment, apply the progress funding fee from July to the Lease, and waive the progress funding fees totaling $97,269.78 for August and September 2020.

66. On September 17, 2020, Huff drafted a document entitled "Negotiation Review" that summarized the parties' dispute and provided a recommended proposal which would have negotiated new terms to the Lease, including the following:

   a. Axos would commence the Lease on October 1, 2020, based on the total funded amount as of September 2020, and Plaintiffs' monthly payments would be adjusted accordingly.

---

[27] Plaintiffs Ex. 51, at 2.

13

    b. Plaintiffs would be responsible for any remaining payments due to vendor/contractor.

    c. Axos would retain the progress funding fees received from November 2019 through June 2020.

    d. Axos would waive the progress funding fees for July, August, and September 2020.

67. The Negotiation Review Memo also indicated that "[t]he installation is complete and operational, and the city inspector has approved the construction."[28]

68. The Negotiation Review Memo shows that the equipment finance business unit recommend that the negotiated terms should be approved, noting "the 10.523% yield remains stronger than [the rate] originally approved at 7.38%."[29]

69. Before the Proposal could be executed, Gordon was required to seek approval from the CEO of Axos Bank, Gregory Garrabrants, for any modifications to the terms of an active lease.

70. In September 2020, Gordon presented the Negotiation Review proposal to Garrabrants. Garrabrants rejected the proposal.

71. Garrabrants testified in his deposition that he refused to authorize the proposal because he expected the lease documentation to be followed and because he "expect[s] people to honor the agreements that they sign and enter into with [Axos]."[30] Garrabrants further

---

[28] Plaintiffs Ex. 158, at 1.

[29] *Id.* at 3.

[30] Garrabrants Video Dep.

explained that his denial was influenced by Plaintiffs' refusal to accept the equipment and follow the lease documents.

72. In response to Mr. Garrabrants' decision, on September 25, 2020, Plaintiffs' counsel directed counsel for Axos to Section 6(a) of the Master Lease Agreement and requested that Axos commence the Lease immediately based on the prior authorizations, and advised that Plaintiffs would be responsible for funding the remainder of the project.

73. On or about October 2, 2020, Axos and Plaintiffs agreed that if Plaintiffs would bring their account current, which included outstanding progress funding fees for July, August, and September 2020, Axos would prepare closing documents and commence the Lease on October 1, 2020.

74. Axos provided Plaintiffs with an invoice for $207,997.80. This included the progress funding payments from July, August, and September 2020, totaling $144,335.80, and the lease payment in the amount of $63,662.00 for October 2020. Plaintiffs promptly paid the invoiced amount.

75. On October 15, 2020, Gordon informed Axos personnel that Garrabrants had approved commencing the Lease effective October 1, requesting that the Lease be commenced by backdating the documentation.

76. On October 26, 2020, Axos emailed Plaintiffs an Acceptance Certificate and Affirmation Letter.

77. The Acceptance Certificate was different from the June 2020 Acceptance Certificate and included additional items.

78. The Acceptance Certificate included the following:

a. As to the Property Condition, Axos agreed to commence the Lease notwithstanding that the property has not yet been fully installed to Plaintiffs' satisfaction. It also included a provision wherein Plaintiffs would "unconditionally accept[] the Property for all purposes under the Lease."[31]

b. Plaintiffs would agree "to indemnify and hold [Axos] harmless from and against any and all claims . . . , damages, judgments, suits, administrative and legal proceedings, and any and all costs and expenses in connection therewith . . . arising out of or in any manner connected with or resulting from the Lease or Progress Funding Agreement."[32]

c. Axos would agree to holdback the remaining $545,910.00, which was the final funding amount owed to Solar Experts, giving Plaintiffs ninety days to ensure the Property was "fully installed, tested, and deemed ready for use to [Plaintiffs'] satisfaction" before authorizing release of the remaining funds to Solar Experts.[33]

79. Phillips testified that the release language was not standard and she had not seen it in other acceptance certificates.

80. Plaintiffs refused to sign the Acceptance Certificate because they believed Axos had misrepresented the nature of the fees being charged, that the fees were improper and undisclosed, and based on the general release language.

---

[31] Plaintiffs Ex. 32, at 3.

[32] *Id.*

[33] *Id.*

81. Plaintiffs objected to the statements requiring them to certify that the Solar System "ha[d] been received, installed and accepted by [Plaintiffs] for all purposes under the Lease . . . [and was] in good working order."[34]

82. Plaintiffs also objected to the statement requiring Plaintiffs to certify that the "Property is free from all liens, claims and encumbrances other than those caused or created by Lessor."[35]

83. On October 28, 2020, Axos issued an invoice to Plaintiffs for the November Lease payment in the amount of $63,662.00, together with $1,897.00 in fees, for a total of $65,559.00. Miles paid the invoice in full.

84. Axos also notified Miles that going forward invoices would be sent to his attention via email approximately every 30 days.

85. On November 18, 2020, Axos sent an email advising Miles that if he did not execute the Acceptance Certificate and Affirmation Letter, that Axos "will be forced to move payments back to progress payments until said forms are executed."[36]

86. On December 3, 2020, Plaintiffs' counsel sent an email to Axos, again directing Axos not to issue the remaining funds to Solar Experts.

87. On December 4, 2020, Plaintiffs filed the instant suit.

88. From October 2020 through August 2025, aside from the $144,350.80 in progress funding fees paid to Axos for July, August, and September 2020, and the $1,897.00 in

---

[34] *Id.* at 6.

[35] *Id.*

[36] Defendant Ex. 526, at 3.

fees, Plaintiffs have made payments identified as "Lease Payments" to Axos totaling the entire purchase price of $3,819,700.00.

89. Ron Castleton, Axos's First Vice President and Portfolio for Equipment Finance, testified that Axos has held the payments received from Plaintiffs in a non-interest bearing escrow account and will apply them to the balance of the Lease as soon as the commencement date has been determined by the Court.

90. To date, Plaintiffs have refused to execute the Acceptance Certificate and Axos has refused to commence the Lease.

Cooper Electric Lien and Lien Actions

91. On February 21, 2020, Plaintiffs executed Authorization No. 3 at the request of Axos and Solar Experts for $250,000.00 to be paid to Cooper Electric for electrical supplies.

92. On February 28, 2020, Axos paid Solar Experts $250,000.00. Solar Experts did not use the $250,000.00 to pay Cooper Electric.

93. On October 14, 2020, Cooper Electric levied a lien against Plaintiffs' property for $164,668.39 ("Cooper Lien") for unpaid electrical equipment on the Solar System.

94. On December 3, 2020, Solar Experts levied a lien against Plaintiffs for $545,910.00 ("Solar Experts Lien").

95. Subsequently, Solar Experts filed an action in New Jersey state court (Burlington County) to foreclose on the Solar Experts Lien. The litigation regarding the Solar Experts Lien was dismissed without prejudice, but the Solar Experts Lien of $545,910 remains in place.

96. On January 5, 2021, Cooper Electric filed suit against Plaintiffs, Solar Experts, and Axos in New Jersey state court. Solar Experts then filed crossclaims or third-party claims against Axos and Plaintiffs for the outstanding Solar Experts Lien amount.

97. In June 2021, the parties entered into a settlement agreement in which, among other things, Axos issued a check payable jointly to Solar Experts and Cooper Electric for the outstanding Cooper Lien amount, $164,668.39; Solar Experts endorsed the check to Cooper Electric to pay the Cooper Lien, after which Cooper Electric released the Lien and dismissed its claims; Solar Experts dismissed without prejudice their crossclaim/third-party claims against Axos and Plaintiffs for the outstanding Solar Experts Lien amount; and Solar Experts agreed that the lien amount paid by Axos to Cooper Electric would be considered part of the total cost of the Solar System and credit it accordingly.

## II. CONCLUSIONS OF LAW

98. "Where the contract allows discretion but does not provide any express standard for exercising that discretion, the covenant [of good faith and fair dealing] imposes an objective standard of reasonableness."[37]

99. "Under the covenant of good faith and fair dealing, each party promises not to intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract, and to comply, a party must act consistently with the agreed common purpose and the justified expectations of the other party."[38]

---

[37] *Markham v. Bradley*, 2007 UT App 379, ¶ 21, 173 P.3d 865.

[38] *Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876 (internal quotation marks and citation omitted).

100. However, the covenant is subject to limitations: "[f]irst, th[e] covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante. Second, this covenant cannot create rights and duties inconsistent with express contractual terms. Third, this covenant cannot compel a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party to the contract. Finally, [the court] will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract."[39]

101.  The Court previously ruled in its summary judgment order that the agreed upon purpose of the Lease was to finance Plaintiffs' purchase of the Solar System, and that Axos breached the covenant of good faith and fair dealing when it prevented Plaintiffs from receiving the fruits of the contract by not commencing the Lease.[40] Having found that Axos Bank breached the covenant of good faith and fair dealing by failing to commence the Lease, the Court must now determine (1) when Axos should have commenced the Lease and (2) what damages, if any, Plaintiffs are owed.

102. Under § 6(a) of the Master Lease Agreement, "[a]fter Lessee receives and inspects any Property and is satisfied that the Property is satisfactory, Lessee shall execute and deliver to Lessor an Acceptance Certificate."

103. Section 6(a) further provides, "Lessee's failure to execute and deliver an Acceptance Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has signed and delivered a Master Progress

---

[39] *Velocity Press v. Key Bank, NA*, 570 F. App'x 783, 790 (10th Cir. 2014) (quoting *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226).

[40] Docket No. 251, at 40–45.

Funding Agreement, Lessor may, in its sole discretion, at any time by written notice to Lessee, declare all prior Authorizations . . . signed in connection with the Master Progress Funding Agreement to be and constitute the Acceptance Certificate for all purposes under the Lease, and Acceptance Date of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Authorization."

104. The parties agree and stipulate that Plaintiffs executed Authorization No. 4 on May 18, 2020.

105. Evidence and testimony presented at trial support that on June 24, 2020, Axos asked Plaintiffs via email to execute proposed Authorization No. 5 authorizing final disbursement of funds to Solar Experts in the amount of $545,910.00.

106. Based on the Master Lease language and the testimony presented at trial, the Court finds that it would have been objectively unreasonable for Axos to commence the Lease prior to Authorization No. 4 which was executed on May 18, 2020.

107. The Lease Agreement provides for a quarterly commencement date, "where the Acceptance Date for such Schedule falls on the first day of a calendar quarter, that date, and, in any other case, the first day of the calendar quarter following the calendar quarter which such Acceptance Date falls."[41]

108. The Master Progress Funding Agreement provided that the progress payment fees "shall continue until all items of Property specified in the Lease are installed, tested and are finally accepted by Lessee . . . ."[42]

---

[41] Plaintiffs Ex. 3, at Ex. A.

[42] Plaintiffs Ex. 5.

109. The Property was more fully described in the Acceptance Certificate from June 2020, as including the SunPower panels and "installation, engineering, permitting and commissioning services and charges."[43]

110. Accordingly, the Court does not find sufficient evidence to support Plaintiffs' arguments regarding the January 1, 2020 or the April 1, 2020 commencement dates.

111. The Court also does not find sufficient evidence to support that it was objectively reasonable for Axos to commence the Lease on July 1, 2020.

112. Testimony from Phillips and Pistorius supported that the reason for the Acceptance Certificate was to protect Axos.

113. There was also testimony that this was Axos' first solar panel equipment lease.

114. Even though the Aspen Field Services inspection ordered by Axos showed the Solar System was in good condition, fully assembled, and operational, in June 2020, Miles told Axos and testified at trial that the System was not up and running and he directed Axos not to release the final funding to Solar Experts and would not sign the Acceptance Certificate.

115. Evidence was presented that between July 2020 and October 2020, Plaintiffs' attorney and Axos worked to resolve the dispute between the parties.

116. Evidence was also presented that the Solar System was completed and working in September 2020.

117. Evidence at trial supported that on October 2, 2020, Axos and Plaintiffs agreed that if Plaintiffs would bring their account current, which included outstanding progress funding

---

[43] Plaintiffs Ex. 33, at 5.

fees for July, August, and September 2020, Axos would prepare closing documents and backdate them to commence the Lease on October 1, 2020.

118. Evidence at trial supported that Axos provided Plaintiffs with an invoice for $207,997.80 that included the progress funding payments from July, August, and September 2020, totaling $144,335.80, and the first lease payment in the amount of $63,662.00 for October 2020. Plaintiffs promptly paid the invoiced amount.

119. Testimony and evidence supported that on October 26, 2020, Axos presented Plaintiffs with an Acceptance Certificate and Affirmation Letter, which included requiring Plaintiffs to give a general release to Axos among other statements with which Plaintiffs disagreed and as such, Plaintiffs refused to sign the Acceptance Certificate

120. Thereafter, Axos refused to commence the Lease.

121. Based on the evidence presented at trial, the Court finds that it would have been objectively reasonable for Axos to commence the Lease on October 1, 2020.

122.  Accordingly, the Court finds that Plaintiffs have paid Axos $3,819,700.00, the total amount due under the Lease.

123. Based on the testimony presented that Axos holds the $3,819,700.00 paid by Plaintiffs in an escrow account, the Court orders that Axos apply those payments to the Lease.

124. The Court finds there is insufficient evidence and an insufficient basis to find that the remaining $23,000.00 deposit Plaintiffs paid to TechEFI should be credited to Plaintiffs as damages.

125. Although Dorand represented to Miles that the deposit would be credited towards the Plaintiffs' payments and Axos requested an invoice from TechEFI reflecting this in June 2020, there was no evidence presented at trial that Axos paid the invoice.

126. The Court is also not persuaded that there is a basis to award such damages. The Court found that Axos breached the covenant of good faith and fair dealing by failing to commence the lease. The record does not support how this purported damage flows from such a breach.

127. Accordingly, the Court will not award Plaintiffs $23,000.00 in credit for their deposit to TechEFI.

128. The Court finds that Axos was not responsible for the Cooper Lien and therefore will not award any damages arising from the Lien.

129. Furthermore, there was no evidence presented that Axos' failure to commence the Lease on October 1, 2020 caused the Cooper Lien to be levied.

130. With regard to the Solar Experts Lien, the Court finds that Axos did not have the authority to release the remaining funds to Solar Experts without receiving authorization from Plaintiffs.

131. Miles testified that he did not authorize funds to be paid out to Solar Experts because he "was made aware of major issues with the installation . . . and [he] wanted it corrected."[44]

132. Miles testified that the Solar Experts Lien was filed because of "non-payment."[45]

133. Therefore, Axos was not responsible for the filing and placement of the Solar Experts Lien.

134. There was also no evidence presented at trial that Axos' failure to commence the Lease on October 1, 2020, caused the Solar Experts' Lien to be levied.

---

[44] Trial Tr. Vol. 1, at 50:21–51:2.

[45] *Id.* at 142:9–10.

24

135. The Court will not award damages to Plaintiffs from Axos arising out of, related to, or resulting from the Solar Experts Lien.

136. Having determined that no damages are owed, the only outstanding issue in this case is the award of attorneys' fees, which the parties have agreed to resolve via post-trial motion practice.

### III. CONCLUSION

Based on the foregoing findings and conclusions, the Court orders as follows:

1. Axos should have commenced the Lease on October 1, 2020.

2. Axos must apply the $3,819,000.00 already paid by Plaintiffs and held in an escrow account to satisfy the Lease.

3. The parties are ordered to brief the issue of attorneys' fees within 30 days of this Order.

It is further

ORDERED that Plaintiffs' Motion to Strike Paragraph 77 of Defendant's Proposed Findings of Fact (Docket No. 329) is GRANTED; it is further

ORDERED that Defendant's Objections to Plaintiffs' Proposed Findings of Fact (Docket No. 334) are SUSTAINED.

DATED  June 11th, 2026.

BY THE COURT:

_____
TED STEWART
United States District Judge

25